JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 1 2008

FILED
CLERK'S OFFICE

**MDL 1958**

**PLEADING NO. 1**

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

In re: ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

---

## MOTION OF PLAINTIFFS FOR TRANSFER OF ACTIONS TO THE UNITED STATES DISTRICT COURT, DISTRICT OF MINNESOTA, PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

---

Plaintiffs, Denise Cox and Terry Cox, Kevin and Christa Haugen, and Robert and Carrie Hvezda, on behalf of themselves and all others similarly situated, in the United States District Court, District of Minnesota Action No. 0:07-cv-03652 and Beverly Barnes and Brian Johnston, on behalf of themselves and all others similarly situated, in the United States District Court, District of North Dakota, Southwestern Division Action No. 1:07-cv-00074 respectfully move this Panel, pursuant to 28 U.S.C. § 1407 for the transfer and consolidation of:

- *Denise Cox and Terry Cox, Kevin and Christa Haugen, and Robert and Carrie Hvezda, on behalf of themselves and others similarly situated v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D. Minn., Civil Action No. 0:07-cv-03652

- *Jody Minnerath and Brian Minnerath, on behalf of themselves and others similarly situated v. Zurn Industries, LLC and Zurn Pex, Inc.*, D. Minn., Civil Action No. 0:07-cv-04849

- *Beverly Barnes and Brian Johnston, on behalf of themselves and all others similarly situated v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D. ND, Civil Action No. 1:07-cv-00074

**OFFICIAL FILE COPY**

IMAGED APR 2 1 2008

The moving parties respectfully request that the *Barnes* action be transferred to the District of Minnesota for coordination with the first-filed *Cox* case and that *Minnerath* and any tag along actions be transferred to the judge assigned to handle this MDL proceeding.

Dated this 15th day of April, 2008.

**LARSON · KING, LLP**

By
Shawn M. Raiter, Esq. (MN #240424)
T. Joseph Snodgrass, Esq. (MN #231071)
2800 Wells Fargo Place
30 E. 7th Street
St. Paul, MN 55101-4922
Telephone: (651) 312-6500

> *ATTORNEYS FOR PLAINTIFFS*
> *DENISE AND TERRY COX, KEVIN AND*
> *CHRISTA HAUGEN, ROBERT AND*
> *CARRIE HVEZDA, BEVERLY BARNES,*
> *BRIAN JOHNSTON*

SWENSON, LERVICK, SYVERSON, TROSVIG,
JACOBSON, PA
Derek A. Trosvig (MN #0241453)
710 Broadway
Alexandria, MN 56308
Telephone: (320) 763-3141

> *ATTORNEYS FOR PLAINTIFFS*
> *DENISE AND TERRY COX, KEVIN AND*
> *CHRISTA HAUGEN, ROBERT AND*
> *CARRIE HVEZDA, BEVERLY BARNES,*
> *BRIAN JOHNSTON*

1227398

RECEIVED
CLERK'S OFFICE
2008 APR 16 A 10: 35
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 1 2008

FILED
CLERK'S OFFICE

**BEFORE THE JUDCIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re: ZURN PEX PLUMBING                           MDL DOCKET NO. ____
PRODUCTS LITIGATION

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

**<u>INTRODUCTION</u>**

The cases at issue in this motion involve the premature failure of brass plumbing fittings. The defendant manufacturers of the fittings, Zurn Pex, Inc. and Zurn Industries (collectively "Zurn"), acknowledge that the fittings have failed across the country.  Zurn has stopped selling these fittings because of the failures.  Three putative class actions have been filed to-date.  More cases will likely have been filed before the Panel considers this motion.

The Plaintiffs in two of the three pending actions – *Denise and Terry Cox et al. v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D.Minn., Court File No. 07-3652 ("*Cox*") and *Beverly Barnes and Brian Johnston et al. v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D.N.D., Court File No. 07-cv-00074 ("*Barnes*") – respectfully submit this brief in support of their motion to: (a) transfer the three related class actions presently pending before two different federal district courts to a single district court; and (b) coordinate the pretrial proceedings in those actions

1

pursuant to 28 U.S.C. § 1407.  Plaintiffs request that these cases be coordinated in the United States District Court for the District of Minnesota.[1]

The Zurn plumbing systems at issue utilize flexible plumbing piping that is generically described as "Pex."  Pex plumbing systems were intended to improve upon their predecessor in flexible plastic plumbing -- the ill-fated polybutylene systems.  Although expected to last for decades and warrantied for 25 years, Zurn's pex systems have failed in just months.  After paying hundreds of warranty claims for premature failures, Zurn now refuses to honor its warranty.

These overlapping putative class actions would benefit from multidistrict transfer and coordination.  The potential for inefficiency and inconsistency supports this request.  Zurn itself has stressed its desire to have the cases coordinated and handled by a single court and has expressed its desire to have pretrial matters decided by the forum of the first-filed case, the District of Minnesota.

## BACKGROUND

A.    **Product Background**

Zurn sells brass fittings that are used to make connections in flexible potable water plumbing systems.  (Ex. A, ¶ 56-62).  The plastic pipe used for these systems is generically called "pex."  (*Id.*, ¶ 45).  Polyethylene is the raw material used for the pipe and the "x" in the generic name "pex" refers to the cross-linking of the polyethylene across its molecular chains (*Id.*).  Pex systems are touted as cheaper alternatives to traditional copper plumbing systems used in the United States.

---

[1] The plaintiffs in the other case pending in the District of Minnesota, *Jody Minnerath and Brian Minnerath et al. v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D.Minn., Court File No. 07-04849, are not moving parties in this motion.

Pex plumbing systems gained acceptance in the United States following the demise of the leak-plagued polybutylene plumbing systems. (*Id.*, ¶ 48-55). Polybutylene systems began failing prematurely because their plastic fittings deteriorated and leaked or cracked. (*Id.*). One of Zurn's predecessor companies, U.S. Brass, entered bankruptcy because of its polybutylene liabilities. (*Id.* at ¶ 49-55). Given the problems with polybutylene, pex systems did not gain widespread code and standards acceptance until the late 1990's. (*Id.*, ¶ 59-60). Zurn began selling its pex products for use in potable water systems in the mid to late-1990's. Shortly thereafter, Zurn began receiving complaints that the brass pex fittings were failing prematurely – sometimes only months after installation.

**B.     Nature of the Defect and Premature Failure of the Fittings.**

Zurn uses a system in which the brass insert fittings are sealed or joined using copper "crimp rings." To make a connection, the brass fittings are slid inside the pex tubing and a special tool is used to "crimp" the copper rings onto the pex pipe. (Ex. B). Zurn's brass fittings are designed to comply with a standard designated "F1807." Under this standard, a manufacturer may choose from a number of metals and materials for the fittings.

Zurn's F1807 fittings use a brass alloy with a high zinc content, which makes the fittings susceptible to premature failure. (Ex. C; Ex. D). Zurn and its consultants have concluded that the failure mode is primarily a phenomenon known as "stress corrosion cracking." (Ex. E). The brass Zurn chose for its F1807 fittings is particularly susceptible to this failure process, as metallurgical experts have concluded in other cases involving failed Zurn fittings. (Ex. C; Ex. D). The brass fittings literally crack off when installed in a potable water system, as the picture below shows:



(Ex. F).

### C.      Failure of the Fittings.

Zurn's brass fittings started to prematurely fail despite being installed as intended in potable water systems.  Plumbers across the country began getting complaints from customers who had suffered water damage after fittings gave way.  For example, one Minnesota plumbing company starting installing Zurn's brass fittings in 2003.  (Ex. G).  Within six months, the Zurn fittings began to fail.  (*Id.*).  The failures continued and turned into an "epidemic" and by 2006 that single company had experienced more than 150 claims for failures "with new [claims] being added each week."  (*Id.*).

Because of the widespread and alarming rate of premature failure of the Zurn F1807 fittings, Zurn's distributors have issued warnings about "catastrophic failures" of the fittings and have recommended an immediate stop to their use.  (Ex. H).  The following warning was recently posted by a plumbing distributor in Missouri:

**Plumber Alert**

Due to recent incidence of catastrophic failure in **ZURN BRASS PEX FITTINGS** in the Lake of the Ozarks region, Ribacks recommends use of the alternative plastic fittings for all pex installations.

The manufacturer contends that water conditions in the area result in dezincification of the brass fitting leading to failure. To date all reported failures in Ribacks marketing area have occurred within 2 years of installation and all have occurred in the Lake area.

Failure of these fittings **MAY RESULT IN SUBSTANTIAL DAMAGE.**

For these reasons Ribacks **WARNS** our customers that continued use of the **BRASS PEX FITTINGS** is at their own risk. The alternative plastic fittings are in stock at Ribacks and are recommended for use in all our marketing areas.

Ribacks will not assume any liability for failure of these **ZURN BRASS PEX FITTINGS** due to dezincification.

Dated_____



(*Id.*).  The largest plumbing distributor in the country has also posted notices in supply outlets that it will no longer sell brass crimp fittings like the Zurn pex fittings.  (Ex. I).  Articles describing the failures have run in newspapers in different parts of the country.  (Ex. J).

The initial discovery and investigation in the *Cox* case has exposed the scope of the failure problem.  Zurn has received warranty claims from states including Minnesota, North Dakota, Michigan, Indiana, Missouri, Ohio, Mississippi, Alabama, Colorado, Montana, Idaho, Oregon, Pennsylvania, North Carolina, Tennessee, Virginia, Florida, Texas, and Hawaii.[2]  Zurn has received hundreds of warranty claims.  Counsel for Plaintiffs has learned that many failures have not been reported to Zurn.  They are instead handled by the plumbers or contractors or submitted to the property insurance carrier of the property owner.

---

[2] Zurn has claimed that the fittings have failed because of localized "aggressive water" conditions.  The widespread geographic location of these failures suggests otherwise.  In addition, many of the failures have occurred on city water systems known to be closely regulated supplies.

### D.    Withdrawal of the Fittings.

The failures of the brass fittings ultimately led Zurn to completely stop selling brass fittings in Minnesota in June 2007.  (Ex. K; Ex. L, pp.14-15).  At about the same time, Zurn started "converting" its brass fittings business to its line of plastic fittings.  (Ex. L, pp. 72-73).  This conversion was caused in part by the failures of the brass fittings.  (*Id.*, pp. 72-73; 116-117).  Zurn will stop selling brass pex fittings – nationwide – by 2009.  (*Id.,* pp. 77-78, 82-83).

### E.    Geographic Concentration of Failures.

Although Zurn fittings have failed across the country, Zurn claims Minnesota has experienced a disproportionate share of failures.  (Ex. M, p. 2; Ex. L, pp. 16, 26-29).  One of Zurn's corporate Vice Presidents testified that the failure rate in Minnesota was "drastically higher than the rest" of the country.  (Ex. L, pp. 65-66).

### E.    Procedural Background

In July 2007, Denise and Terry Cox served a Minnesota state court action against Zurn, commencing the first putative class action for the brass fittings failures.  (Ex. A). That case, titled *Denise and Terry Cox, on behalf of themselves and all others similarly situated v. Zurn Pex, Inc. and Zurn Industries, Inc.*, seeks certification of alternative state and nationwide classes.  (*Id.*). The *Cox* suit brings warranty, tort and statutory claims relating to defects in Zurn's brass fittings. ( *Id.*).

Zurn removed the *Cox* case to the District of Minnesota.  Discovery in *Cox* has commenced and is in the initial stages.  Written discovery has been exchanged and Zurn has produced some of the documents requested by Plaintiffs.  Plaintiffs have served more than 10 third-party subpoenas for the production of documents.  Plaintiffs have also conducted a number of corporate designee depositions of Zurn.

The *Cox* court has considered several motions, including: (1) a motion for a single phase discovery plan, (2) a motion to compel discovery of documents withheld on claims of privilege, (3) a motion to enjoin the filing of related suits, and (4) a motion for a protective order. (See *Cox* docket sheet). The orders on these motions included substantial analysis of the factual and legal underpinnings of the case. (Ex N). The *Cox* complaint was recently amended to add several additional representatives of the putative class.[3] The *Cox* court has ordered that the initial discovery in the case focus on matters needed for the consideration of class certification. A scheduling order has not yet been issued.

The *Barnes* case was filed in the District of North Dakota on October 23, 2007. That case involves factual and legal allegations similar to those made in *Cox*. (Ex. O). The plaintiffs in *Barnes* seek certification of alternative classes including a North Dakota statewide class and a nationwide class. (*Id.*). Like the *Cox* suit, the *Barnes* case involves warranty, tort and statutory claims relating to defects in Zurn's brass fittings. (*Id.*).

The parties have had their Rule 26 conference in *Barnes* and have exchanged the first set of written discovery requests. No depositions have been taken. The only motion decided by the *Barnes* court was Zurn's motion to stay, which is discussed in greater detail below. The *Barnes* court has not yet issued a scheduling order.

The *Minnerath* case was filed in the District of Minnesota on December 13, 2007. The case makes factual and legal allegations similar to those made in *Cox* and *Barnes*. (Ex. P). The *Minnerath* case seeks certification of a statewide Minnesota class with alternative nationwide and multi-state classes sought as well. (*Id.*). It appears that no motions have been filed in

---

[3] The case is now captioned *Denise and Terry Cox, Kevin and Christa Haugen, and Robert and Carrie Hvezda, on behalf of themselves and all others similarly situated v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D.Minn., Court File No. 07-3652.

7

*Minnerath.*  (*Minnerath* Docket Sheet).  Plaintiffs also understand that discovery has not yet

commenced in *Minnerath.*

**F.      Zurn Supports Coordination and Believes Minnesota is the Proper Forum for Resolution of Pretrial Matters.**

In various pleadings filed in the currently pending cases, Zurn has expressed a desire to

coordinate the cases and to avoid duplicative effort.  For example, Zurn filed a motion to enjoin

counsel for the Plaintiffs in *Cox* from filing additional lawsuits.  (Ex. Q).  In doing so, Zurn

expressed its desire to avoid duplicative litigation and that the Minnesota court should decide the

pretrial matters.  (*Id.,* pp. 1, 8-9).

Zurn also moved to stay *Barnes* until after class certification was decided in the first-filed

Minnesota case.  (Ex. R).  Zurn argued, in part, that avoiding unnecessary duplication of work

and expense justified having the pretrial proceedings coordinated.  (*Id.,* p. 6).  After that motion

was denied, Zurn's attorneys have sought consolidation of the two Minnesota cases for pretrial

purposes and have requested that *Barnes* in North Dakota be coordinated with the Minnesota

cases.  (Ex. S).  Zurn stated:

> Defendants submit that the coordination of discovery proceedings in
> this action with that currently pending and related putative class
> action *Cox v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D.Minn.,
> Court File No. 07-3652, which is already well into the discovery
> process already, will serve the convenience of the parties and
> witnesses and promote the just and efficient conduct of the litigation
> by, *inter alia*, eliminating duplicative discovery, preventing
> inconsistent pretrial rulings including rulings regarding discovery
> scheduled and discovery rulings, and conserving the resources of the
> parties, their counsel, and the judiciary.

(*Id.*, p. 2).

In addition to stressing the need for coordination, Zurn has also indicated its preference

for having these cases coordinated in Minnesota.  In its motion to enjoin *Cox* and in its motion to

stay *Barnes*, Zurn supported Minnesota -- as forum of the first filed case – as the venue for conducting coordinated pretrial proceedings. (Ex. Q, pp. 5-6; 8; Ex. R, p. 6).

## ARGUMENT

**I.     THESE CASES SHOULD BE TRANSFERRED TO A SINGLE DISTRICT FOR COORDINATION.**

There are currently three putative class actions pending in two different district courts. More cases will likely be filed by the time the Panel hears his motion.  Zurn agrees these cases should be coordinated and has asked that the cases be decided in the District of Minnesota. Plaintiffs agree and therefore file this motion for coordination and transfer of the pending, as well as any future, cases.

The Judicial Panel on Multidistrict Litigation (the "Panel") may transfer civil cases to a single district court for coordinated pretrial proceedings where: (a) the cases "involve[e] one or more common questions of fact;" (b) the transfers would further "the convenience of the parties and witnesses;" and (c) the transfers "will promote the just and efficient conduct of [the] actions."  28 U.S.C. § 1407(a).

The transfer and coordination of cases under § 1407 is appropriate where, as here, it will "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of parties, their counsel, and judiciary."  *In re Mirtazapine Patent Litig.*, 199 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002); *In re Cooper Tire & Rubber Co. Tires Prods. Liab. Litig.*, Docket No. 1393, 2001 WL 253115, at *1 (J.P.M.L. Feb. 23, 2001).  As set forth below, each of these requirements is satisfied, and transfer of these cases to the District of Minnesota is appropriate.

### A.     The Cases Involve Multiple Common Questions of Law and Fact.

Coordination and transfer of *Barnes*, *Minnerath* and *Cox* is appropriate because the actions involve common questions of law and fact concerning allegations by overlapping classes

that Zurn is responsible for damages resulting from the defective design, manufacture and the premature failure of its brass fittings.  *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994).  Each action raises similar questions including, *inter alia*, whether Zurn's fittings were defectively designed and manufactured, what warranties apply for the failures and whether Zurn violated various consumer protection statutes. (Ex. A; Ex. O; Ex. P).

Cases involving common questions of fact concerning allegations of product defect and failure such as those present here, are particularly well-suited for coordination.  *In re Cooper Tire*, 2001 WL 253115 at *1 (transfer ordered where "[a]ll actions involve allegations relating to Cooper's tire design and its manufacturing process"); *In re St. Jude Med., Inc.*, Docket No. 1396, 2001 U.S. Dist. LEXIS 5226, at *2-3 (J.P.M.L. Apr. 18, 2001) (transfer ordered where "[a]ll actions are brought as class actions . . . and arise from the same factual milieu, namely the manufacture and marketing of allegedly defective heart valve and replacement products"); *In re Bridgestone/Firestone, Inc.*, Docket No. 1373, 2000 U.S. Dist. LEXIS 15926, at *5-6 (J.P.M.L. Oct. 24, 2000); *In re GMC Type III Door Latch Prods. Liab. Litig.*, Docket No. 1266, 1999 U.S. Dist. LEXIS 5075, at *1-2 (J.P.M.L. Apr. 14, 1999) (transfer ordered where "the three actions in this litigation involve common questions of fact concerning allegations that the 'unmodified Type III door latches' on certain GM vehicles are defective and prone to failure"); *In re Chrysler Corp. Vehicle Paint Litig.*, Docket No. 1239, 1998 U.S. Dist. LEXIS 15675, at *2 (J.P.M.L. Oct. 2, 1998) (transfer ordered in product defect cases).

The Panel has rejected contentions from parties opposing transfer and coordination that product defect cases involve factual issues or legal theories too unique or localized for coordination.  *In re Bridgestone/Firestone*, 2000 U.S. Dist. LEXIS 15926 at *7-8 (ordering

transfer over argument that cases presented too many unique issues, parties, or legal theories). Indeed, "[t]ransfer under § 1407 does not require a complete identity or even majority of common factual issues as a prerequisite to transfer. Nor is the presence of additional or differing legal theories significant when the underlying actions still arise from a common factual core." *Id.*; *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 654-55 (J.P.M.L. 1981) (ordering transfer and coordination of eight actions asserting substantially identical conspiracy allegations despite fact that certain cases might present unique or localized factual or legal issues); *In re A.H. Robins Co., Inc. "Dalkon Shield" IUD Prods. Liab. Litig.*, 406 F. Supp. 540, 541 (J.P.M.L. 1975) (same); *In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609, 611 (J.P.M.L. 1974) ("the mere fact that divergent legal theories are asserted arising out of the same substantive claims and allegations presents no bar to a Section 1407 transfer").

Here, all three actions presently before the Panel are brought as class actions and similarly allege that Zurn's brass pex fittings designed, manufactured, marketed and sold for use in potable water plumbing systems were defective and prematurely fail, causing damage to consumers' homes and other structures. The plaintiffs in each action assert substantially identical factual allegations and products liability claims. In addition, the plaintiffs in all three actions seek similar relief on behalf of overlapping classes of owners of homes and buildings with Zurn pex plumbing systems installed with Zurn's brass crimp fittings.

**B.      Transfer and Coordination of These Actions Will Serve the Convenience of the Parties and Witnesses.**

Convenience to the parties strongly favors coordination of the three related actions presently before the Panel. Coordination will benefit Plaintiffs by allowing them to look to and rely upon a single tribunal to handle their claims in a consistent manner. Fairness to Plaintiffs and the putative class[es] strongly weighs in favor of coordination where a single court can speak

to a class in a single voice and issue a single set of rulings.  The alternative is the kind of

"pretrial chaos" that § 1407 was designed to avoid.  *In re Plumbing Fixture Cases*, 298 F. Supp.

484, 493 (J.P.M.L. 1968).

Moreover, if the cases presently before the Panel – and those likely to follow – proceed in

litigation separately, Zurn can expect to find itself the subject of multiple and repetitive

discovery requests and depositions with respect to both class discovery and merits or liability

discovery.  Thus, transfer of all actions to a single district is essential to prevent such

unnecessary duplication of discovery and to conserve the resources of the parties, their counsel

and the judiciary.  *In re St. Jude Medical*, 2001 U.S. Dist. LEXIS 5226 at *3-4.  Zurn has

recognized as much in pleadings already filed in the pending actions.  (Ex. Q, pp. 1, 5-6, 8-9; Ex.

R, p. 6; Ex. S, p. 2).

Coordination minimizes inconvenience to the parties and witnesses by enabling a single

judge to formulate a pretrial discovery program that will curtail witness inconvenience and

overall expense.[4]  The Panel has often recognized that relieving the parties of such burdens is a

principal objective in § 1407.  *In re Cuisinart*, 506 F. Supp. at 655; *In re Bristol Bay Salmon*

*Fishery Antitrust Litig.*, 424 F. Supp. 504, 506-07 (J.P.M.L. 1976).  The analysis in *In re St. Jude*

*Medical* is insightful when considering the motion currently before the Panel:

> [T]ransfer under Section 1407 has the benefit of placing all actions in this docket
> before a single judge who can structure pretrial proceedings to consider all the
> parties' legitimate discovery needs while ensuring that common parties and
> witness are not subjected to discovery demands which duplicate activity that has
> already occurred or is occurring in other actions.  We also note that transfer under
> Section 1407 has the additional salutary effect of placing the actions before one
> judge who can formulate a pretrial program that: i) allows discovery with respect
> to any non-common issues to proceed concurrently with remaining discovery on

---

[4] "[T]here is usually no need for the parties and witnesses ever to travel to the transferee court for pretrial proceedings."  *In re Nat'l Airlines, Inc. Maternity Leave Practices and Flight Attendant Weight Prog. Litig.*, 399 F. Supp. 1405, 1407 (J.P.M.L. 1975); *In re Bristol Bay Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 506-07 (J.P.M.L. 1976); Fed. R. Civ. P. 45(3)(A)(ii), (iv).

common issues, * * * and ii) ensures that pretrial proceedings will be conducted
in a manner leading to the just and expeditious resolution of all actions to the
overall benefit of the parties.

*Id.*, 2001 U.S. Dist. LEXIS 5226 at *4 (internal citation omitted).  Here, convenience to the

parties and witnesses can be maximized by consolidating the related cases at issue in Minnesota.

Accordingly, the Panel should transfer the *Barnes* action to the District of Minnesota for

coordination with the *Cox* and *Minnerath* actions.

     **C.**     **Coordination of These Actions Will Promote the Just and Efficient Conduct
of Actions Relating to Zurn Pex Fittings.**

     Coordination of the *Cox*, *Barnes*, and *Minnerath* actions will facilitate the just and

efficient conduct of these related class actions.  Without coordination there will be duplicative

discovery and the potential for confusion of the putative class[es] and conflicting pretrial rulings,

especially with respect to questions of privilege, confidentiality, class certification, and summary

judgment.  *In re Mirtazapine*, 199 F. Supp. 2d at 1381; *In re St. Jude Medical*, 2001 U.S. Dist.

LEXIS 5226 at *4; *In re TMJ*, 844 F. Supp. at 1554.

     **D.**     **Coordination Will Prevent Duplicative Discovery and Conflicting Pretrial
Rulings.**

     The potential for inefficiency, confusion, and prejudice created by similar class actions in

different federal district courts supports coordination and transfer.  The Panel has consistently

held that the risk of overlapping or inconsistent class determinations supports transfer for

coordinated pretrial proceedings to avoid duplicative efforts and inconsistent rulings.  *In re*

*Bridgestone/Firestone*, 2000 U.S. Dist. LEXIS 15926 at *6; *In re TMJ*, 844 F. Supp. at 1554-55;

*In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975); *In re Nat'l Airlines,*

*Inc. Maternity Leave Practices and Flight Attendant Weight Prog. Litig.*, 399 F. Supp. 1405,

1407 (J.P.M.L. 1975); *In re Roadway Express, Inc. Employment Practices Litig.*, 384 F. Supp. 612, 613 (J.P.M.L. 1974).

Where, as here, "an analysis of the complaints reveals a commonality of factual issues concerning the design, testing, manufacture, labeling and inspection" of a defective product, transfer "is necessary in order to prevent duplication of discovery and eliminate the possibility of conflicting pretrial rulings." *In re Dalkon Shield*, 406 F. Supp. at 542. Relevant discovery, including expert testimony, as well as motion practice will overlap considerably in such actions, rendering centralization under § 1407 both appropriate and necessary. *In re Cooper Tire*, 2001 WL 253115 at *1; *In re Bridgestone/Firestone*, 2000 U.S. Dist. LEXIS 15926 at *6.[5] Moreover, any discovery or motion practice unique to a particular action can be expeditiously scheduled by the transferee judge without sacrificing the benefits of coordinated or consolidated pretrial proceedings. *In re Dalkon Shield*, 406 F. Supp. at 542; *In re Sugar Indus. Antitrust*, 395 F. Supp. at 1273; *In re Railway Express*, 384 F. Supp. at 613.

The *Cox*, *Barnes*, and *Minnerath* actions arise from nearly the same factual situations and share numerous questions of fact concerning allegations that Zurn's fittings are defective and prone to premature failure. Discovery and motion practice on these issues will be time-consuming for the parties and the courts. Further, these three related proposed class actions will call upon the federal courts to resolve similar issues concerning class certification and substantive legal issues. These and various other pivotal issues may cause considerable conflict if these cases are not coordinated. Coordination of these three related proposed class actions will best minimize duplicative pretrial proceedings and inconsistent pretrial rulings on these critical

---

[5] *See also In re St. Jude Med.*, 2001 U.S. Dist. LEXIS 5226 at *3; *In re GMC Type III*, 1999 U.S. Dist. LEXIS 5075, *2; *In re Chrysler Corp.*, 1998 U.S. Dist. LEXIS 15675, *2; *In re TMJ*, 844 F. Supp. at 1554.

issues. *In re TMJ*, 844 F. Supp. at 1554; *In re First Nat'l Bank, Heavener, Oklahoma, (First Mortgage Revenue Bonds) Sec. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978).

### E.    Transfer Will Facilitate Uniform Treatment of Class Certification.

Transfer and coordination under § 1407 is needed for competing class actions because "[i]t is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *In re Plumbing Fixture Cases*, 298 F. Supp. at 493. Accordingly, the Panel has "consistently held that transfer of actions under section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determination exists." *In re Sugar Indus. Antitrust*, 395 F. Supp. at 1273; *see also In re Bridgestone/Firestone*, 2000 U.S. Dist. LEXIS 15926 at *6 (recognizing that centralization is particularly necessary to prevent inconsistent pretrial rulings with respect to overlapping class certification requests); *In re TMJ*, 844 F. Supp. at 1554-55 (same); *In re Cuisinart*, 506 F. Supp. at 654; *In re Roadway Express*, 384 F. Supp. at 613 (same); *In re Mutual Fund Sales Antitrust Litig.*, 361 F. Supp. 638, 639-40 (J.P.M.L. 1973) (same).

"Furthermore, the assignment of these actions to the same judge is surely the most efficient way to resolve the questions of proper class representation and the effect of each of these actions on the other." *In re Litig. Arising from Termination of Retirement Plan for Employees of Fireman's Fund Ins. Co.*, 422 F. Supp. 287, 290 (J.P.M.L. 1976); *see also In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609, 611 (J.P.M.L. 1974) ("the appearance of conflicting class representation claims between the California and Nevada actions militates strongly in favor of transfer"). Where there are overlapping class actions simultaneously pending in different federal district courts, transfer for coordination is a practical necessity. Indeed, "[b]ecause these actions have been brought on behalf of the same plaintiff class, we emphasize that it is desirable

to have a single judge oversee the class action issues in [all three] actions to avoid duplicative efforts in this area." *In re First Nat'l Bank*, 451 F. Supp. at 997.

    **F.**    **The Pending Cases Are Sufficiently Complex to Warrant Transfer.**

A large number of related or overlapping cases is not a prerequisite to coordination. All that is required for the Panel to order transfer and coordination is that there exist two related cases which would benefit from such treatment, as is the case presently before the Panel. *See, e.g., In re Standard Auto. Corp. Retiree Benefits "ERISA" Litig.*, 431 F. Supp. 2d 1357, 1358 (J.P.M.L. 2006) (two actions consolidated); *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 435 F. Supp. 2d 1338, 1340 (J.P.M.L. 2006) (three actions consolidated); *In re Bank of Am. ATM Fee Litig.*, 398 F. Supp. 2d 1367, 1368 (J.P.M.L. 2005) (three actions consolidated); *In re GMC Type III*, 1999 U.S. Dist. LEXIS 5075 at *2-3 (three actions consolidated); *In re First Nat'l Bank*, 451 F. Supp. at 998 (two actions consolidated).

The three currently pending product liability actions involve overlapping issues relating to product design, product defect, causation, warranty and damages. The presentation of these cases will involve expert testimony in areas of metallurgy, product design, water chemistry and other technical fields. The cases will undoubtedly feature procedural motions like motions for summary judgment and class certification. They may also involve *Daubert* motions and other pretrial motions that should be handled consistently among the cases.

**II.**    **THE DISTRICT OF MINNESOTA IS THE APPROPRIATE TRANSFEREE COURT.**

The District of Minnesota is a logical and convenient forum for transferring and consolidating the related actions presently before the Panel. As an initial matter, two of the three related actions are already pending in the District of Minnesota. *Cox* was the first-filed of the three proposed class actions. *In re MERSCORP, Inc. Real Estate Settlement Procedures Act*

*(RESPA) Litig.*, 473 F. Supp. 2d 1379, 1380 (J.P.M.L. 2007) (ordering transfer of related cases to district of first-filed action for purposes of coordinated or consolidated pretrial proceedings); *In re Standard Auto. Corp.*, 431 F. Supp. 2d at 1358 (same); *In re Wells Fargo Home Mortgage*, 435 F. Supp. 2d at 1340 (same); *In re Bank of Am. ATM Fee Litig.*, 398 F. Supp. 2d at 1368 (same); *In re GMC Type III*, 1999 U.S. Dist. LEXIS 5075 at *2 (selecting transferee district based, in part, on the fact that one of the three constituent actions was already pending there).

The *Cox* action has been pending in the District of Minnesota since July 9, 2007 and pretrial proceedings are already underway in that district.  Discovery in the *Cox* matter has commenced in earnest but is still in its initial phases.  The *Cox* court has already considered and ruled upon several discovery and scheduling-related motions.  It is therefore well familiar with the background of this products liability litigation.

In contrast, *Barnes* and *Minnerath* just passed the Rule 26 conference stage and discovery recently started in both actions.  Because *Cox* is further advanced in pretrial proceedings it is the appropriate transferee district for coordination of the three related actions.  *In re Standard Auto. Corp.*, 431 F. Supp. 2d at 1358 (ordering transfer to district in which pretrial proceedings were already underway); *In re Litig. Arising from Termination of Retirement Plan for Employees of Fireman's Fund Ins. Co.*, 422 F. Supp. 287, 291 (J.P.M.L. 1976) (selecting preferable transferee district based on fact that action pending in that district appeared further advanced in pretrial proceedings); *In re Roadway Express*, 384 F. Supp. at 613 (same).

Zurn agrees that the District of Minnesota is the proper forum in which to resolve the pretrial aspects of this litigation.  (Ex. Q, pp. 1, 5-6, 8-9; Ex. R, p. 6; Ex. S, p. 2).  In addition, Zurn claims a disproportionate share of the failures to-date has occurred in Minnesota.  (Ex. M, p. 2; Ex. L, pp. 16, 22-29, 65-66).  Zurn's decision to stop selling the brass fittings first in

Minnesota (and later entirely) supports a conclusion that Minnesota is an appropriate place to conduct the pretrial proceedings.  (Ex. K; Ex. L, pp. 14-15).

In addition to the foregoing considerations, when determining a proper location for transfer, the Panel will consider whether the proposed forum is geographically central, and whether the proposed district has the requisite resources to effectively handle the coordinated multidistrict docket at issue.  *In re Wells Fargo Home Mortgage*, 435 F. Supp. 2d at 1340; *In re St. Jude Med.*, 2001 U.S. Dist. LEXIS 5226 at *4-5; *In re TMJ*, 844 F. Supp. at 1554; *In re Dalkon Shield*, 406 F. Supp. at 543.  In *St. Jude*, the Panel noted that Minnesota was the most appropriate forum for transfer and coordination of the docket because "the forum is geographically central for a litigation already nationwide in scope."  *Id.*, 2001 U.S. Dist. LEXIS 5226 at *4; *see also In re TMJ*, 844 F. Supp. at 1554 (same).  The District of Minnesota is an accessible location that will be geographically convenient for the litigants, witnesses, and counsel in the *Cox, Barnes*, *Minnerath* and any subsequent actions.[6]

Further, and as noted by this Panel in *St. Jude*, "the [District of Minnesota] enjoys general case load conditions that will permit the Panel to effect the Section 1407 assignment to a court with the present resources to devote the time to pretrial matters that this docket is likely to require."  *Id.*, 2001 U.S. Dist. LEXIS 5226 at *4.  The District of Minnesota is well equipped with the resources and technology that this products liability docket is likely to require.  *Id.*; *see also In re Wells Fargo Home Mortgage*, 435 F. Supp. 2d at 1340.[7]

---

[6] This especially holds true with respect to the parties' counsel since counsel of record for both Plaintiffs and Defendants in those cases hail from Minnesota.

[7] The District of Minnesota has recently handled some significant MDL proceedings, including the *Baycol, Guidant, Medtronic* and *St. Jude* products liability actions.  The vast majority of the cases in those proceedings have been resolved through settlement or other pretrial proceedings.

Finally, the anticipated number of cases that will be filed should be easily handled by the District of Minnesota. There are currently three known class action cases filed against Zurn in federal court for problems with brass fittings. Plaintiffs do not know whether there are individual plaintiff cases pending but believe the number of any such cases should be manageable since only a fraction of the fittings failures have caused damage exceeding the $75,000 diversity jurisdiction requirement.

Based on the foregoing key factors, Minnesota is the most convenient location for and the most appropriate venue to handle centralized pretrial proceedings for this proposed MDL. Zurn has characterized this problem with premature failure of its fittings as a matter geographically concentrated in Minnesota. It further concedes that it has received more warranty claims in Minnesota than in any other state. These facts make the District of Minnesota an appropriate forum for the conduct of this litigation.

## CONCLUSION

For all the foregoing reasons, the coordination of these overlapping proposed class actions arising out the defective design, manufacture and the premature failure of Zurn's brass fittings would further the "convenience of parties and witnesses and [would] promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a). Plaintiffs therefore respectfully request that the Panel order the transfer of the *Barnes* action, as well as any tag along actions, to the United States District Court for the District of Minnesota for coordination of pretrial proceedings with the first-filed *Cox* action and the *Minnerath* action.

Dated: Apri 15, 2008.

**LARSON · KING, LLP**

By
Shawn M. Raiter, Esq. (MN #240424)
T. Joseph Snodgrass, Esq. (MN #231071)
2800 Wells Fargo Place
30 E. 7th Street
St. Paul, MN 55101-4922
Telephone: (651) 312-6500

*ATTORNEYS FOR PLAINTIFFS
DENISE AND TERRY COX, KEVIN AND
CHRISTA HAUGEN, ROBERT AND
CARRIE HVEZDA, BEVERLY BARNES,
AND BRIAN JOHNSTON*

**SWENSON, LERVICK, SYVERSON,
TROSVIG, JACOBSON, PA**
Derek A. Trosvig (MN # 0241453)
710 Broadway
Alexandria, MN 56308
Telephone: (320) 763-3141

*ATTORNEYS FOR PLAINTIFFS
DENISE AND TERRY COX, KEVIN AND
CHRISTA HAUGEN, ROBERT AND
CARRIE HVEZDA, BEVERLY BARNES,
AND BRIAN JOHNSTON*

Lk1226959

RECEIVED
CLERK'S OFFICE
2008 APR 16 A 10: 35
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

20

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 1 2008

FILED
CLERK'S OFFICE

### Before the Judicial Panel on Multidistrict Litigation
### MDL-_____ - In re ZURN PEX PLUMBING PRODUCTS LITIGATION

## SCHEDULE OF ACTIONS

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiffs:**<br>Denise Cox and Terry Cox, Kevin and Christa Haugen, and Robert and Carrie Hvezda, on behalf of themselves and all others similarly situated<br><br>**Defendants:**<br>Zurn Pex, Inc. and Zurn Industries, Inc. | U.S. District. Court District of Minnesota | 0:07-cv-03652 | Ann D. Montgomery |
| **Plaintiffs:**<br>Jody Minnerath and Brian Minnerath, on behalf of themselves and all others similarly situated<br><br>**Defendants:**<br>Zurn Industries, LLC and Zurn Pex, Inc. | U.S. District Court District of Minnesota | 0:07-cv-04849 | James M. Rosenbaum |
| **Plaintiffs:**<br>Beverly Barnes and Brian Johnston, on behalf of themselves and all others similarly situated<br><br>**Defendants:**<br>Zurn Pex, Inc. and Zurn Industries, Inc. | U.S. District Court District of North Dakota, Southwestern Division | 1:07-cv-00074 | Daniel L. Hovland |

1227292

RECEIVED
CLERK'S OFFICE
2008 APR 16 A 10: 35
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 1 2008

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

In re ZURN PEX PLUMBING                    MDL DOCKET NO. ____
PRODUCTS LITIGATION

---

## PROOF OF SERVICE

---

I hereby certify that a copy of the foregoing Motion, Brief, Schedule of Actions and this
Certificate of Service was served by Federal Express Next Day Delivery on April 15, 2008 to the
following:

    Clerk of Court
    United States District Court
    District of Minnesota
    U.S. Courthouse
    300 South Fourth Street
    Minneapolis, MN  55415

    Clerk of Court
    United States District Court
    District of North Dakota
    Southwestern Division
    220 East Rosser Avenue
    PO Box 1193
    Bismarck, ND  58502

    Derek A. Trosvig
    Swenson, Lervick, Syverson, Anderson, Trosvig, Jacobson
    710 Boradway
    Alexandria, MN  56308
    **Counsel for Plaintiffs: Denise Cox and Terry Cox, Kevin and Christa Haugen, and
    Robert and Carrie Hvezda**, U.S. District Court, District of Minnesota, 0:07-cv-03652

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

2008 APR 16  A 10: 36

RECEIVED
CLERK'S OFFICE

J. Gordon Rudd, Jr.
Brian C. Gudmundson
Zimmerman Reed, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402-4123
**Counsel for Plaintiffs: Jody Minnerath and Brian Minnerath**, U.S. District Court,
    District of Minnesota, 0:07-cv-04849

James A. O'Neal
Amy R. Freestone
Catherine G. Davis
Daniel J. Connolly
Faegre & Benson, LLP
90 South 7th Street, Suite 2200
Minneapolis, MN 55402-3901
**Counsel for Defendants: Zurn Industries, LLC, Zurn Industries, Inc. and Zurn Pex,
    Inc.**, U.S. District Court, District of Minnesota, 0:07-cv-04849 and 0:07-cv-
    03652; and U.S. District Court, Southwestern District of North Dakota, 1:07-cv-
    00074

Ronald H. McLean
Jane L. Dynes
Serkland, Lundberg, Erickson, Marcil & McLean, Ltd.
P.O. Box 6017
Fargo, ND 58108-6017
**Counsel for Defendants: Zurn Pex, Inc. and Zurn Industries, Inc.**, U.S. District
    Court, Southwestern District of North Dakota, 1:07-cv-00074

Dated this 15th day of April, 2008.          **LARSON · KING, LLP**

                                              By
                                              Shawn M. Raiter, Esq. (MN #240424)
                                              T. Joseph Snodgrass, Esq. (MN #231071)
                                              2800 Wells Fargo Place
                                              30 E. 7th Street
                                              St. Paul, MN 55101-4922
                                              Telephone: (651) 312-6500

                                              ATTORNEYS FOR PLAINTIFFS DENISE AND
                                              TERRY COX, KEVIN AND CHRISTA HAUGEN,
                                              ROBERT AND CARRIE HVEZDA, BEVERLY
                                              BARNES AND BRIAN JOHNSTON ON BEHALF
                                              OF THEMSELVES AND ALL OTHERS
                                              SIMILARLY SITUATED

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2008 APR 16  A 10: 36

RECEIVED
CLERK'S OFFICE

SWENSON, LERVICK, SYVERSON, TROSVIG,
JACOBSON, PA
Derek A. Trosvig (MN #0241453)
710 Broadway
Alexandria, MN 56308
Telephone: (320) 763-3141

ATTORNEYS FOR PLAINTIFFS DENISE AND
TERRY COX, KEVIN AND CHRISTA HAUGEN,
ROBERT AND CARRIE HVEZDA, BEVERLY
BARNES AND BRIAN JOHNSTON ON BEHALF
OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED

1227294

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT A

RECEIVED
CLERK'S OFFICE

2008 APR 16 A 10: 36

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

STATE OF MINNESOTA

COUNTY OF BECKER

DISTRICT COURT

SEVENTH JUDICIAL DISTRICT

---

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,

        Plaintiffs and Proposed Class
        Representatives,

    vs.

Zurn Pex, Inc. and Zurn Industries, Inc.,

        Defendants

Court File No. _____

**COMPLAINT IN CLASS ACTION**

---

Plaintiffs Denise and Terry Cox, on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this Complaint in class action and state and allege as follows:

## THE PLAINTIFFS

1.     Plaintiffs and proposed class representatives Denise and Terry Cox are residents of and the owners of property in Detroit Lakes, Minnesota.

2.     Plaintiffs and proposed class representatives bring this case on behalf of themselves and a class of similarly situated persons in the State of Minnesota.

3.     In the alternative, Plaintiffs and proposed class representatives bring this case on behalf of themselves and a class of similarly situated persons in the United States.

4.     In the alternative, Plaintiffs and proposed class representatives bring this case on behalf of themselves and a class of similarly situated persons in certain, but not all, of the United States.

## THE DEFENDANTS

5.    Defendant Zurn Pex, Inc. is a privately-held foreign entity that is in the business, among other things, of advertising, warranting, manufacturing, selling and servicing plumbing components.

6.    On information and belief, Zurn Pex, Inc. has its principle place of business in Texas.

7.    On information and belief, Zurn Pex, Inc. is responsible for some or all of the acts and omissions alleged herein.

8.    Defendant Zurn Industries, Inc. is a privately-held foreign entity that is in the business, among other things, of advertising, warranting, manufacturing, selling and servicing plumbing components.

9.    On information and belief, Zurn Industries, Inc. has its principle place of business in Pennsylvania.

10.    On information and belief, Zurn Industries, Inc. is responsible for some or all of the acts and omissions alleged herein.

11.    On information and belief, Zurn Pex, Inc. and Zurn Industries, Inc. have acted in concert with each other with the respect to the actions and omissions alleged herein.

12.    At various times in marketing and advertising, in addressing quality control issues, warranty issues, manufacturing issues and legal issues associated with the subject matter of this Complaint, the Defendants have used literature and correspondence that reference "Zurn Pex, Inc.", "Zurn Industries, Inc.", "Zurn Plumbing Products Group", "Qest, Inc. a division of Zurn Industries, Inc." and "Zurn Industries, Inc. Qest Operations."

13.    The products at issue are advertised at websites with URL addresses www. Zurn.com and www.zurnpex.com.

14.    On information and belief, "Qest, Inc." and "Qest Operations" are not separate legal entities.

15.    On information and belief, "Zurn Plumbing Products Group" is not a separate legal entity.  Rather, "Zurn Plumbing Products Group" is a trade name used by both "Zurn Industries, Inc." and "Zurn Pex, Inc."

16.    On information and belief, Zurn Pex, Inc. and Zurn Industries, Inc. are jointly and/or severally liable to the Plaintiffs and putative class members as joint venturers, or in the alternative, operate such that any pretend corporate formalities amongst and between the two should be disregarded or pierced, or in the alternative, are subject to an agency relationship, or in the alternative, are subject to predecessor and successor liability theories, or in the alternative, are otherwise jointly and severally liable for all acts and omissions alleged herein.

17.    Throughout the remainder of this Complaint, Zurn Pex, Inc. and Zurn Industries, Inc. and their respective predecessors will be collectively referred to as "Zurn."

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the parties, the proposed class, and the causes of action asserted herein pursuant to Rule 23 of the Minnesota Rules of Civil Procedure.

19.    Venue in this forum is proper in that the proposed class representatives reside in Minnesota, certain putative class members reside in Minnesota, the causes of action for the class representatives arose, in part, in Minnesota, the causes of action for certain putative class members arose, in part, in Minnesota, and Zurn transacts business within Minnesota.

20.    Upon information and belief, this is the first class action commenced concerning the subject matter of this Complaint.

21.    Upon information and belief, no other class action or proposed class action has been asserted against Zurn relating to the subject matter of this Complaint.

## SUMMARY OF CLASS ACTION

22.    Plaintiffs on behalf of themselves and all other persons similarly situated bring this action for and on behalf of the owners of homes and buildings with Zurn plumbing systems with cross-linked polyethylene ("Pex") tubing.  These systems are defective.

23.    Plaintiffs and putative class members have been damaged as a result of the design, development, advertisement, marketing, sale and warranty misconduct of Zurn in connection with Zurn Pex plumbing systems installed with Zurn's brass crimp fittings.

24.    Zurn has used different names for its brass crimp fittings since 2002, including referring to them as "QestPEX Crimp System," "Qicksert fittings," and "Qick/Sert insert fittings" (hereinafter referred to as "brass crimp fittings").

25.    Zurn has sold brass crimp fittings for its Pex plumbing systems in Minnesota and in each of the United States.

26.    Zurn warrants and advertises that its brass crimp fittings provide "a worry free" plumbing system.

27.    Zurn warrants and advertises that, with its brass crimp fittings, "you can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

28.    Zurn warrants and advertises its brass crimp fittings as having a 25-year warranty – that expressly covers consequential damages arising from leaks or failures in the plumbing system.

4

29.    Zurn's brass crimp fittings, however, are defectively designed and manufactured and have been failing as quickly as one year or less after being put into service.

30.    The failures of the Zurn brass crimp fittings have and will in the future cause water leaks. These leaks have and will in turn cause extensive damage to other property including the homes and personal property of the owners. Such water leaks can result in mold and other damage which can be harmful to the health of putative class members.

31.    The foregoing types of damages arising from Zurn's defective brass crimp fittings are reasonably foreseeable at the time of design and manufacture of the brass crimp fittings.

32.    The foregoing types of damages are reasonably foreseeable at the time of sale of the brass crimp fittings.

33.    Zurn's brass crimp fittings have been prematurely failing by the hundreds, if not thousands despite being used for potable water systems in the state of Minnesota for only a few years.

34.    The foregoing brass fitting failures have included premature failures in the State of Minnesota.

35.    After convincing consumers to purchase the Zurn brass crimp fittings based in part on the 25-year warranty, Zurn now refuses to honor the warranty because the failures are allegedly not "covered in [Zurn's] cost structure."

36.    Plaintiffs and putative class members seek damages arising from and proximately caused by Zurn's breach of consumer protection statutes, fraud and misrepresentations, negligence, breach of contract and breach of warranties. The Plaintiffs and putative class members also seek declaratory and injunctive relief, as described below.

## DEFINITION OF PROPOSED CLASSES

37.      Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Minnesota Rules of Civil Procedure.  The first proposed class is defined as:

> All persons and entities that own a structure located within the State of Minnesota that contains a Zurn Pex plumbing system with brass crimp fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claim that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

38.      In the alternative, Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Minnesota Rules of Civil Procedure.  The second proposed class is defined as:

> All persons and entities that own a structure located within the United States that contains a Zurn Pex plumbing system with brass crimp fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claim that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

39.      In the alternative, Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Minnesota Rules of Civil Procedure.  The third proposed class is defined as:

> All persons and entities that own a structure located within certain, but not all, of the United States, all as may be more specifically identified in subsequent motions to certify a class, that contains a Zurn Pex plumbing system with brass crimp fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claim that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

40.     For all proposed classes, Plaintiffs specifically exclude Zurn or its related entities from the proposed class, all subsidiaries or affiliates of Zurn; any entity in which Zurn has a controlling interest; and any and all of Zurn's employees, affiliates, legal representatives, heirs, successors or assignees.

41.     Plaintiffs also specifically exclude from the Class any person or entity that has previously commenced and concluded a lawsuit against Zurn arising out of the subject matter of this lawsuit.

42.     Plaintiffs also specifically exclude from the Class the judge assigned to this case and any member of the judge's immediate family.

43.     For all proposed classes, Plaintiffs specifically include the claims of all persons or entities, like insurance companies, that have paid for the repair, replacement and / or damage caused by prematurely failed Zurn brass crimp fittings.

## FACTUAL BACKGROUND

**Zurn Pex Plumbing Background**

44.     Zurn is the manufacturer and seller of various plumbing products including Pex plumbing materials.

45.     Pex is an acronym for cross-linked polyethylene. Polyethylene is the raw material and the "X" in the generic name "Pex" refers to the cross-linking of the polyethylene across its molecular chains

46.     For decades, plumbers and homeowners have used copper piping for potable water plumbing systems.

47.     Copper is and has been accepted by virtually all plumbing codes throughout the United States.

48.     In the 1990's, manufacturers in the United States began selling and plumbers began installing potable water plumbing systems with tubing made from polybutylene plastic.

49.     Zurn was a manufacturer, seller and distributor of plumbing systems using tubing made from polybutylene plastic.

50.     Plumbing systems using tubing made from polybutylene plastic were touted by manufacturers as being easier to install, cheaper and longer-lasting than copper plumbing systems.

51.     Polybutylene plumbing systems quickly proved to be poorly conceived, designed and manufactured systems.

52.     Those polybutylene systems began to fail prematurely in the field causing substantial property damage.

53.     A substantial amount of litigation ensued as a result of the widespread, premature failure of polybutylene plumbing systems.

54.     Several class actions were filed and settlements in those cases exceeded several billion dollars.

55.     At least in part in response to the failure of polybutylene plumbing systems, virtually all manufacturers ceased manufacturing polybutyene plumbing systems for sale in the United States. In addition, most plumbing codes eventually prohibited the installation of polybutylene plumbing systems.

56.     In recent years, Zurn and other manufacturers developed alternative, non-copper plumbing products.

57.     Specifically, Zurn designed, manufactured and marketed a plumbing system using Pex tubing for use in residential and commercial settings.

58.     Zurn and other manufacturers of Pex plumbing products have touted Pex plumbing systems as being easier to install, cheaper and longer-lasting than copper plumbing systems.

59.     In recent years, more plumbing state and local plumbing codes have allowed for the installation of Pex plumbing products in addition to copper piping.

60.     Installation of Pex plumbing systems, however, remains prohibited in certain areas of the United States.

**Zurn Pex Brass Crimp Fittings**

61.     Zurn's Pex plumbing system uses a crimp connection design in which insert fittings made of brass alloy are inserted into the Pex tubing.  The brass fittings are secured by using a special tool that crimps copper rings around the outside of the tubing, which in turn, creates a seal between the Pex tubing and the brass fittings.

62.     The crimp system design chosen by Zurn for its Pex plumbing systems places a great deal of stress on the brass crimp fittings once the system is assembled as intended.

63.     The design, choice of material and manufacturing methods of the Zurn brass crimp fittings also result in residual stress on the fittings following the manufacturing process but before the system is assembled in the field.

64.     Zurn was negligent in its design and manufacture of the brass crimp fittings for a number of reasons, including Zurn's choice of a high zinc content brass alloy as the material used for the fittings.

65.     Zurn knew or should have known that the brass alloy it chose for the brass crimp fittings made the fittings susceptible to premature failure through various processes like dezincification and stress corrosion cracking.

66.    Zurn knew or should have known that its crimp fitting design, Pex system design, and choice of brass alloy also made the brass crimp fittings susceptible to premature failure through stress corrosion cracking.

67.    Zurn's design and materials choices have created a product that begins to fail on its first day of use, even if perfectly installed in its intended environment.

68.    Because of their defective design and manufacture, Zurn's brass crimp fittings failed in their intended purpose.

69.    Because of their defective design and manufacture, Zurn's brass crimp fittings are inherently defective and are substantially certain to fail within the 25 year express warranty provided by Zurn and / or the useful life of the fittings.

70.    All class members own Zurn Pex plumbing systems with brass crimp fittings that have already or are in the process of failing prematurely and thus have suffered or are reasonably certain to suffer actual injury well in advance of the warranted and expected life of their plumbing systems.

### Inadequate Testing of Zurn Brass Crimp Fittings

71.    Zurn did not test the brass crimp fittings in their anticipated environments before selling those brass crimp fittings to the public.

72.    In an effort to save time and money, Zurn did not end use test the brass crimp fittings in Pex systems.

73.    Zurn conducted inadequate testing on its brass crimp fittings and failed to test things that it knew or should have known would lead to premature failure of the brass crimp fittings.

74.     Zurn also failed to investigate or test whether well-known and expected water conditions would lead to premature failure of the brass crimp fittings.

### False Advertising of Zurn Pex Systems

75.     Zurn falsely advertised that the Pex plumbing system – including its brass crimp fitting components -- was reliable despite never testing and determining the reliability of its product when used in real world conditions.

76.     Zurn holds itself out as a "proven leader in the plumbing industry" and as a manufacturer of reliable plumbing products.

77.     Zurn also advertises itself as being "the time tested and proven leader in the flexible plumbing industry."

78.     Among other false and inaccurate representations of its Pex plumbing systems with brass crimp fittings, Zurn falsely advertised and represented that the system "resists mineral buildup, rust, corrosion, and electrolysis," had "No exotic parts to fail," and made "More positive connections, quicker, easier."

79.     Zurn also falsely represented its QestPEX Crimp System as "utilizes high quality brass fittings and copper crimp rings to provide a connection which is stronger than the pipe itself" and that "When properly installed, the QestPEX Crimp System is a worry free system!"

80.     Zurn also falsely represented that owners of its Pex plumbing systems "can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

81.     Zurn falsely advertises its brass crimp fitting system as "the most time tested and reliable fitting system available."

82.     Zurn also falsely advertises that its brass crimp fittings "are actually stronger than the pipe itself and once crimped, they can not be pulled apart or blown out."

11

83.     Zurn also falsely advertises that its brass crimp fittings and ease of installation will provide "perfect connections every time, giving you a plumbing system that will be worry free for a lifetime."

84.     Zurn also falsely marketed its Pex plumbing systems as being safe, reliable, and corrosion-resistant.

85.     Zurn also falsely marketed its Pex plumbing systems as being proven, time-tested and worry free.

86.     Zurn also falsely marketed and warranted its Pex plumbing systems as being extensively tested, and that based on the results of those tests, the Pex plumbing system and its brass crimp fittings were properly designed, developed, marketed, and manufactured so as to perform adequately, reliably and as represented.

87.     Zurn also falsely marketed and warranted that its Pex plumbing systems were superior to copper plumbing systems.

88.     Zurn also falsely marketed and warranted that its Pex plumbing systems and the brass crimp fittings were of superior design and materials than similar products made by competitors.

89.     Zurn and its authorized agents and distributors made each of the above described assertions, statements, representations and warranties with the intent and purpose of inducing plumbing suppliers, builders, plumbers, and consumers to purchase and install Zurn Pex plumbing systems and its brass crimp fittings in their properties in the state of Minnesota and elsewhere.

90.     Zurn also made numerous material omissions and uniformly withheld important information relating to the design, reliability and performance of its brass crimp fittings and Pex plumbing systems.

91.     Had Zurn not withheld and omitted important information about the design, reliability and performance of its brass crimp fittings and Pex plumbing systems, Plaintiffs and the members of the putative class would not have purchased those products.

**Field Failures of Zurn Pex Systems**

92.     By 2003 at the latest, Zurn began receiving notice from the field that its brass crimp fittings were failing prematurely, including within the State of Minnesota.

93.     Zurn brass crimp fittings have failed prematurely in numerous locations throughout Minnesota.

94.     For example, Zurn brass crimp fittings have failed prematurely in properties located in Garrison, Brainerd, Detroit Lakes, Alexandria, Moundsview, Forest Lake, Farmington, Hutchinson, Bird Island, Willmar, Brandon, Pillager, Garfield, Grey Eagle, Elbow Lake, and Audobon.

95.     Zurn brass crimp fittings have failed prematurely in properties located elsewhere in Minnesota.

96.     Zurn brass crimp fittings have failed prematurely in properties located in places outside Minnesota.

97.     By July 1, 2005, Zurn had admitted that two to three years earlier it had noticed increased failure rates of its brass crimp fittings in Minnesota.

98.     By July 1, 2005, Zurn had admitted that "the majority of fittings that are cracking are tees and elbows."

99.    By July 1, 2005, Zurn had admitted that "the majority of these fittings are cracking from inside the wall cavity of the fittings."

100.    As but one example of the high number of premature failures in Minnesota, one plumbing company alone had reported over 150 failures of Zurn brass crimp fittings by the end of 2006.

101.    Because of the unacceptable rate of premature failure, that plumbing company stopped using Zurn's Pex systems and brass crimp fittings and switched to a competitor's product.  The competitor's product has performed well without failure, in the same installation area.

102.    By early 2005, Zurn directed its Minnesota distributors to stop selling the brass crimp fittings.

103.    By early 2005, Zurn directed its Minnesota distributors to sell only its Poly Alloy fittings for Pex systems used in Minnesota.

104.    By early 2005, Zurn's Minnesota distributors sent back their remaining inventory of Zurn brass crimp fittings.

105.    By early 2005, Zurn provided credits to its Minnesota distributors for the returned brass crimp fittings.

106.    Zurn has also received reports that its brass crimp fittings have failed prematurely in states other than Minnesota.

**Competitors' Use of Different Product Materials and Designs**

107.    Several of Zurn's competitors in the Pex plumbing market chose designs and materials that are much more resistant to the premature failure problems that have plagued the Zurn Pex brass crimp fittings.

108.    For example, some of Zurn's competitors in the Pex plumbing market chose fitting and assembly designs that exert less stress on the fittings than the Zurn Pex brass crimp fittings.

109.    Some of Zurn's competitors in the Pex plumbing market chose fitting materials like copper, bronze and plastic that are less susceptible to premature failure than the Zurn Pex brass crimp fittings in residential plumbing applications.

**Plaintiffs' Circumstances**

110.    Plaintiffs, through their licensed plumber, purchased and had a Zurn Pex plumbing system installed in their home located in Detroit Lakes, Minnesota.

111.    Before installing the Zurn Pex system at Plaintiffs' home, Plaintiffs' plumber, Hank's Heating, had been trained and certified by Zurn representatives to install Zurn Pex systems with brass crimp fittings.

112.    Just over one year after installation, one of the Zurn brass crimp fittings failed at Plaintiffs' home causing damage to property other than the Pex plumbing system.

113.    Only months later, another Zurn brass crimp fitting failed at Plaintiffs' home causing damage to property other than the Pex plumbing system.

114.    Plaintiffs, like many class members, have already suffered out-of-pocket damage to repair their home following the premature failures of the Zurn Pex brass crimp fittings. Likewise, all putative class members have incurred or are reasonably certain to incur, the cost of repairing their homes because of fittings failures and / or prematurely replacing their plumbing systems.

115.    Plaintiffs and the proposed class members suffered general and specific compensatory and contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

**Zurn's Warranty Misconduct**

116.    Plaintiffs presented a warranty claim to Zurn for the damage caused by the premature failure of the brass crimp fittings.

117.    Zurn denied the warranty claim and alleged that the failure of Plaintiffs' Zurn brass crimp fittings was not covered by Zurn's 25-year warranty.

118.    Zurn denied Plaintiffs' warranty claim because of alleged limitations and disclaimers Zurn contended were part of its warranty.

119.    Zurn's brass crimp fittings, however, were uniformly sold without any limitations of warranties because Zurn and / or its distributors failed to provide any alleged warranty limitations or disclaimers at the time of the sale of the brass crimp fittings.

120.    In fact, Zurn brass crimp fittings are provided to plumbers and / or consumers in plastic bags without any warranty disclaimers.

121.    Zurn did not provide any alleged warranty disclaimers or limitations at the time of sale of the brass crimp fittings used in Plaintiffs' home.

122.    Zurn did not provide any alleged warranty disclaimers or limitations at the time of sale of the brass crimp fittings used in the structures of any of the members of the putative class.

123.    Minnesota law, and the laws of other states, requires a seller of a product to provide the purchaser of the product with any alleged warranty disclaimers or limitations.

Failure to provide the alleged warranty limitations or disclaimers at the time of sale renders such attempted disclaimers and limitations invalid.

124.   As a result, Zurn well knew that it was legally obligated to compensate all consumers for their full measure of damages arising out of brass crimp fitting failures.

125.   Pursuant to uniform company policy, Zurn provided false, deceptive, misleading and fraudulent information to consumers with failed Zurn Pex systems by advising them that the Zurn warranty was subject to vague and ambiguous limitations about "corrosion" and "corrosive water."

126.   In response to the claims of its customers, Zurn has adopted a uniform company policy not to pay customers their full measure of damages.

127.   Zurn's attorneys and corporate executives were aware of this misconduct and condoned the misconduct because the flood of warranty claims Zurn has received were not included in Zurn's "cost structure" for these systems.

128.   Beginning in at least 2002 or soon thereafter, Zurn became aware through various claims and reports that the Zurn Pex brass crimp fittings that it was manufacturing, distributing and advertising were subject to premature failures, problems and deterioration.

129.   Despite the fact that Zurn knew its product was defective and that its system would not perform as advertised, warranted or otherwise expressly represented, Zurn continued to sell the product to the public without correction and, in fact, concealed from the public the fact that its Pex system and brass crimp fittings were defective, not durable and would begin to fail immediately upon being placed into service.

130.   Because the Zurn Pex plumbing system related to the habitability of persons' homes, Zurn had a duty to the consumer and to the public to disclose the defective nature of its

system and not to conceal and suppress the defective nature of the product from the Plaintiffs and putative class representatives.

131.    Zurn, however, has engaged in a scheme to cover up the true nature of the problem with its brass crimp fittings and Pex plumbing system.

132.    Consistent with the usage in the plumbing trade, Zurn originally covered warranty claims for the premature failures of its brass crimp fittings but, after realizing the magnitude of the problem, began denying the warranty claims blaming the premature failures on "aggressive water."

133.    Zurn knew the cause of the premature failures was not "aggressive water" and has fraudulently concealed and suppressed from the Plaintiffs and putative class the true nature of the problems with the Pex plumbing and brass crimp fitting system.

134.    To this day, Zurn continues in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the public the true nature of the problems with the brass crimp fittings. In fact, many members of the putative class are still unaware that their plumbing system is prematurely failing and will continue to fail due to its design defect.

## SATISFACTION OF CLASS PREREQUISITES

135.    This class action satisfies numerosity, commonality, typicality, adequacy and superiority requirements for maintaining a class.

136.    **Numerosity.**  Pursuant to Rule 23.01(a) of the Minnesota Rules of Civil Procedure, the proposed class "is so numerous that joinder of all members is impracticable." The number of members of the proposed class is believed to be tens of thousands of individuals and/or entities that own properties with Zurn Pex plumbing systems with brass crimp fittings.

137.    Zurn's own representatives have publicly stated that Zurn sold more than two million fittings in the State of Minnesota alone from 2003 to 2006. Joinder of the persons and entities into whose properties the Zurn Pex plumbing systems were installed is impractical and not feasible.

138.    **Commonality.** Pursuant to Rule 23.01(b) of the Minnesota Rules of Civil Procedure, the proposed class shares "questions of law or fact" that predominate and individualized issues. The common questions include, but are not limited to, the following:

- Were Zurn's brass crimp fittings defectively designed for their intended application?

- If so, what is the nature of the design defect?

- Did Zurn fail to warn consumers that the brass crimp fittings were not properly tested during design and development process?

- Did Zurn adequately warn consumers about any types of installations that may cause premature failure of the brass crimp fittings?

- Did Zurn make fraudulent, false, deceptive and/or misleading statements in connection with the sale of Zurn Pex plumbing systems in its product literature, including those relating to standards and reliability?

- Did Zurn omit material information when it sold its Pex systems and brass crimp fittings?

- Did Zurn properly account for foreseeable variations in installation in the development and design of the Zurn Pex plumbing system and brass crimp fittings?

- Did Zurn exercise reasonable care in the design, manufacture and testing of the Zurn Pex plumbing system and brass crimp fittings?

- Are the brass crimp fittings progressively deteriorating at an accelerated rate?

- Will the brass crimp fittings fail prematurely?

- Did Zurn deliberately sell or allow brass crimp fittings to be distributed after it knew the fittings were failing at an increased rate?

- Did Zurn engage in fraudulent, false, deceptive and/or misleading misconduct with respect to the handling of warranty claims?

- What categories of damages are recoverable for owners of structures with Zurn Pex plumbing systems and brass crimp fittings, e.g., replacement, consequential, incidental or other damages?

- Are the Plaintiffs entitled to relief under the U.C.C. for breach of the implied warranty of merchantability?

- Are the Plaintiffs entitled to relief under the U.C.C. for breach of the implied warranty of fitness for a particular purpose?

- Are the Plaintiffs entitled to relief under consumer protection statutes?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

- Should Zurn be enjoined from denying warranty claims based on alleged warranty disclaimers or limitations that were not provided to the purchaser at the time of sale of the brass crimp fittings?

- Are Plaintiffs' claims barred in whole or in part by any of Zurn's affirmative defenses?

139.   **Typicality.** Pursuant to Rule 23.01(c) of the Minnesota Rules of Civil Procedure, the claims of the proposed class representatives, Plaintiffs "are typical of the claims … of the class." Plaintiffs and all members of the proposed class who own Zurn's defective Pex plumbing systems with brass crimp fittings have suffered damages as a result of Zurn's wrongful acts and misconduct. Pursuant to corporate directives, Zurn engaged in a similar pattern of misconduct towards both the Plaintiffs and all other putative class members.

140.   **Adequacy.** Pursuant to Rule 23.01(d) of the Minnesota Rules of Civil Procedure, the proposed class representatives "will fairly and adequately protect the interests of the class." The Plaintiffs have no adverse interests to the proposed class members. Plaintiffs were sold a plumbing system with defective brass crimp fittings. The Plaintiffs have retained a litigation firm, Larson · King, LLP, whose attorneys have substantial resources, experience and

success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

141.   **Superiority.**   Pursuant to Rule 23.02 of the Minnesota Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons:  A class action in this instance conserves the resources of the proposed class, Zurn and the Court.  The damages of most putative class members are not, in isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for the Plaintiffs and most putative class members, makes it difficult if not impossible for the class members to seek redress.  On information and belief, neither the Minnesota Attorney General nor the Attorney General of any other state has brought an enforcement action against Zurn to remedy the claims asserted herein.

Because the nature of the claims involved, the class members need swift and uniform resolution of their claims before additional damage is caused by failures.  Zurn has been uniformly refusing to pay the Plaintiffs and putative class members their full damages.

Further, there may or will be other cases pending against Zurn.  Serial adjudications in numerous venues is not efficient, timely, or proper.  Judicial resources throughout Minnesota and United States will be unnecessarily depleted by resolution of individual claims.  Joinder on an individual basis of thousands of claimants in any one suit would be impractical or impossible.  Individualized judgments and rulings could result in inconsistent relief for similarly situated plaintiffs.  Individualized suits could also establish incompatible standards of conduct for Zurn in creating, marketing, sale and post-sale conduct in connection with Zurn's Pex plumbing systems and brass crimp fittings.

COUNT I

(CONSUMER FRAUD)

142.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

143.    Minnesota Statutes § 325F.69, subd. 1 makes it unlawful for any person by use of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby...." Consumer protection laws of other states make similar conduct unlawful.

144.    By engaging in the conduct described herein, Zurn violated and continues to violate Minn. Stat. § 325F.69, subd. 1 and the similar laws of other states.

145.    Zurn's wrongful conduct and use of false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others relied on those statements, includes, by way of example and not by limitation:

a.    Zurn's fraudulent, misleading, and deceptive statements and practices relating to Zurn's Pex plumbing system and brass crimp fittings;

b.    Zurn's warranty related misconduct, including its fraudulent, deceptive and unfair practice of lying about unenforceable warranty limitations;

c.    Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system and brass crimp fittings, the improper design of the products, and Zurn's knowledge of those defects, and

d.    Zurn's concealment of the true nature of its defective plumbing system.

146.    As a result of Zurn's fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practice practices relating to the sale of its Pex plumbing

systems and brass crimp fittings, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

147.    As a result of Zurn's fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practices, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

148.    That as a direct, proximate and foreseeable result of Zurn's violation of statute, the Plaintiffs and putative class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT II

### (UNLAWFUL TRADE PRACTICES)

149.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

150.    Minnesota Statutes § 325D.13 provides that, "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise." Consumer protection laws of other states make similar conduct unlawful.

151.    By engaging in the conduct described herein, Zurn violated and continues to violate Minn. Stat. § 325D.13 and the similar laws of other states.

152.    Zurn's wrongful conduct and misrepresentation of the true quality of its Pex plumbing systems and brass crimp fittings, includes, by way of example and not by limitation:

a.    Zurn's fraudulent, misleading, and deceptive statements relating to the true quality of Zurn's Pex plumbing system and brass crimp fittings;

23

b.   Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system and brass crimp fittings, the improper design of the products, and Zurn's knowledge of those defects, and

c.   Zurn's concealment of the true nature of its defective plumbing system

153.   Zurn and its agents and distributors also misrepresented the true quality of the Zurn Pex plumbing system and its brass crimp fittings by making the various statements about the alleged quality of the system and brass crimp fittings referenced herein.

154.   As a result of Zurn's practices relating to misrepresentation of the true quality of the Pex plumbing systems and its brass crimp fittings, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

155.   As a result of Zurn's practices relating to misrepresentation of the true quality of the Pex plumbing systems and its brass crimp fittings, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

156.   That as a direct, proximate and foreseeable result of Zurn's violation of statute, the Plaintiffs and putative class members sustained damages, in the aggregate, in excess of $50,000.00.

<u>COUNT III</u>

(DECEPTIVE TRADE PRACTICES)

157.   Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

158.   Minnesota Statutes § 325D.44, subd. 1 provides in part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (5)   Represents that goods or services have…characteristics, ingredients, uses, benefits…that they do not have…

> (7)   Represents that goods or services are of a particular standard, quality, or grade,…if they are of another.

> (13)   Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Consumer protection laws of other states make similar conduct unlawful.

159.   By engaging in the conduct described herein, Zurn violated and continues to violate Minn. Stat. § 325D.44 and the similar laws of other states.

160.   Zurn's wrongful conduct and misrepresentation of the true characteristics, standards, quality, and grade of its Pex plumbing systems and brass crimp fittings, includes, by way of example and not by limitation:

  a.   Zurn's fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of Zurn's Pex plumbing system and its brass crimp fittings;

  b.   Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system and its brass crimp fittings, the improper design of the products, and Zurn's knowledge of those defects, and

  c.   Zurn's concealment of the true nature of its defective plumbing system

161.   Zurn and its agents and distributors also misrepresented the true characteristics, standards, quality, and grade of the Zurn Pex plumbing system and its brass crimp fittings by making the various statements about the alleged quality of the system and brass crimp fittings referenced herein.

162.    As a result of Zurn's practices relating to misrepresentation of the true characteristics, standards, quality, and grade of the Pex plumbing systems and its brass crimp fittings, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

163.    As a result of Zurn's practices relating to misrepresentation of the true characteristics, standards, quality, and grade of the Pex plumbing systems and its brass crimp fittings, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

164.    That as a direct, proximate and foreseeable result of Zurn's violation of statute, the Plaintiffs and putative class members sustained damages, in the aggregate, in excess of $50,000.00.

<u>COUNT IV</u>

(FALSE ADVERTISING)

165.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

166.    That Minnesota Statutes § 325F.67 provides in part:

> Any person, firm, corporation, or association who, with intent to sell or in any way dispose of merchandise, …service, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or places before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise,…service or anything so offered to the public for use, consumption, purchase, or sale, which advertising contains

26

any material assertion, representation or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any other person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

Consumer protection laws of other states make similar conduct unlawful.

167.    That by engaging in the conduct described herein, Zurn violated and continues to violate Minn. Stat. § 325F.67 and the similar laws of other states.

168.    Zurn's untrue, deceptive, and misleading assertions and representations about its Pex plumbing systems and brass crimp fittings, include, by way of example and not by limitation:

    a.    Zurn's fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of Zurn's Pex plumbing system and its brass crimp fittings;

    b.    Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system and its brass crimp fittings, the improper design of the products, and Zurn's knowledge of those defects, and

    c.    Zurn's concealment of the true nature of its defective plumbing system

169.    Zurn and its agents and distributors also made untrue, deceptive, and misleading assertions and representations about the Zurn Pex plumbing system and its brass crimp fittings by making the various statements about the alleged quality of the system and brass crimp fittings referenced herein.

170.    As a result of Zurn's untrue, deceptive, and misleading assertions and representations about the Pex plumbing systems and brass crimp fittings, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

171.    As a result of Zurn's untrue, deceptive, and misleading assertions and representations about the Pex plumbing systems and brass crimp fittings, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

172.    Plaintiffs seek to enjoin Zurn from untrue, deceptive, and misleading assertions and representations about the Pex plumbing systems.

## COUNT V

## (NEGLIGENCE)

173.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

174.    Zurn was negligent in that it failed to use reasonable care when it created, marketed and sold its Pex plumbing system with brass crimp fittings.

175.    Zurn owed a duty to the Plaintiffs and proposed class members to provide a safe and quality product, and a duty to provide a product that would perform as it was advertised. Zurn breached those duties.

176.    That as a direct and proximate result of Zurn's negligence, lack of care, and other wrongful acts, the Plaintiffs and proposed class members sustained and will sustain damages.

177.    As a result of Zurn's negligence, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in their homes and structures a plumbing system that is defective.

178.    As a result of Zurn's negligence, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace brass crimp fittings, but also include, without limitation, consequential and incidental damages.

179.    That as a direct, proximate and foreseeable result of Zurn's negligence, the Plaintiffs and proposed class members have been damaged, in the aggregate, in an amount in excess of $50,000.

## COUNT VI

### (NEGLIGENT FAILURE TO WARN)

180.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

181.    As the manufacturer of a product, Zurn had a duty to provide instructions for proper use of its products.

182.    As the manufacturer of a product, Zurn had a duty to warn of foreseeable dangers inherent in the proper use of its products and also had a duty to warn of dangers associated with foreseeable misuse of its products.

183.    That to the extent Zurn claims in this lawsuit that the premature failures of its Pex plumbing brass crimp fittings was the result of characteristics of the water chemistry present in the Plaintiffs or the members of the putative class's water supply, Zurn failed to warn of those characteristics or dangers.

184.    That as a direct, proximate and foreseeable result of Zurn's failure to warn, Plaintiffs and proposed members of the class suffered damage.

185.    As a result of Zurn's failure to warn, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

186.    As a result of Zurn's failure to warn, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace brass crimp fittings, but also include, without limitation, consequential and incidental damages.

187.    That as a direct, proximate and foreseeable result of Zurn's failure to warn, the Plaintiffs and proposed class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT VII

### (NEGLIGENT MISREPRESENTATION)

188.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

189.    In making material misrepresentations of material facts regarding the characteristics and capabilities of its Pex plumbing system through its advertising and product information and through its internet website, Zurn knew or should have known it was misrepresenting material facts and that the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, the Plaintiffs and putative class), would be relying on Zurn's representations to their detriment and damage.

190.    In concealing material facts regarding the characteristics and capabilities of its Pex plumbing system, Zurn knew or should have known it was not disclosing material facts and that the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, the Plaintiffs and putative class), would be relying on Zurn's representations to their detriment and damage.

191.    That as a direct, proximate and foreseeable result of Zurn's failure to fully disclose material facts and Zurn's making misrepresentations of material fact, Plaintiffs and proposed members of the class suffered damage.

192.    As a result of Zurn's negligence, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

193.    As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace brass crimp fittings, but also include, without limitation, consequential and incidental damages.

194.    That as a direct, proximate and foreseeable result of Zurn's negligent misrepresentations, the Plaintiffs and proposed class members sustained damages, in the aggregate, in excess of $50,000.00.

<u>COUNT VIII</u>

(FRAUD, MISREPRESENTATION AND CONCEALMENT)

195.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

196.    Zurn's direct and indirect representations through its advertising and product information and through its internet website regarding the quality, durability and efficiency of its Pex plumbing system and brass crimp fittings were false and misleading, were material facts, and were made willfully and intentionally with the intent to deceive.

197.    Zurn knew or should have known it was intentionally and fraudulently misrepresenting material facts and that the Plaintiffs and putative class (and also Zurn's

distributors and installers, and through them, the Plaintiffs and putative class), would be relying on Zurn's representations to their detriment and damage.

198.    Zurn fraudulently concealed the nature of its Pex plumbing and brass crimp fitting system from the Plaintiffs and putative class, both in pre-sale communications and by its post-sale misconduct, as alleged above.

199.    As a result of Zurn's practices, the Plaintiffs and the putative class have suffered actual damages and that they have purchased and installed in homes and structures a plumbing system that is defective.

200.    As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

201.    That, as a direct, proximate and foreseeable result of Zurn's fraud and misrepresentations, the Plaintiffs and proposed class members have been damaged, in the aggregate, in an amount in excess of $50,000.

## COUNT IX

### (BREACH OF IMPLIED WARRANTY – MERCHANTABILITY)

202.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

203.    Zurn was at all relevant times a merchant with respect to its Pex plumbing system and that there was implied in the agreements between Zurn, Zurn's representatives and the Plaintiffs and putative class that such goods would be of merchantable quality.

204.    Zurn breached such warranties implied in the agreements and contracts by producing, marketing and selling a defective plumbing system. As a result thereof, the Plaintiffs

and the putative class did not receive goods as impliedly warranted by Zurn to be merchantable. The Plaintiffs and proposed class members are beneficiaries of the contracts.

205.    That as a direct, proximate and foreseeable cause of Zurn's breach of implied warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT X

### (BREACH OF IMPLIED WARRANTY – FITNESS FOR PARTICULAR PURPOSE)

206.    Plaintiffs and putative class members reallege foregoing paragraphs, inclusive, as though fully set forth herein.

207.    The Plaintiffs and putative class members relied upon Zurn's claimed skill, expertise and quality assurance to provide suitable goods for such purposes.

208.    At the time Zurn sold the goods to the Plaintiffs and the putative class, Zurn knew of the particular purpose for which the goods were required and knew that the Plaintiffs and proposed class members were relying on Zurn to provide goods suitable for their purpose, including all foreseeable variances in conditions and installation.  Accordingly, there was an implied warranty that the plumbing systems were fit for their particular purpose.

209.    Zurn breached such warranty implied in the agreements and contracts by providing defective plumbing systems.  The beneficiaries of the contracts, including the Plaintiffs and putative class members, did not receive goods as impliedly warranted by Zurn to be fit for their particular purpose.

210.    Proper presuit notification, to the extent required, has been provided.

211.    That as a direct, proximate and foreseeable result of Zurn's breach of the implied warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT XI

### (BREACH OF IMPLIED WARRANTY – COURSE OF DEALING/USAGE OF TRADE)

212.    Plaintiffs and putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

213.    It is the course of dealing and usage of trade in the plumbing industry to deliver brass fittings for plumbing systems that have sufficient specifications to avoid premature failure from stress corrosion cracking in residential applications.

214.    Zurn breached such warranty implied in the agreements and contracts by providing defective plumbing systems in violation of industry standards.

215.    Proper presuit notification, to the extent required, has been provided.

216.    That as a direct, proximate and foreseeable result of Zurn's breach of the implied warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT XII

### (BREACH OF EXPRESS WARRANTIES)

217.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

218.    On information and belief, and in the alternative, Zurn made certain express warranties to distributors relating to the goods it would provide.

219.    On information and belief, the express warranties provided by Zurn include warranties that it would provide properly designed plumbing systems and a 25-year warranty on such systems.

220.    Through distributors, the Plaintiffs and putative class members relied upon Zurn's express warranties.

221.    Zurn breached such express warranties by providing defective plumbing systems that have or are reasonably certain to fail well before the 25 year warranty or useful life of the system.

222.    That as a direct, proximate and foreseeable cause of Zurn's breach of express warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT XIII

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

223.    Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

224.    Plaintiffs and the putative class members are consumers within the meaning of 15 U.S.C. § 2301 et seq.

225.    As described herein, Zurn, as the warrantor within the meaning of 15 U.S.C. § 2301 et seq., committed several violations of state law, including breach of contract and breach of warranties.

226.    Plaintiffs and the proposed class members have sustained damages in excess of $50,000 by Zurn's breach of their warranties, implied warranties, and contracts, 15 U.S.C. § 2310(d)(1), and are entitled to recover reasonable attorney's fees and costs.

## COUNT XIV

### (DECLARATORY AND INJUNCTIVE RELIEF)

227.  Plaintiffs and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

228.  Pursuant to Rule 23.02 (b) of the Minnesota Rules of Civil Procedure and any applicable statute or rule providing for declaratory and / or injunctive relief, Plaintiffs and putative class members seek a declaratory judgment as follows:

a.  To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because Zurn at the time of sale and thereafter concealed and suppressed that the system was defective, and because the provisions are otherwise unconscionable;

b.  To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate remedies because the defect in the plumbing system is latent and because the Plaintiffs lack sufficient bargaining power;

c.  To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is unlawful and unenforceable;

d.  To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is barred by Zurn's failure to provide the alleged warranty disclaimers at the time of sale of the product;

e.  Any releases obtained by Zurn, that did not otherwise provide full compensation to the putative class, were fraudulently induced, are unconscionable, were obtained by suppression and concealment, were obtained under duress by persons needing to repair their plumbing systems, and are null and void; and

f.  To the extent Zurn has had an adverse adjudication against it arising from the subject matter of this Complaint, that the putative class may use

offensive collateral estoppel against Zurn for the rulings and determinations therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Zurn as follows:

1.  Certification of this plaintiff class and appointing Plaintiffs and their counsel to represent the class;

2.  Compensation for damages suffered by Plaintiffs and the proposed class members;

3.  Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.  Enjoin Zurn from engaging in any conduct in violation of statute;

5.  Enjoin Zurn from denying Pex warranty claims for failed brass crimp fittings;

5.  Declaring the rights and obligations of the parties as prayed for; and

6.  Such other and further relief the Court deems just and equitable.

Dated: July 9th, 2007.

LARSON KING, LLP

By
Shawn M. Raiter (240424)
T. Joseph Snodgrass (231071)
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
Telephone: (651) 312-6500

SWENSON LERVICK SYVERSON TROSVIG
JACOBSON, P.A.
Derek A. Trosvig
Box 787 – 710 Broadway
Alexandria, MN 56308
Telephone (320) 763-3141

ATTORNEYS FOR PLAINTIFFS AND
PUTATIVE CLASS

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney

and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the party against whom

the allegations in this pleading are asserted.

Shawn M. Raiter (#240424)

1205441

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT B



Key









**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT C



METALLURGICAL LTD.                              Consulting Metallurgical Engineers

April 20, 2007

Mr. John C. Lervick
Attorney
Swenson Lervick Syverson Law Firm
710 Broadway
Alexandria, MN 56308

Subject: Evaluation Of Failed PEX Fittings
         Engel Metallurgical Project No. 582-002

Dear Mr. Lervick:

The initial evaluation of submitted PEX fittings that have failed has been complete. Twenty two failed PEX fittings were submitted for potential evaluation. It is reported that the fittings are from residential homes and supply potable water within the homes. This report is a summary of the initial evaluation results. All of the records and data will be kept on file at Engel Metallurgical. A more detailed report can be prepared at a later time if required.

**RESULTS:**

The twenty two fittings were visually examined. Some of the fittings have completely failed and others contain cracks that have leaked. Based on this first visual examination, one fitting, which had cracked and leaked, was selected for a more detailed initial evaluation. This fitting is identified as Engel Metallurgical specimen identification (SID) number 11295. The tag on the fitting is marked with: "Ron Draper Fairway Lk IDA" and "25".

The fitting, identified as SID 11295, is a brass 90° PEX elbow with serrated PEX tubing connections on both ends. The fitting has at least one major circumferential crack located at the inboard end of one of the serrated areas on the fitting. The crack can be visually observed on both the ID and OD surfaces.

The fitting was sectioned longitudinally which resulted in the crack being present in both halves of the fitting. The crack in one half of the fitting was mechanically opened to permit direct examination of the crack's fracture surface. The fracture surface was examined visually and with a scanning electron microscope. The portion of the fracture surface related to the crack exhibits a dark discoloration which extends completely through the wall of the fitting. The crack fronts indicate that

the crack is propagating from the ID surface toward the OD surface. The laboratory fracture surface resulting from the opening of the crack is bright in appearance. The fracture surface has a somewhat feathery appearance typical of stress corrosion cracking in brass alloys.

The energy dispersive spectroscopy (EDS) analyses of the laboratory fracture indicate that the fitting material is a copper-zinc-lead alloy. The alloy contains about 36% zinc, 6% lead, and the remainder copper. The EDS analyses of the fracture surface reveal significant losses of zinc in the alloy at the ID surface. The zinc content at the ID surface is about 10%.

The remaining half of the cracked fitting was mounted and metallographically prepared. The microstructure is typical of copper-zinc-lead brass alloys. The cracking in the fitting is mostly intergranular with some branching.

**DISCUSSION OF RESULTS:**

The result of the initial evaluation of one of the failed PEX fittings clearly indicates that the failure mode is stress corrosion cracking with some dezincification at the ID surface. High zinc alloys of the type used to make this fitting are very susceptible to this type of failure. This type of failure can readily occur in stressed alloys of this type when exposed to normal potable water. Low zinc, less than 15%, brass alloys are not susceptible to stress corrosion cracking in potable waters.

The root cause of this fitting failure is the improper selection of a high zinc alloy for these fittings.

Prepared by _Lester Engel_

Lester B. Engel, P.E.
Metallurgical Engineer

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT D

02/20/2007 16:35    320763    .7                SWENSON LERVIC    .TAL                    PAGE  02/03

May 17 06 04:00p    brian                           218-583-4389                    p.3

Mr. Mark Ullery/GISLASON & HUNTER, LLP                                June 29, 2005
Crane File No: T5199K                                                   Page 2 of 10

## BACKGROUND

A brass elbow which is part of a Zurn water piping system failed in a home owned by the Jane Harberts Irrevocable Trust. The home is located near Henning, Minnesota and water is supplied by a private well. The elbow failed on July 17, 2004 and caused water damage to the home.

The failed elbow was sent to Zurn for examination. In a letter dated June 2, 2005 they attributed the elbow failure to stress corrosion cracking (SCC) caused by "exposure to unusually aggressive water." On June 20, 2005 the failed elbow was submitted to Crane Engineering for examination.

## INSPECTION

Figure 1 shows the failed elbow and the attached PEX tubing as received. The black ring around the PEX tubing is the crimp ring which locks the PEX tubing onto the brass elbow. Figure 2 shows the markings on the failed elbow.

Figure 3 is photos showing a side view of the exposed end of the fracture. Figure 4 is photos showing an end view of the two fracture faces. Figure 5 is photos showing the mating fracture section inside the PEX tubing.

The fracture surfaces were examined using a Scanning Electron Microscope (SEM) equipped with an Energy Dispersive Spectrograph (EDS). Figures 6 and 7 show SEM images of the fracture surface. The fracture is predominantly intergranular with secondary cracks in the grain boundaries. This is typical of stress corrosion cracking in high zinc brasses.

Figure 8 shows the EDS spectrum obtained on a clean surface of the failed elbow. EDS is a semi-quantitative analytical technique and thus does not provide a precise check of the material composition. The technique does provide a relative measure of the concentration of elements in the specimen. This analysis shows that the particular alloy used to make the brass elbow contains a significant amount of zinc (Zn) and lead (Pb).

## ANALYSIS

Inspection of this failed elbow revealed clear indications of stress corrosion cracking (SCC). SCC requires a combination of mechanical stress and a liquid environment which contributes to crack growth. Some materials are much more susceptible to SCC than others. This is the case with brass alloys. Brass containing more than 15% zinc is susceptible to SCC while brasses with less than 15% zinc are resistant to SCC.

SEM/EDS analysis of the failed elbow shows that it contains over 15% zinc (see figure 8). Because of oxides and residues on the surface, the percentage of zinc shown in figure 8 (17.55%) is lower than the actual percentage contained in the brass alloy. Destructive testing would be needed to determine the exact percentage of zinc in this brass elbow. My experience has been that plumbing components such as this, which were manufactured in the Far East, have over 35% zinc in them. I have seen a number of SCC failures in those components.



02/20/2007  16:35   320763    7                    SWENSON LERVIC   TAL                    PAGE  03/03

May 17 06 04:00p    brian                          218-583-4389                            p.2

Mr. Mark Ullery/GISLASON & HUNTER, LLP                                    June 29, 2005
Crane File No: T5199K                                                     Page 3 of 10

Zurn alleges in their letter that unusually aggressive water caused stress corrosion cracking of this brass elbow. Water chemistry certainly is a factor in SCC; however, common well waters widely used in the Midwest have been shown to cause problems with high zinc brasses. SCC failures have occurred in city water systems with extensive treatment facilities. The water in this home is very likely comparable to the water supply in millions of homes.

The stress component of SCC comes from two sources: internal stresses in the component from machining and external stresses resulting from installation and the service environment. The design of this elbow joint used a crimp ring to secure the PEX tubing to the brass elbow. Crimping that ring during assembly of the piping system puts stress on the brass elbow. The failure occurred directly under the crimp ring. This is also the thinnest section of the brass elbow. The water pressure in the elbow also adds stress.

## CONCLUSIONS

Based upon my examination of the failed brass elbow, and my previous education and experience, I have reached the following conclusions:

1. The brass elbow failed due to stress corrosion cracking.
2. The primary cause of the failure is the high zinc content brass used to make the elbow. High zinc brasses should not be used for water piping components
3. The crimp design used to fasten the PEX tubing to the brass elbow creates significant stress in the brass elbow and this contributes to more rapid failure of the brass elbow.
4. The PEX system as designed by Zurn is intended for water distribution in homes; therefore it should be compatible with all types of water commonly found in the Midwest as well as other market areas.
5. The use of high zinc content brass and the crimp configuration are design defects which caused this failure.

I reserve the right to modify these conclusions should further information become available.

Respectfully submitted,

I hereby certify that this plan, specification, or report was prepared by me or under my direct supervision and that I am a duly Licensed Professional Engineer under the laws of the State of Minnesota.

Dave Kramer, P.E.
Metallurgical Engineer
License No.: 10526
davek@CraneEngineering.com

DK/hmt

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

# EXHIBIT E



131 Woodsedge Drive
Lansing Business & Technology Park
Lansing, NY 14882

Phone  607.533.7000 • Fax  607.533.9210
www.imrtest.com • E-mail imr@imrtest.com
Toll Free  888.464.8422

## Analysis of Brass Water Fittings

### IMR Report # 200408786

Prepared for:

Gary Runyan
Zurn PEX Plumbing & Radiant Heating Systems
Highway 11 East
Commerce, TX  75429

P.O. #:  34337
Date Received:  October 5, 2004
Fitting #:  1 - 6

Prepared by:

Neil Burns
Failure Analyst / Corrosion Engineer

Reviewed by:

George Wildridge
Manager – Failure Analysis

October 28, 2004

- All procedures will be performed in accordance with the IMR, Inc. Quality Manual, current revision, and related procedures; and the PWA-MCL Manual F-23 and related procedures.
- IMR, Inc. will maintain a quality system in compliance with the ISO/IEC 17025:1999.
- IMR, Inc. is accredited by the American Association for Laboratory Accreditation (A2LA), certificates # 1140.01 and #1140.02.
- IMR, Inc.'s reports shall apply only to the actual sample(s) tested.  Test results are not necessarily representative of the qualities of apparently identical or similar test or operating conditions.
- Any test report provided to the customer by IMR, Inc. shall not be reproduced or used in any advertisement/promotional device without written authorization from IMR, Inc.
- The recording of false, fictitious, or fraudulent statement or entries on this document may be punished as a felony under federal law

**EXHIBIT I**

## I) CONCLUSIONS

- The three field returned fittings probably failed due to stress corrosion cracking. Cracking initiated on the interior, water covered surface, and then progressed until service stresses caused overload of the remaining material. Some dealloying was noted on the cracked fittings, but this was mainly thought to be secondary attack and not a contributing factor to the failures.

- No aggressive species were detected using EDS, but some species known to cause stress corrosion cracking in brasses (e.g., ammonia) are not detectable by this method. Since the fittings were exposed to potable water the most likely aggressive species are ammonia, sulfates, nitrates, and nitrites.

- No cracks were detected on the new fittings. Some dealloying was noted on one of the new fittings (#5). The degree of attack on this fitting was considered superficial, and may have been due to prolonged exposure to an aggressive fluid during manufacture or storage.

- All six fittings had a chemical composition and microstructure consistent with C377 leaded brass. There were no material imperfections detected in or around any of the fracture regions.

- Residual and assembly stresses within the component should be assessed to determine if they are high enough to facilitate stress corrosion cracking. The presence of residual stress can be assessed by the Mercurous Nitrate Test (ASTM B154), and assembly stresses assessed by the Ammonia Vapor Test (ASTM B858). Both tests are offered by IMR Test Labs, if required.

## II) MATERIAL RECEIVED

Six brass fittings were received for evaluation. Three of the fittings had failed when exposed to potable water, and the other three fittings were new. The samples were identified as follows:

| Fitting # | Description |
|---|---|
| 1 | ½" x ½" PEX barb elbow, QE33X.  Manufactured in Plant G.  Material C37700 Brass. Installed in Larson Home by Erickson Plumbing.  In service between 1 and 2 years. |
| 2 | ¾" x ½" x ½" PEX barb tee, QT433X.  Manufactured in Plant D.  Material C37700 Brass.   Installed in Klemmenhagen Home by Ellingson Plumbing.   In service approximately 1 year. |
| 3 | ¾" x ¾" ½" PEX barb tee, QT443X.  Manufactured in Plant G.  Material C37700 Brass.  Installed in Delfiacco Home by Ellingson Plumbing.  Service time not known at this time. |
| 4 | ½" x ½" PEX barb elbow, QE33X.  Manufactured in Plant G.  Material C37700 Brass. From inventory, not installed. |
| 5 | ¾" x ¾" PEX barb elbow, QE44X.  Manufactured in Plant D.  Material C37700 Brass. From inventory, not installed. |
| 6 | ¾" x ¾" x ½" PEX barb tee, QT443X.  Manufactured in Plant G.  Material C37700 Brass.  From inventory, not installed. |

The chemical composition of all the fittings and the cause of the failure on were to be determined.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882

## III) METHODS

The following methods were used in this analysis:

1) Visual Examination
2) Fracture Surface Examination
3) Microstructure
4) Chemistry

## IV) RESULTS

### Visual Examination

All six of the as-received fittings can be seen in Figures 1 through 6, Fittings 1 through 3 were reportedly cracked. Cracking was noted on Fittings #1 and #2. Fitting #3 did not show any obvious cracking, although it exhibited noticeable green deposits (See Figure 7).  Copper corrosion products can be green in color.

The fracture faces generally displayed mechanical damage.  Therefore macroscopic fracture features were difficult to distinguish (See Figure 8). No clear crack path was apparent.

All three of the failed fittings were sectioned and their interiors examined for evidence of attack. Cracking was noted on the interior surface of Fitting #1, in the region of the fracture face (See Figure 9). The crack morphology was similar to that seen with stress corrosion cracking (See Figure 10). No cracks were apparent on the exterior of the fitting in the same location as the interior cracks (See Figure 11). Neither of the other failed samples displayed any cracks on their interior surfaces, however, they may have been too fine to detect macroscopically.

None of the new fittings displayed any evidence of corrosion, cracking, or surface imperfections.

### Fracture Surface Examination

Sections were removed from Fittings #1, #2, and #3. The sections were analyzed using a scanning electron microscope with energy dispersive spectroscopy (SEM/EDS). This instrument is equipped with a light element detector capable of detecting carbon and elements with greater atomic numbers (i.e., cannot detect hydrogen, helium, lithium, beryllium and boron).

The EDS spectrum obtained from the interior cracked surface on Fitting #1 (See Figure 12) shows the presence of copper, zinc, and lead, all of which are in the base metal. Carbon, oxygen, silicon, and calcium were also detected. No aggressive species, like chlorine, were detected. However, it should be noted that species like ammonia, which are known to cause stress corrosion cracking in copper alloys, cannot be detected using SEM/EDS.

The cracked region of Fitting #1 was ultrasonically cleaned to remove the deposit from the fracture face. The cracked interior surface of Fitting #1 can be seen in Figure 13. The interior wall of the tube was rough in appearance, which may have been due to corrosion attack (See Figure 14).

The fracture face towards the interior of the tube tended to display intergranular fracture features, which became more dimple-like in appearance towards the exterior wall (See Figures 15, 16, and 17). In other areas of the fracture face the intergranular-like features had progressed to the exterior wall, with the interior wall region exhibiting a corroded appearance (See Figures 18 and 19). Intergranular fracture features in copper alloys are often associated with stress corrosion cracking in near neutral solutions.

It appears that stress corrosion cracking had initiated on the interior surface, progressed through material, and the tube had fracture through eventual overload of the remaining load bearing wall material (producing the ductile features). Exposure of the fracture surface to the corrosive media has lead to attack of the face, with the greatest attack occurring on the fracture regions exposed for the longest period of time (i.e., the interior surface as shown in Figure 18.)

The partially opened crack in Fitting #1 was also examined (See Figure 20). This also displayed intergranular features, like those on the fracture face (See Figures 15 and 16), further suggesting that stress corrosion cracking had occurred.

The fracture surface of Fitting #2 was examined before and after ultrasonic cleaning. Due to corrosion damage no discernable fractographic features were apparent.


## Microstructure

A section was taken through all six fittings. The sections were mounted, polished to a 1 μm finish, and then examined optically at magnifications up to 1000X.

The cross-section through the fracture face of Fitting #1 can be seen in Figure 21. The main crack is seen at the top of the image, with two other cracks apparent below this, running from the interior surface towards the exterior (See Figures 22 and 23). Some dealloying was apparent on the interior surface and along the fine cracking apparent in the material (See Figure 24). The fine cracking is a further indication that stress corrosion cracking may have been the cause of the failure. The presence of dealloying along the crack path may be a secondary corrosion mechanism.

Fittings #2 and #3 also displayed fine cracking (See Figures 25 through 28). Cracks were in a similar location to that seen on Fitting #1. The interior surface the cracks appeared larger, and more open, and tended to close down towards the exterior surface .This suggests that the cracks ran from the interior surface to the exterior. The fine, branched crack morphology seen on the fittings is an indication of stress corrosion cracking. No pronounced dealloying was detected on the interior, exterior, or crack walls, although some corrosion damage was noted along the crack path. This damage was most likely secondary. No other cracks were detected on the sections from Fittings #2 and #3.

Examination of the three new fittings did not highlight any cracking or material imperfections that would have promoted failure in the location where it occurred on the three field returned parts. Fitting #5 did exhibit some slight surface dealloying, similar to that seen on Fitting #1 (Compare Figures 24 and 29). No dealloying was noted on Fittings #4 and #6. Fitting #5 was not as bright in appearance as Fittings #4 and #6, with a fluid-like mark particularly apparent on the interior (See Figure 30). This suggests that the dealloying on Figure #5 may be from prolonged contact with a fluid during manufacture or storage. EDS analysis of marked and unmarked areas (See Figure 31) did not show any discernable differences between the two regions. The slight surface dealloying would probably not make the sample more prone to stress corrosion cracking since Fitting #2 and #3 had fractured and did not show significant dealloying.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882

## Microstructure – continued

To reveal their microstructure all six samples were subsequently etched in acidified ferric chloride solution. The structure of all six samples was consistent with forged leaded brass (See Figure 32).

## Chemistry

All the samples were was subjected to chemical analysis. The results, tabulated below, indicate that they all meet the chemical requirements of UNS-C-37700 for a forging brass.

| Element | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 | Sample 6 | UNS-C-37700 |
|---------|----------|----------|----------|----------|----------|----------|-------------|
| Cu[1] | 60.33 | 59.73 | 59.33 | 59.68 | 60.12 | 58.96 | 58.0 - 61.0 |
| Fe | 0.27 | 0.22 | 0.26 | 0.26 | 0.26 | 0.29 | 0.30 Maximum |
| Pb | 2.06 | 1.99 | 1.87 | 1.99 | 2.14 | 1.84 | 1.5 - 2.5 |
| Zn | 36.82 | 37.49 | 38.04 | 37.55 | 37.11 | 38.50 | --- |
| OT | 0.52 | 0.57 | 0.50 | 0.52 | 0.38 | 0.41 | --- |
| Ag | 0.02 | 0.01 | 0.02 | 0.10 | 0.01 | 0.01 | --- |
| Al | 0.02 | <0.01 | 0.02 | 0.02 | <0.01 | 0.01 | --- |
| As | 0.01 | 0.01 | 0.01 | 0.01 | <0.01 | 0.01 | --- |
| Ni | 0.16 | 0.11 | 0.14 | 0.11 | 0.13 | 0.11 | --- |
| P | 0.01 | 0.01 | <0.01 | 0.01 | <0.01 | <0.01 | --- |
| Sb | 0.01 | 0.01 | 0.01 | 0.01 | <0.01 | 0.01 | --- |
| Si | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | <0.01 | --- |
| Sn | 0.28 | 0.41 | 0.29 | 0.25 | 0.23 | 0.26 | --- |

[1]Determined by difference.
Results in weight percent unless otherwise indicated.
Other elements tested (<0.01%) were: B, Be, Bi, Cd, Co, Cr, Mg, Mn, Se, Te, Ti, and V.
Method: CAP-046A (ICP-AES).

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882



Figure 1.      The as-received Fitting #1.



Figure 2.      The as-received Fitting #2.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882



Figure 3.      The as-received Fitting #3.



IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882

Figure 4.        The as-received Fitting #4.



Figure 5.        The as-received Fitting #5.



IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882

Figure 6.       The as-received Fitting #6.



Figure 7.       Deposits apparent on Fitting #3.



Figure 8.       The fracture face of Fitting #1 does not show a clear crack path.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882





IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882

Figure 9.      Fine cracking was apparent on the interior of Fitting #1.



Figure 10.     The fine cracking had a morphology resembling stress corrosion cracking.



Figure 11.     Examination of the exterior in the same location as the interior cracking did not highlight the presence of any imperfections. This suggests that the cracking progressed from the interior to the exterior.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882



Figure 12.    The EDS spectrum from the interior cracked face does not show the presence of any aggressive species.



Figure 13.    Cracking was apparent on the interior surface of Fitting #1. The morphology was similar to that seen with stress corrosion cracking.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882



Figure 14.     Corrosion attack was present on the interior surface of Fitting #1.



Figure 15.     Moving from the interior surface towards the exterior the fracture face changed from being intergranular in appearance, to exhibiting ductile dimples.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882



Figure 16.    Intergranular features were apparent on the crack face around the interior of the fitting.



Figure 17.    Ductile dimples were apparent towards the exterior surface of the fracture face.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882



Figure 18.    In some locations the intergranular appearance was across the whole wall thickness, with corrosion attack apparent on the interior surface. This would suggest that the part had cracked and then corrosion had occurred on the fracture face.



Figure 19.    Some areas of the fracture surface exhibited a corroded appearance.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882



Figure 20.    The fracture face of the partially opened crack on the interior surface of the component exhibited intergranular features, with some slight corrosion attack.



Figure 21    A cross-section through the fracture face of Fitting #1 shows cracking in the interior surface, with a ductile shear slip on the exterior of the fracture face.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882



Figure 22.    The cracking clearly runs from the interior surface towards the exterior.



IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882

Figure 23.    Crack-like features and dealloying are apparent on the interior surface, especially around the fracture region.





Figure 24.    The crack-like features appear to be associated with the dealloying. However, the dealloying is most likely secondary attack damage.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882





Figure 25.    The cross-section through the fracture face of Fitting #2 also showed cracks initiating on the interior surface. The crack morphology was similar to that seen on Fitting #1.



Figure 26.    The interior surface of Fitting #2 showed evidence of corrosion, with corrosion also apparent on the fracture face and along the crack.



Figure 27.    Cracking was apparent on Fitting #3.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882



Figure 27.    The majority of the cracking on Fitting #3 also appeared to run from the interior to the exterior. The crack was wider at the interior suggesting that this was the origin.



Figure 28.    The crack morphology was similar to that seen on Fittings #1 and #2, and was indicative of stress corrosion cracking.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY 14882



Figure 29.    Slight dealloying was apparent on both exterior and interior surface of Fitting #5.



Figure 30.    The interior of Fitting #5 displayed features resembling fluid marks (highlighted area). This was the only new fitting that exhibited dealloying, which may be related to the fluid marks.

IMR Test Labs • 131 Woodsedge Drive • Lansing, NY  14882



Figure 31.     The EDS spectra from fluid marked and free areas do not show any appreciable differences. No aggressive species were detected.



Figure 32.     The microstructure of the fittings is consistent with that expected for forged leaded brass.

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT F



**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT G

# ELLINGSON

## Plumbing, Heating & A/C

2510 BROADWAY STREET SOUTH
ALEXANDRIA, MN  56308
320-762-8645  FAX 320-762-8054
www.ellingsons.com

320 INDUSTRIAL DRIVE, PO BOX 157
FREEPORT, MN  56331
320-836-2117   FAX 320-836-2836
www.ellingsons.com

September 22, 2006

Chuck Ferguson
Minnesota Attorney General's Office
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN  55101

Dear Chuck:

In 2003 Ellingson Plumbing, Heating & A/C began installing Zurn Pex Pipe and brass fittings in residential and commercial applications. Approximately six months later the Zurn fittings began to fail. Initially we assumed we had a bad batch of fittings, but the fittings continued to fail. We contacted the manufacturer's representative, David Sackrison, of Marketing Service Group. He lined up a conference call on September 14, 2004 between Carl Nikolia from Zurn, Dave Sackrison and myself. Mr. Nikolia stated to not worry about the costs because Zurn has a 20 year warranty. He also suggested we should change to their plastic fittings. For the next year Zurn was paying our claims for the bad fittings. Once this turned into an epidemic, Mr. Nikolia called and told us that our water was causing the problems with their fittings and Zurn would no longer take care of the claims and customers are on their own. We now have over one hundred thousand dollars worth of damage and it is continuing. We asked Mr. Nikolia to send us some proof backing up his claim that our water was causing the fittings to fail. He stated he would send us the proof, but we have never received anything from him on this. We sent Zurn fittings to two different metallurgists and both have verified that the water was not causing the failure, but the process used to make the brass fittings is causing the failure.

We started to turn the complaints and claims into our insurance company because our customers feel we should be responsible. Our insurance company won't cover it because it is a manufacture defect, not negligence on our part. We are not alone in this problem, many plumbers in Minnesota and elsewhere are having the same

problems, which is affecting many homeowners.   We now have 150 claims with new ones being added each week.  We are now installing a bronze fitting manufactured by Viega.  We have installed thousands of these fittings without failure.

Please initiate some action to get this problem resolved.  I have also included copies of notes taken during conversations about these problems.  Thank you for your help in this matter.  If you have any questions please contact me at (320) 762-8645.

Sincerely,

Tom Hills
Executive Vice-President of Operations
Ellingson Plumbing, Heating & A/C

Cc: Dave Sackrison, Marketing Service Group
    Jim Peterson, Plumbing Supervisor-State of Minnesota
    Randy Ellingboe, Engineering Program Supervisor-State of Minnesota
    Jory Isakson, Minnesota PHCC

RECEIVED

2006

ATTORNEY GENERAL

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

# EXHIBIT H

# Plumber Alert

Due to recent incidence of catastrophic failure in **ZURN BRASS PEX FITTINGS** in the Lake of the Ozarks region, Ribacks recommends use of the alternative plastic fittings for all pex installations.

The manufacturer contends that water conditions in the area result in dezincification of the brass fitting leading to failure.  To date all reported failures in Ribacks marketing area have occurred within 2 years of installation and all have occurred in the Lake area.

Failure of these fittings **MAY RESULT IN SUBSTANTIAL DAMAGE.**

For these reasons Ribacks **WARNS** our customers that continued use of the **BRASS PEX FITTINGS** is at their own risk.  The alternative plastic fittings are in stock at Ribacks and are recommended for use in all our marketing areas.

Ribacks will not assume any liability for failure of these **ZURN BRASS PEX FITTINGS** due to dezincification.

Dated_____



**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

# EXHIBIT I



**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

# EXHIBIT J

# IDAHOBUSINESSREVIEW

## Idaho Business *News*

## Faulty plumbing fittings found in Valley homes

**Posted: Monday, September 24, 2007**

At least one Idaho contractor has had problems with fittings for plumbing systems failing in Treasure Valley homes.
"They are snapping completely," said Brian Schneider of RidgeWay Industrial, a Meridian mechanical and plumbing contractor.

At issue are allegedly faulty fittings for cross-linked polyethylene, or PEX, plumbing systems manufactured by Zurn Pex. Homes require just one PEX system to distribute water, but a single PEX system can contain 10 to 25 brass fittings, Schneider said.

RidgeWay has verified that two of its end customers' homes developed leaks in the last few weeks due to faulty fittings made by Zurn.

To have two happen that close together concerns Schneider.

Ridgeway is investigating two more claims to see if they had the same cause, he said. He has no way of knowing how widespread the problem is in the Treasure Valley because Zurn has not been cooperative, he said, but it appears to be one bad run.

If one of RidgeWay's end customers gets a leak after the warranty period has passed, Schneider said RidgeWay will look to see if the system includes Zurn fittings and if it does, they will submit the claim to insurance.
RidgeWay has eliminated Zurn's products from its inventory and is using PEX products made by Zurn's competitors, which Schneider said have not been problematic.

The company is talking about changing over entirely to other systems that have no joints or fittings, which it currently makes available as an upgrade.

RidgeWay is reluctant to use those in all buildings, however, because they can cost $1,000 to $1,500 more.

RidgeWay has used Zurn's products in 300 to 400 homes and doesn't know how many may be affected. "Plus that's just us," he said. He's spoken to insurance adjusters who claim they've seen the problem in homes other Treasure Valley plumbing contractors have worked on.
Zurn claims the problems are due to aggressive water, but Schneider calls this claim dubious. "Our first fitting that broke had only been in four months," he said.

Zurn is fighting a class action lawsuit filed in Minnesota, where the majority of the failing PEX systems have occurred.

The lawsuit involves claims from across the country; one plumber has over 200 claims, according to attorney Shawn Raiter. Some claims exceed $100,000 in damage, he said.
RidgeWay is the only Idaho plumber involved in the class action suit so far, Raiter said.

### Class action suit

Zurn marketed its fittings with a 25-year warranty covering damages that result from leaks or failures in the plumbing system, according to the class action suit filed in Minnesota federal district court. However, many of the fittings have been failing after less than a year of use, according to the lawsuit.

The suit accuses Zurn of consumer fraud, negligence, false advertising, breach of warranty and unlawful and deceptive trade practices.

Hundreds, if not thousands, of the fittings have been failing, which the plaintiffs claim is due to the materials and design of the fittings.

The fittings use a brass alloy with a high zinc content – Raiter said normal water can leach the zinc out, leaving weak pockets – and a crimp-fitting design that when used in concert with the high zinc content can lead to stress corrosion cracking, Raiter said. The plaintiffs also claim the fittings were not properly tested in real-world situations. Competing products have not had the same problems, according to the suit.

Zurn began to hear about problems with the fittings in at least 2002, and in 2005 it acknowledged it had seen increased failure rates and cracking. It stopped selling the brass fittings in Minnesota that year, though they were still available in other states.

Zurn is refusing to honor warranties because it claims the failures are due to "corrosive" or "aggressive" water, and it told plaintiffs Denise and Terry Cox that those damages were excluded by limitations and disclaimers in the warranty.

But the plaintiffs state they never received a copy of the warranty limitations in the bag with the product when it was sold to them, so any limitations are invalid by Minnesota state law and other states' laws.

The suit alleges that Zurn adopted a company policy not to pay for customers' damages in full because it was cost-prohibitive.

In Zurn's reply to the lawsuit, it denied that it was at fault, said the warranty disclaimers were in the installation manual provided to plumbers, and reiterated its claims that the warranty would not cover corrosive water conditions.
***
To contact the author of this story, send e-mail to:  lora.volkert@idahobusiness.net.

© 2007 Idaho Business Review
Idaho Business Review 855 W. Broad Street, Suite 103 Boise, ID 83702
Phone 208.336.3768 | Fax 208.336.5534

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT K

## Tom Fleck

| | |
|---|---|
| **From:** | Morgan, Ron [Ron.Morgan@zurn.com] |
| **Sent:** | Tuesday, June 26, 2007 12:48 PM |
| **To:** | Whitaker , Rick |
| **Cc:** | Johnson, Trevor; Sauer, Patrick; MSG - Tom Fleck; dsackrison@mktsvc.com; Nalley, Joann |
| **Subject:** | RE: Minnesota WHolesale orders |

I believe an explanation letter is being drafted.
Yes, we would accept the return of re-saleable Zurn product without a handling charge.
At this point all potable brass products are affected including sweat adapters,valves and drop ear elbows.

---

**From:** Whitaker , Rick
**Sent:** Monday, June 25, 2007 11:41 AM
**To:** Morgan, Ron
**Cc:** Johnson, Trevor; Sauer, Patrick; MSG - Tom Fleck; 'dsackrison@mktsvc.com'
**Subject:** RE: Minnesota WHolesale orders

Ron - Tom & Dave of MSG have started making the notification calls this morning regarding the decision
to stop selling brass fittings & valves in the State of Minnesota, and the wholesalers say they need a letter of
explanation from Zurn PEX to give to their plumbing contractor customers.  Also, some requests & questions
have come up that need to be answered:
   1 - Can they return existing inventory of Brass Fittings & Valves for credit?
   2 - Can they take back the contractor inventories to be returned for credit?
   3 - Are all QickSert Brass Fittings & Valves affected by the stop sell including sweat adapters & valves?
Please advise.
Thanks.
Rick

---

**From:** Morgan, Ron
**Sent:** Monday, June 25, 2007 10:52 AM
**To:** Whitaker , Rick
**Subject:** FW: Minnesota WHolesale orders

FYI

---

**From:** Morgan, Ron
**Sent:** Friday, June 22, 2007 4:10 PM
**To:** Sauer, Patrick
**Cc:** Johnson, Trevor
**Subject:** Minnesota WHolesale orders

This email and any attachment are confidential and may be legally privileged.
If you are not the intended recipient, please notify the author by replying to
this email message, and then delete all copies of the email on your system.
If you are not the intended recipient, you must not disclose, distribute, copy,
print, or use this email in any manner.

Email messages and attachments may contain viruses. Although we take
precautions to check for viruses, we make no assurances about the absence
of viruses. We accept no liability and suggest that you carry out your own
virus checks.

000266

## Tom Fleck

| | |
|---|---|
| **From:** | Morgan, Ron [Ron.Morgan@zurn.com] |
| **Sent:** | Tuesday, June 26, 2007 9:37 AM |
| **To:** | Whitaker , Rick |
| **Cc:** | MSG - Tom Fleck |
| **Subject:** | Brass |

Tom called a few minutes ago and I apologize for not getting you both a note off before now, even though nothing has changed, other than heating items are not included in this restriction.
Trevor, Gary Runyan and I met yesterday to discuss the issues with sweat adapters,valves and drop ear elbows. Until we arrive at some alternatives or redefinition of the corporate directive of not shipping brass fittings into the State of Minnesota I am continuing to instruct our Sales/Service personnel to enter only the non brass items on orders as the orders come in.
I have attached an updated open order file. The items hi-lited in yellow are the brass items that will not be shipped. You will also notice there are some non-MSG orders in the file,namely LaSalle Bristol, but I will be sending this list to Elkhart so they needed to be included.
I will let you know as soon as I know any changes.

This email and any attachment are confidential and may be legally privileged.
If you are not the intended recipient, please notify the author by replying to this email message, and then delete all copies of the email on your system.
If you are not the intended recipient, you must not disclose, distribute, copy, print, or use this email in any manner.

Email messages and attachments may contain viruses. Although we take precautions to check for viruses, we make no assurances about the absence of viruses. We accept no liability and suggest that you carry out your own virus checks.

000267

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

# EXHIBIT L

```
 1         IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MINNESOTA

 3   DENISE AND TERRY COX,

     ON BEHALF OF THEMSELVES

 4   AND ALL OTHER SIMILARLY

     SITUATED,

 5

         Plaintiffs        NO. 07-3652 (ADM/RLE)

 6

     VS.              Class Action

 7

     ZURN PEX, INC., AND ZURN

 8   INDUSTRIES, INC.,

 9      Defendants

10

11   ORAL AND VIDEOTAPED DEPOSITION OF TREVOR JOHNSON,

12     AS CORPORATE REPRESENTATIVE FOR ZURN PEX, INC.

13

14

15

16

17      ORAL AND VIDEOTAPED DEPOSITION OF TREVOR JOHNSON,

18   AS CORPORATE REPRESENTATIVE FOR ZURN PEX, INC., produced as

19   a witness at the instance of the Plaintiffs, and duly

20   sworn, was taken in the above-styled and numbered cause on

21   the 30th day of January, 2008, from 8:55 a.m. to 11:43 p.m.,

22   before Linda A. Kaiser, CSR in and for the State of Texas,

23   reported by machine shorthand, at the offices of Settle

24   Pou, 3333 Lee Parkway, 8th Floor, Dallas, Texas, pursuant

25   to the Minnesota rules of civil procedure.
```

COPY

Trevor Johnson - 1/30/2008
**Denise and Terry Cox, et al v. Zurn Pex, Inc., et al**

---

Page 14

1 can -- if it's all right, because they're both defendants

2 in the case.  But Zurn decided to stop delivering brass

3 products into the State of Minnesota, correct?

4    **A.  That is correct.**

5    Q.  And the first topic we're going to talk about,

6 then, as I said, is the individuals, groups or entities

7 involved in that decision.

8    **A.  Okay.**

9    Q.  Okay?  So can you tell me what individuals were

10 involved in that decision, please?

11    **A.  That encompasses a lot of -- a lot of people and**

12 **a lot of time.  It wasn't really one factor that made us**

13 **stop selling in Minnesota.**

14       **We -- back in the end of '04, beginning of**

15 **'05, we gave the plumbers another option with the poly**

16 **alloy or plastic fittings for areas that had aggressive**

17 **water.  So over those years, pardon me, we were promoting**

18 **that where there might have been corrosion problems.**

19       **We also had, pardon me, the manifold system.**

20 **So over those years, there were quite a few people involved**

21 **in those decisions, and pushed the plastic fittings.**

22    Q.  Let's try to go at it this way.  When did Zurn

23 make a decision to stop delivering brass into the State of

24 Minnesota?

25    **A.  That would have been June 22nd of '07.**

---

Page 15

1    Q.  June 22, 2007, a decision is made to stop

2 delivering brass products for potable plumbing systems into

3 the State of Minnesota?

4    **A.  That is correct.**

5    Q.  And while I understand your testimony that a lot

6 of individuals might have been involved in that decision,

7 let's try to break it down.

8       I presume that you're going to have a number

9 of people involved on the technical side of things.  The

10 Gary Runyans, Mark Samples --

11    **A.  Sure.**

12    Q.  -- of the world, who have more of a technical

13 view of the product and how it's used and where it's used.

14       Then you have people on the business side as

15 well.  The Trevor Johnsons, the Pat Sauers --

16    **A.  Sure.**

17    Q.  -- and others, correct?

18    **A.  Uh-huh.**

19    Q.  That's yes?

20    **A.  Yes.**

21    Q.  You have to remember that's one rule, you have

22 got to say yes or no, if you can, please.

23       So let's start with, I presume that the

24 decision to stop delivering brass into Minnesota is made

25 primarily from the business side of the operation; is that

---

Page 16

1 true?

2    **A.  All decisions are business based, I would say,**

3 **yes.**

4

5

6

7

8 *Redacted*

9 *Pursuant to*

10

11

12

13

14 *Protective Order*

15

16

17

18

19       The other thing -- pardon me -- is we had a

20 disproportional number of claims in Minnesota.

21       And then the final thing that really made us

22 stop selling was word of the lawsuit coming down.

23       So those three things kind of determined our

24 decision.

25    Q.  So when you say, our decision, were you involved

---

Page 17

1 in the decision?

2    **A.  Yes.**

3    Q.  And you are -- what is your position again at

4 Zurn?

5    **A.  General manager.  Vice president, general**

6 **manager.**

7    Q.  Vice president, general manager of Zurn PEX,

8 Inc.?

9    **A.  Zurn PEX, yes, sir.**

10    Q.  And Zurn Pex, Inc. is the entity that

11 manufactures and sells PEX -- brass Pex fittings for

12 potable water systems?

13    **A.  We manufacture the tubing, we buy all of the**

14 **fittings.**

15    Q.  Got It.

16       You then market them collectively as the

17 Zurn PEX system?

18    **A.  Yes, we do.**

19    Q.  And as the general manager and vice president of

20 Zurn PEX, Inc., are you the top of the food chain at Zurn

21 PEX, Inc.?

22    **A.  Yes, I am.**

23    Q.  Who else, then, within your management structure

24 at Zurn PEX, Inc. was involved in that ultimate decision?

25       Right now, I just want to know about the

---

Trevor Johnson - 1/30/2008
Denise and Terry Cox, et al v. Zurn Pex, Inc., et al

| Page 26 | Page 28 |
|---|---|

Page 26

1    A.  **Correct.**

2    Q.  And just so I understand your distribution system

3  for those folks, I presume that you don't deliver straight

4  to the Home Depot in Eagan, Minnesota?  I presume they must

5  have some distribution network.

6    A.  **No, Home Depot, we deliver direct to the store.**

7    Q.  You do?

8    A.  **Yeah.**

9    Q.  Okay.  So they place orders with you and you ship

10  them right to the particular store?

11    A.  **Correct.**

12    Q.  Okay.  So this decision to stop delivering into

13  Minnesota was made by you, Carl Nicolia, Patrick Sauer,

14  correct?

15    A.  **Correct.**

16    Q.  And was the decision actually made on June 22,

17  2007?

18    A.  **There or within a couple of days of that.**

19    Q.  And you had been looking at this issue for some

20  time before that, correct?

21    A.  **Without a doubt, yes.**

22    Q.  Why does the decision finally get made at the end

23  of June in 2007?

24    A.  **Well, that's kind of the three things leading up**

25  **to that, you know.**

Page 27

1       We were going -- from really the end of '03,

2  we started doing a lot of analysis, as you've seen in the

3

4

5

6

7

8

9

10

11

12

13

14

15

16

*Redacted Pursuant to Protective Order*

17       There was some push back from especially the

18  traditional side.  A lot of them had lived through the

19  polybutylene days, and they saw the plastic, and, you know,

20  this is much heavier, brass, much more substantial.  You

21  know, the plastic fitting weighs less.  But it took time to

22  convert them over.

23       And then also we had, like I said, a

24  disproportionate amount of claims in Minnesota compared to

25  the rest of the country.  Even though the vast majority

Page 28

1  performed as intended, the ratio was much higher in

2  Minnesota.

3       So then, when we got news that there was

4  also a lawsuit coming down, that was kind of like, all

5  right, guys, we've tried to convert you over the years; you

6  know, where you have aggressive water, you need to be using

7  these fittings.

8       They weren't converting completely.  So at

9  that time, we're like, it's time to stop.

10    Q.  Did you have word of this lawsuit coming down?

11    A.  A lawsuit, that's all we heard.

12    Q.  Okay.  How did you hear that?

13    A.  I'm not exactly sure.  It was through, I guess,

14  the grapevine.

15    Q.  So was it through your distributor network, was

16  it through your --

17    A.  Very well could have been.  I don't know if it

18  was Patrick or Carl who really got word -- or wind of

19  it, I should say.

20    Q.  But they knew that something was coming as it

21  related to --

22    A.  Well, we had the letter, you know, that we had to

23  reply to the Attorney General.  We had the letter before

24  that that we had to reply to the Department of Labor, and I

25  forget what -- there's labor and something.

Page 29

1    Q.  Industry.

2    A.  Industry.  And, you know, we knew there were some

3  things going on in Minnesota.

4    Q.  So part of the decision to stop delivering in

5  Minnesota is kind of a liability decision-making process,

6  correct?

7    A.  Sure.  We don't have that type of liability built

8  into our cost structure.  And what we'd seen is, in

9  Montana, we were having some failures.

10       We finally convinced them to just go on

11  themselves, say, okay, we're going to the CR, and our

12  problems stopped.  So we knew this product would work in

13  those areas of aggressive water.

14    Q.  How long had you been working on the distributors

15  or the plumbers in Minnesota to switch over to CR?  Was it

16  since the '04/'05 time frame, when you had the poly alloy

17  fittings?

18    A.  I'd say, spring of '05, we started the push.

19    Q.  How did you do that, in terms of delivering that

20  message to the field?

21    A.  We have a Qick market intelligent call every

22  month.  The first week of the month is the east region, the

23  second week is the central region, and the third week is

24  the west region.

25       And we have all of our area managers on

**Trevor Johnson - 1/30/2008**
**Denise and Terry Cox, et al v. Zurn Pex, Inc., et al**

## Page 62

1  other depositions.

2  But the general subject matter is --

3  MR. RAITER:  They say what they say.

4  MR. CONNOLLY:  Right.

5  **A.  Right.**

6  Q.  So the world of investigation and analysis that

7  Zurn did is what I'm trying to get at here.

8  So we know we have these outside

9  consultants, Giacomini, MES, IMR, these other labs.  These

10  have been produced to us in the case.  Peter Cartwright, we

11  know that, was involved in the analysis to stop selling

12  brass in Minnesota.

13  You had your own internal analysis done by

14  Gary Runyan, or at least some of these fittings analyses,

15  Gary Runyan and Mark Samples.

16  Did Zurn do any independent testing of its

17  own, stress testing, corrosion testing, composition testing

18  of fittings, to try to determine why the fittings were

19  failing in Minnesota?

20  MR. CONNOLLY:  Just -- I'm going to object

21  to it so far as what I just said.  It's beyond the scope.

22  It's already been addressed.

23  But insofar as you can, go ahead and answer.

24  **A.  Besides the firms that we have just been**

25  **mentioning, you mean?**

## Page 63

1  Q.  Right.

2  **A.  Not to my knowledge, no.**

3  Q.  And what I'm trying to figure out is, I can see

4  that there was a fair amount of testing done by outside

5  firms.  Okay?  Right?

6  **A.  Correct.**

7  Q.  I can see that when a fitting comes in on a

8  warranty claim, Mark Samples or Gary Runyan do a visual

9  analysis of the fitting, right?

10  **A.  Correct.**

11  Q.  What I'm trying to figure out is whether Zurn did

12  any internal engineering type testing or analysis of the

13  cause of these failures that it used as part of its

14  decision to stop selling the fittings in Minnesota.

15  **A.  We really aren't metallurgists, so we rely on**

16  **specialty outside firms for those type of analyses.**

17  Q.  So I take it the answer to mean -- to be that you

18  didn't do any internally, other than these visual reviews

19  of the fittings that came in on a failure claim?

20  **A.  We run all of the ASTM tests except for the**

21  **chlorine at our facility.  So anything that's in the**

22  **protocols, we can run at our facility; and we do, on an**

23  **ongoing basis.**

24  But as far as composition of brass or things

25  like that, we don't produce any of that, so we really don't

## Page 64

1  **have the need for that type of equipment.**

2  Q.  So no testing done on stress corrosion cracking,

3  for example, as it relates to the cause of failures in

4  Minnesota?

5  **A.  Internally?**

6  Q.  Correct.

7  **A.  No, sir.**

8  Q.  No testing done on de-zincification as it relates

9  to the cause of failures in Minnesota?  And again, internal

10  testing or investigation.

11  **A.  No, sir.  We rely on the outside labs for those.**

12  **And our suppliers.**

13  MR. CONNOLLY:  Tell me when it's a good time

14  for a break.

15  MR. RAITER:  We can take a break right now.

16  It's been an hour.

17  THE VIDEOGRAPHER:  Off the record at 10:01

18  a.m.

19  (Recess 10:01 to 10:08.)

20  THE VIDEOGRAPHER:  On the record at 10:08

21  a.m.

22  Q.  Mr. Johnson, when we broke, we were talking about

23  the investigation analysis Zurn used to reach the decision

24  to stop selling brass Pex fittings in Minnesota.  We talked

25  about some of the outside consultants, and I just want to

## Page 65

1  make sure I got the universe covered here.

2  Other than Peter Cartwright, the IMR, MES,

3  AAFDW (sic), Giacomini entities, did Zurn rely on any

4  testing or investigation done by any other third parties in

5  reaching the decision to stop selling brass Pex fittings in

6  Minnesota?

7  **A.  Not to my knowledge.**

8  Q.  There weren't any other consultants, experts,

9  state agencies, regulatory boards, standards committees,

10  anything like that that you're aware of --

11  **A.  Not to my knowledge.**

12  Q.  And you've done an investigation of this topic,

13  correct?

14  **A.  Yes.**

15  Q.  Talked with all those individuals you told me

16  talked to earlier today -- withdraw the question.

17  You spoke with all these other individuals

18  that you listed as people you consulted with to prepare for

19  this deposition, and none of them had any other entities or

20  organizations to tell you about as it regarded topic number

21  three, correct?

22  **A.  Correct.**

23  Q.  Did Zurn internally do any analysis of the

24  failure rate of the fittings in Minnesota before it decided

25  to stop delivering brass fittings into the State of

Trevor Johnson - 1/30/2008
Denise and Terry Cox, et al v. Zurn Pex, Inc., et al

## Page 66

1  Minnesota?

2        THE WITNESS: I'm sorry, could I hear that

3  again?

4        (Record read.)

5     A.  Yes, that's how we knew it was drastically higher

6  than the rest.

7     Q.  And what kind of analysis did Zurn do?

8     A.  Just reported type claims.

9     Q.  Was it looking solely at the number of claims

10  that it received, or did --

11     A.  In proportion to the number of fittings sold.  I

12  mean, still the vast majority performed as intended.

13     Q.  And this analysis that you're talking about, did

14  someone type up a report or an e-mail saying, we've sold

15  this many fittings, we've had this many reported failures?

16  Did they do a PowerPoint, did they do a spreadsheet?

17     A.  I think, in one of Lillian's letters, there was

18  some numbers about failures to fittings sold between 2003

19  to 2006.  So it was that type of analysis that we used.

20     Q.  And who did that?

21     A.  Who actually did the analysis?  It would probably

22  be Mark Samples.

23     Q.  Do you believe that there were reports done or an

24  analysis, either in an e-mail, a memo, PowerPoint, where

25  you looked and you said, gee, as we're looking at

## Page 67

1  Minnesota, we think we've sold about this many fittings,

2  we've seen this many claims in that state.  If we compare

3  it to other states or other areas, this sticks out, that

4  kind of a comparative analysis?

5     A.  And Mark Samples mentioned that in his

6  deposition, that he had done an analysis.

7     Q.  He also talked about a map where he was putting

8  on failure locations.

9        Was that a part of the analysis to stop

10  selling fittings in Minnesota?

11     A.  Not part of the analysis to stop selling, no.

12     Q.  But you are aware that there is such a map?

13     A.  Yes.

14     Q.  Have you seen it?

15     A.  Many months ago.

16     Q.  And was there some analysis separate than the map

17  that he talked about that you're aware of, as you prepared

18  for today, to try to answer the question that we have, or

19  at least the topics in number three, which is what

20  investigation analysis was done?

21     A.  Well, I know Mark was doing some analysis on, you

22  know, fittings sold versus claim response, by state.

23     Q.  Do you know that from his deposition, or do you

24  know that separate and apart from his deposition?

25     A.  I knew he was working on something.  But once I

## Page 68

1  read his deposition, it was confirmed that he was working

2  on that.

3     Q.  Was he doing -- was he working on that before

4  this lawsuit started?

5     A.  Timingwise?  I would imagine so, yes.

6     Q.  This lawsuit started the first part of August of

7  2007.

8     A.  August 2000 -- yes, he was working on it before

9  that.

10     Q.  And so, it was --

11     A.  Wait.  He tracked -- when he was in QC, he

12  started a tracking system for all of them, for all claims

13  that came in.

14     Q.  And that was part of his normal job?

15     A.  Uh-huh.

16     Q.  That's yes?

17        MR. CONNOLLY:  Yes.

18     A.  Yes, it was.

19        THE WITNESS:  I was drinking water.

20        MR. RAITER:  Let's mark this.

21        (Exhibit No. 3 marked.)

22     Q.  This is a document -- unfortunately the Bates

23  label is cut off on the copy, I think it's ZP 011613 --

24  produced by Zurn in this case.  It's an e-mail dated March

25  6th, 2006.  You're listed as a recipient.  It's from Carl

## Page 69

1  Nicolia.

2        MR. CONNOLLY:  For what it's worth, it might

3  be helpful, mine has the full number on it.

4        Do you want me to replace that one on the

5  record?

6        MR. RAITER:  Yeah, why don't we do that.

7        MR. CONNOLLY:  You can give me that one

8  there.  That one is a cleaner copy.

9        MR. RAITER:  Mine is cut off.

10        MR. CONNOLLY:  I just thought that makes it

11  easier.

12        MR. RAITER:  Thank you.

13     Q.  So that is ZP 011613, is the Bates stamp on that

14  document.  And you're listed as a recipient on this.

15        The subject is, learnings from commercial

16  brass corrosion issues, importance is high.  Carl says:

17  Team, in talking with Al Becker and Bob Saadi --

18     A.  Saadi.

19     Q.  -- the flush valve operation has had some

20  experience in stress corrosion cracking and

21  de-zincification.  Please call Marc Bloch to discuss the

22  findings.  And then gives his number.

23        And says, Marc -- I believe related to Marc

24  Bloch -- any insight you can add would be appreciated.

25        Do you see that?

Trevor Johnson - 1/30/2008
Denise and Terry Cox, et al v. Zurn Pex, Inc., et al

## Page 70

1    A. Yes, I do.

2    Q. Do you remember that, at least as of March 2006,

3  you folks were consulting with other Zurn entities to -- or

4  divisions to consult with them about stress corrosion

5  cracking and de-zincification issues?

6    A. It does appear that way, yes.

7    Q. Do you remember any of that, as you sit here

8  today?

9    A. I do not.

10    Q. Do you remember whether there were any

11  communications between those divisions and people from your

12  entity, like Gary Runyan, Mark Samples, about stress

13  corrosion cracking, de-zincification?

14    A. I'm sure Mark followed up with -- Mark Samples

15  followed up with Marc Bloch.

16    Q. You don't know whether there was anything in

17  writing, whether there were e-mails, memos --

18    A. That is correct.

19    Q. -- PowerPoints, correct?

20        So as part of your analysis, though, in

21  reaching the decision on June 22, 2007 to stop selling

22  brass into Minnesota, did you take this kind of information

23  into account, that whatever you received from other

24  entities --

25    A. Personally, I did not, no.

## Page 71

1    Q. Do you know whether Carl Nicolia did?

2        MR. CONNOLLY: Object to the form.

3    Q. I'm sorry, Carl was involved in the decision?

4    A. He was. But I -- I do not know if he talked to

5  Marc Bloch.

6    Q. You can't -- as you sit here today, you can't

7  tell us anything more about this issue, other than --

8    A. This issue, no, sir.

9    Q. -- this e-mail?

10        Let's just -- we're jumping on top of each

11  other a little bit.

12        As you sit here today, you can't tell me

13  anything more about this issue about consulting with the

14  commercial brass entity within Zurn about stress corrosion

15  cracking and de-zincification?

16    A. That's correct.

17        (Exhibit No. 4 marked.)

18    Q. This is Exhibit Number 4. This is a memo dated

19  May 9, 2007 to Zurn PEX sales representatives. You're

20  listed as a cc recipient of it. It's Bates 00256 from MSG

21  and Cox 000331.

22        You've seen this document before today, sir,

23  right?

24    A. Yes, I have.

25    Q. And in this document -- I don't need to read the

## Page 72

1  whole thing -- Zurn communicates to its sales

2  representatives that your direction was to convert your

3  brass fittings to the QuickSert CR poly fittings starting

4  immediately.

5        That's at the top of the third paragraph.

6  Do you see that?

7    A. That is correct.

8    Q. So this is part of that strategic planning

9  process that we've already talked about, correct?

10    A. Yes, it is.

11    Q. And some of the reasons for converting that brass

12  business over to the plastic business are set out in this

13  memo, correct?

14    A. Correct.

15    Q. And the two really that are talked about at the

16  top of the document in the first paragraph are, one, the

17  price volatility of the copper and the copper alloys,

18  right?

19    A. Correct.

20    Q. And two, the corrosion related problems you were

21  seeing with brass fittings in certain areas of the country,

22  correct?

23    A. That is correct.

24    Q. Now, as of this point, in May 9, 2007, you'd seen

25  an increased proportion of failures in Minnesota, but you'd

## Page 73

1  seen some pockets elsewhere as well?

2    A. That is correct.

3    Q. You mentioned Montana earlier, correct?

4    A. Correct.

5    Q. Kind of the Kalispell area, you were having some

6  problems, right?

7    A. That is right.

8    Q. And there had been some problems in other

9  locales, Southern Missouri, for example?

10    A. Okay.

11    Q. That doesn't -- well, why don't I just ask you

12  this: Other than Minnesota and Montana, by May 9 of 2007,

13  can you identify other areas of the country in which you've

14  seen some increased concentration of failures?

15    A. Michigan was one. I'd probably say North

16  Carolina was another. But you've got to remember, North

17  Carolina is -- is a huge Pex market. I mean, they were

18  really the first ones to adopt it, so... We sell a lot

19  into that area.

20        But those are the main ones that I would

21  say.

22    Q. By May of 2007?

23    A. Well, I mean, there were other areas, other

24  pockets that it popped up, but those are -- I guess the

25  Minnesotas and the Montanas and the Michigans are the ones

Trevor Johnson - 1/30/2008
Denise and Terry Cox, et al v. Zurn Pex, Inc., et al

## Page 74

1 that stick out to me.
2    Q.  As being more concentrated levels of failure?
3    A.  More concentrated.  But also, say, Montana, we
4 actually, you know, resolved a lot of our issues up there
5 by converting to the CR.  So, that was one of our initial
6 focuses up there.
7    Q.  And when did you convert to CR in Montana?
8    A.  I don't know the exact time line.  My best guess
9 would be, say, middle of 2005.
10    Q.  So you'd seen some failures in Montana before
11 2000 -- before the middle of 2005, and you responded to
12 that by saying, hey, start using our plastic instead?
13    A.  Correct.
14    Q.  And I assume that Zurn mobilized its sales force
15 in some way to go out and make this conversion?
16    A.  Well, we worked through our reps --
17    Q.  But you --
18    A.  -- and our area managers.
19    Q.  But you communicated to the reps that one way to
20 avoid this problem is to use the plastic?
21    A.  Definitely.
22    Q.  And so, by the middle of 2005, in Montana, you
23 were successful, at least in part, in getting people to
24 switch over and use plastic, right?
25    A.  That is correct.

## Page 75

1    Q.  And then you saw a decrease in the number of
2 failures in that area?
3    A.  Correct.
4    Q.  And when you worked through your sales reps, you
5 must have given them some information about the nature of
6 the problem that was causing you to -- to tell them to
7 convert over to brass -- or to plastic from brass, correct?
8    A.  We told them about stress corrosion cracking and
9 kind of explained the three things needed for that to
10 happen.
11        And we had done outside testing to confirm,
12 you know, the content of our brass and our stress, and that
13 it really leads to localized pockets of aggressive water.
14    Q.  And you conveyed that information to your sales
15 reps in Montana?
16    A.  Yes.
17    Q.  Who -- who covers Montana?  What is the rep in
18 Montana?
19    A.  I'm not -- I want to say Advantage, but I'm not
20 positive on that.
21    Q.  Who is your regional manager for that region?
22    A.  Tim Smith.
23    Q.  And he's still with Zurn?
24    A.  Yes, he is.
25    Q.  So between Zurn, Tim Smith, and the local sales

## Page 76

1 rep, whoever that is, it might be Advantage, you were able
2 to get the plumbers, with some information in their hands,
3 to stop using the brass and start using plastic?
4    A.  Correct.
5    Q.  And that worked well --
6    A.  Yes, it did.
7    Q.  -- in terms of the failure issue, right?
8    A.  Well, and like I say, you know, it's a lower cost
9 product for them, better for us, more stable.  So, it's a
10 win/win.
11    Q.  And were you, yourself, involved in this process
12 of converting the business in Montana in 2005?
13    A.  Not personally, no.
14    Q.  Do you know if Gary Runyan, Mark Samples were
15 involved in that process?
16    A.  I'm sure Gary was involved to some degree,
17 explaining.
18        Like I said, again, a lot of these plumbers
19 lived through the polybutylene days.  And so, when you
20 said, well, convert to the plastic fitting, there was a lot
21 of hesitation, especially by some of the wholesalers up
22 there.
23        And I'm sure Gary was involved in showing,
24 you know, look, we've worked with Solvay on this, they've
25 done their testing on this material, this is not the same

## Page 77

1 material that was used back then.
2        So from a technical standpoint, I'm sure he
3 was involved in talking with the reps.
4    Q.  Do you know whether any water testing had been
5 done in Montana by Zurn or at Zurn's request to look at the
6 nature of the water that was present where you were seeing
7 these failures?
8    A.  In Montana, I'm not sure.  I know we've done
9 water testing, but I do not know all the locations where we
10 have.
11    Q.  You've done some in Minnesota?
12    A.  Yes, we've done some in Minnesota.
13    Q.  You've done some elsewhere?
14    A.  Yes, we have.
15    Q.  But you just don't know where it's been done, per
16 se?
17    A.  Right.
18    Q.  Now, the decision to convert the business in
19 2007, May of 2007, from brass to plastic was a decision
20 that applied to all your territories, correct?
21    A.  Yes, it did.
22    Q.  And it was made for the reasons you have already
23 told us here today?
24    A.  Correct.
25    Q.  One of which was problems with corrosion or

Trevor Johnson - 1/30/2008
Denise and Terry Cox, et al v. Zurn Pex, Inc., et al

## Page 82

1   that's not reality.
2       **A.  No, it's not.**
3           MR. CONNOLLY:  Object to the form.
4       Q.  So part of the analysis was, despite our best
5   intentions and despite whatever we tell these guys, they
6   still have their preferences; and if they want to use
7   brass, they're going to try to use brass, if it works?
8       **A.  Again, very small percentage of claims.  So, most**
9   **people aren't seeing these problems.**
10      Q.  But I wasn't going to claims here.  I'm just
11  going to why you didn't convert the entire country, in June
12  of 2007, to plastic, like you basically did in Minnesota.
13          And in part, you're saying, well, we were
14  not seeing as much of a corrosion or failure problem
15  elsewhere, and we've been successful in other markets in
16  converting plumbers to plastic?
17      **A.  True.**
18      Q.  That's kind of the dual role there, right?
19      **A.  Correct.**
20      Q.  Because in your mind, you're saying, hey, if we
21  weren't having a bigger failure problem in a state, we're
22  not as hurried to get them --
23      **A.  No, that's not true.**
24      Q.  Okay.
25      **A.  We want to convert everybody, believe me.**

## Page 83

1       Q.  So if you had it your way, you'd be selling only
2   plastic for brass Pex potable applications?
3       **A.  There are a few fittings you can't sell plastic**
4   **in.  But, yes, for the majority, definitely, we would be**
5   **all --**
6       Q.  You've got some conversions and some --
7       **A.  Right, sweat adapters and -- exactly.**
8       Q.  Yeah, some sweats that just technically need to
9   be metal?
10      **A.  Right.**
11      Q.  The topic number four is the information data
12  testing and investigation Zurn considered in reaching the
13  decision to stop selling brass Pex fittings in Minnesota.
14          Other than what we've already talked about
15  here today, did Zurn rely on anything else to reach its
16  decision to stop selling brass Pex fittings in Minnesota in
17  June of 2007?
18      **A.  Not really.  I mean, I have read some materials**
19  **on one of your papers up there about health concerns with**
20  **the water and how it might have nitrates and things in it.**
21          **So I mean, there were some other, just**
22  **articles out there in the public domain that I personally**
23  **read; but as far as, you know, technical data or strat**
24  **plans and things, we've pretty much covered all of them**
25  **today.**

## Page 84

1       Q.  Those articles that you read, do you still have
2   those?
3       **A.  I don't think so.  I mean, I didn't -- I didn't**
4   **print them and file them, if that's what you're asking.**
5       Q.  And you can't tell me the names of any of them,
6   as you sit here today?
7       **A.  No, I cannot.**
8       Q.  Did anyone else at Zurn consider anything else
9   that we haven't already talked about here today?
10          And remember, you're here as the corporate
11  representative --
12      **A.  Well, I understand that.**
13      Q.  -- so it's your obligation to have investigated
14  to see whether there's anything that we're missing so far.
15      **A.  As far as talking to Mr. Sauer, Mr. Nicolia,**
16  **we've covered everything, yeah.**
17      Q.  Mr. Samples, Mr. Runyan, the same thing?
18      **A.  The same thing, yes.**
19      Q.  So those -- those categories -- and correct me if
20  I'm wrong, those include outside testing reports from
21  outside agencies; they include the analysis of Zurn of
22  warranty claim failures; they include Peter Cartwright's
23  analysis or testing; they include your strategic plan, and
24  the circumstances around the strategic plan as well; and
25  they include, then, just the general claims history of the

## Page 85

1   entire United States, as Minnesota compares to other
2   states, et cetera.
3           Are there any other categories or topics of
4   information that Zurn relied upon to reach this decision to
5   stop selling brass in Minnesota in 2007?
6       **A.  Not to my knowledge.**
7       Q.  One other thing you did mention earlier, and that
8   was the -- the potential lawsuit, right?
9       **A.  Oh, yes.  Yes.**
10      Q.  And that was -- you had received --
11      **A.  I guess I didn't have -- documentwise, we didn't**
12  **have anything on -- that was more of, you know, we heard**
13  **that something might be happening.**
14      Q.  You heard that something might be happening, and
15  you made a business decision, I presume, that it was time
16  to make sure that you kind of nipped this in the bud in
17  Minnesota and not sell any more fittings up there where you
18  might have failures, right?
19      **A.  Correct.**
20      Q.  The fifth topic asks for documents and
21  communications generated by individuals, groups or entities
22  involved in the decision to stop selling brass Pex fittings
23  in Minnesota.
24          We also asked that you identify the format
25  of those documents and communications.

Trevor Johnson - 1/30/2008
Denise and Terry Cox, et al v. Zurn Pex, Inc., et al

## Page 114

1  own plastic fitting, you rebranded -- or you used a
2  competitor's plastic fitting?
3      A.   Correct.
4      Q.   So that you offered plastic, right?
5      A.   Correct.
6      Q.   And that -- you started that sometime in late
7  2004, early 2005?
8      A.   Correct.
9      Q.   And up until that time, you only were selling
10 brass fittings for potable water Pex applications?
11     A.   Brass, copper, and manifolds.
12     Q.   Were you selling copper tees and elbows and
13 couplings for Pex fittings?
14     A.   No, no.  Most of the time, when they use copper,
15 it's more expensive than brass.  So they'll do, like I
16 explained earlier, they'll run a main line and then have a
17 five or six port manifold there that drops down into a
18 bathroom or a kitchen or something.
19          So they don't -- our plumbers don't use them
20 as a branch and tee system a lot of times.
21     Q.   So the -- if you look at the fitting components
22 in a Pex system for potable water manufactured by Zurn or
23 sold by Zurn, before you focused on the plastic fittings,
24 when you're looking at elbows, tees, couplings, drop ears,
25 swivels, those are all brass?

## Page 115

1      A.   Yes, sir.
2      Q.   And then you had some of these other kind of
3  ancillary products that were copper, right?
4      A.   Copper manifolds, yes.
5      Q.   And most of your -- your valves were brass?
6      A.   Yes, sir.
7      Q.   So as of the time that you had plastic fittings
8  available, late 2004, early 2005, you had made a decision
9  to start to try to convert to plastic at that point in
10 time?  Were you already focused on converting the
11 plastic --
12     A.   I can't say we were as focused at that point.
13 That -- in the beginning, the focus was to work on the
14 manufactured structures.  They're a very price sensitive
15 market.  And like I was saying before, the plastic fittings
16 are less expensive.
17     Q.   So you bring the plastic fittings on board to --
18 to help address the more price sensitive markets, be
19 competitive in those markets, right?
20     A.   That's correct, initially.
21     Q.   And sometime after that initial time frame, you
22 then start focusing on converting all of your brass
23 business, to the extent possible --
24     A.   Right.
25     Q.   -- over to plastic, right?

## Page 116

1      A.   Correct.
2      Q.   When -- when would you say you started to focus
3  on that?
4      A.   I'd say, probably -- probably mid to end 2005,
5  there was a focus.
6          I don't know if it was as concentrated, you
7  know.  Coming out of the strat plan, there was a directive.
8  I mean, it wasn't like, yeah, push them, you know, try to
9  sell them here and there.  It was convert, you know,
10 convert these people because of the prices of copper and
11 brass.
12          Earlier, we -- we bought from our
13 competitor; and as we were doing that, we were developing
14 our own line because we knew that wouldn't last for very
15 long.
16          So we took our top sellers, and we just keep
17 adding to that line as we move forward.  And once we had
18 what we considered a complete line, then we started to
19 really offer them in the industry and pushing them.
20     Q.   When did you have a complete line?
21     A.   I'd probably say it wasn't until the beginning of
22 2006, when you could, you know, plumb a house in all our
23 fittings, where we didn't have to buy from our competitor.
24     Q.   So by the beginning of 2006, Zurn, then, is
25 starting to try to convert business to all plastic, if

## Page 117

1  possible?
2      A.   Yes.
3      Q.   And you're doing that nationwide?
4      A.   Yes.
5      Q.   And that is, in part, because of price volatility
6  of copper; but also, you've got this failure issue going on
7  as well?
8      A.   Right.  We have a win/win situation with the
9  plastic fittings.
10     Q.   And you mentioned earlier that the plumbers, or
11 at least some of them who have been around during
12 polybutylene, were resistant to going to plastic fittings
13 because the primary problem with the polybutylene systems
14 were the fittings --
15     A.   Correct.
16     Q.   -- and they were plastic fittings that broke
17 down, right?
18     A.   Correct.
19     Q.   So some of these guys, rightly or wrongly, were
20 gun-shy to go to a plastic fitting again?
21     A.   Correct.  And it's not just the plumbers, but you
22 also got, you know, your plumbing codes.  A lot of the
23 plumbing codes didn't include the plastic insert fitting.
24 They only included the brass insert fitting.  So not only
25 was it a plumber's resistance, there were some areas where,

**BEFORE THE JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. ____

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS**
**PURSUANT TO 28 U.S.C. § 1407**

---

# EXHIBIT M

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,                    Court File No. 07-3652 (ADM/RLE)

    Plaintiffs and Proposed
    Class Representatives,

                **DEFENDANTS' STATEMENT**
                  **OF THE CASE**
vs.

Zurn PEX, Inc. and Zurn Industries, Inc.,

    Defendants.

Pursuant to this Court's Pretrial Notice and Order dated September 11, 2007,

defendants Zurn Pex, Inc. ("Zurn Pex") and Zurn Industries, LLC (improperly named in the

Complaint as "Zurn Industries, Inc.") hereby submit the following Statement of the Case:

### FACTS

Brass has been used successfully in plumbing applications for decades.  One of the

most common brass alloys used in such applications is the brass alloy that Zurn Pex uses for

the fittings at issue in this case, which are used with the PEX piping that is manufactured by

Zurn Pex.[1]  The industry standard that governs such fittings, ASTM F1807, specifically

provides that this alloy may be used.  Further, that standard provides quite specific detail as

to how the fitting, and the crimping process used to attach the fitting, should be designed.

The Zurn Pex brass fittings in question comply with that industry standard.  They are also

similar--in terms of alloy, design and crimping process--to fittings made by several

---

[1] "PEX" refers to cross-linked polyethylene, a flexible plastic piping that is in common use in plumbing applications
across the country.

competitors.

In addition to following quite specific dictates of the accepted industry standard, the Zurn Pex brass fittings are in extremely common use. They are in use in plumbing applications all over the country. Yet the number of claims regarding failed fittings that Zurn Pex has received is a very small percentage of such a number. Further, while those claims have been located in many areas around the country, a disproportionate number of them have been in Minnesota. Indeed, the preponderance (not all) of the Minnesota claims have been in particular areas of Minnesota, especially the area around Alexandria. The precise reasons for this phenomenon are not yet clear or easy to document. However, it appears to be associated with characteristics of the groundwater in that and other areas where there have been claims.

The Complaint refers to a phenomenon associated with brass and numerous other materials, called "stress corrosion cracking." This is a very complex phenomenon that has been much studied, but remains not fully understood and certainly very difficult to predict. In essence, stress corrosion cracking involves a material, with some level of stress within the material, attacked by chemicals that are corrosive to that material. Examples of chemicals that have been shown to be associated with stress corrosion cracking in brasses include ammonia, nitrates and certain sulfide compounds. Such chemicals may sometimes be found in the groundwater in rural areas, where there may be large quantities of bacteria or the residues of agricultural chemicals in the aquifers. Testing for such chemicals may or may not be productive, as the chemical composition of the water in a plumbing system can vary at different times and at different locations.

Where fittings do fail, each individual fitting tells its own individual story. An installer may make a crimp that is crooked or otherwise improper, imposing unanticipated

stresses in the material.  A plumbing system may be designed in an unusual manner, that imposes unusual stress at a particular location.  And, of course, a plumbing system may be exposed to water that is unusually aggressive and corrosive, for reasons well beyond the knowledge or control of the fitting manufacturer.  The nation's water supply is extremely complex and extremely localized, meaning that no manufacturer can anticipate all possible localized conditions to which its products will be exposed.  Zurn Pex provides training, free of charge, to all plumbers who wish it, and indeed Minnesota and some other states actually require plumbers to be certified by such training prior to installing this PEX system.

The legal implications of this universe of facts include the following:

1.  Because of the unpredictable and varying water supplies all over this country, Zurn Pex excludes failure due to corrosion from the 25 year warranty that is provided with its piping and fittings.  While Zurn Pex has often made exceptions or settled claims despite this limitation, in the interest of customer good will, the limitation is still an effective and enforceable one.  Plaintiffs' contentions that the warranty exclusion is unenforceable (although apparently they seek to rely on the warranty to which it is appended) are incorrect, for reasons that will be briefed at the appropriate time.

2.  Many of the claims made in the Complaint will be barred by the economic loss doctrine.

3.  This case is particularly insusceptible to certification as a class action.  Each claim involves its own individual story that may implicate installation issues, localized water conditions, statute of limitations problems, conflict of laws problems, and the rest of the panoply of Rule 23 issues that have led more and more federal courts to find cases of this general sort not to be certifiable as class actions.  This litigation should properly involve the

property damage claims of Denise and Terry Cox, and no other claims.

## STATUTES

The Complaint makes a variety of claims, including statutory claims under various Minnesota consumer statutes (Minn. Stat. § 325F.69; Minn. Stat. § 325D.13; Minn. Stat. § 325D.44 and Minn. Stat. § 325F.67) and the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.*).   Defendants deny liability under these and all other claims.

## DAMAGES

At this early stage of the litigation, defendants have no information as to the plaintiffs' claimed damages herein.

Dated: October 19, 2007                    FAEGRE & BENSON LLP


                                           s/ James A. O'Neal
                                           _____
                                           James A. O'Neal, #8248X
                                           Daniel J. Connolly, #197427
                                           Amy R. Freestone, #285493
                                           Catherine G. Davis, #0386635
                                           2200 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, MN  55402-3901
                                           (612) 766-7000
                                           Attorneys for Defendants


fb.us.2348127.01

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,

       Plaintiffs,

       v.

Zurn PEX, Inc. and Zurn Industries, Inc.,

       Defendants.

**CERTIFICATE OF SERVICE**

Case No.: 07-3652 (ADM/RLE)

I hereby certify that on October 19, 2007,  I caused the following document(s):

    1.    Statement of the Case

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an
e-notice of electronic filing to the following:

- **Shawn M Raiter**
  sraiter@larsonking.com, lselman@larsonking.com, lburks@larsonking.com

- **T Joseph Snodgrass**
  jsnodgrass@larsonking.com, pnally@larsonking.com, rmerrill@larsonking.com

- **Derek A Trosvig**
  dat@alexandriamnlaw.com

Date:  October 19, 2007

s/James A. O'Neal
James A. O'Neal, #8248X
Attorney for Defendants
Faegre & Benson LLP
2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, MN 55402
(612) 766-7000
joneal@faegre.com

fb.us.2366896.01

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT M

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,

                    Plaintiffs and Proposed
                    Class Representatives,

vs.

Zurn PEX, Inc. and Zurn Industries, Inc.,

                    Defendants.

Court File No. 07-3652 (ADM/RLE)

## DEFENDANTS' STATEMENT
## OF THE CASE

Pursuant to this Court's Pretrial Notice and Order dated September 11, 2007,

defendants Zurn Pex, Inc. ("Zurn Pex") and Zurn Industries, LLC (improperly named in the

Complaint as "Zurn Industries, Inc.") hereby submit the following Statement of the Case:

## FACTS

Brass has been used successfully in plumbing applications for decades. One of the

most common brass alloys used in such applications is the brass alloy that Zurn Pex uses for

the fittings at issue in this case, which are used with the PEX piping that is manufactured by

Zurn Pex.[1] The industry standard that governs such fittings, ASTM F1807, specifically

provides that this alloy may be used. Further, that standard provides quite specific detail as

to how the fitting, and the crimping process used to attach the fitting, should be designed.

The Zurn Pex brass fittings in question comply with that industry standard. They are also

similar--in terms of alloy, design and crimping process--to fittings made by several

---

[1] "PEX" refers to cross-linked polyethylene, a flexible plastic piping that is in common use in plumbing applications
across the country.

1

competitors.

In addition to following quite specific dictates of the accepted industry standard, the Zurn Pex brass fittings are in extremely common use.  They are in use in plumbing applications all over the country.  Yet the number of claims regarding failed fittings that Zurn Pex has received is a very small percentage of such a number.  Further, while those claims have been located in many areas around the country, a disproportionate number of them have been in Minnesota.  Indeed, the preponderance (not all) of the Minnesota claims have been in particular areas of Minnesota, especially the area around Alexandria.  The precise reasons for this phenomenon are not yet clear or easy to document.  However, it appears to be associated with characteristics of the groundwater in that and other areas where there have been claims.

The Complaint refers to a phenomenon associated with brass and numerous other materials, called "stress corrosion cracking."  This is a very complex phenomenon that has been much studied, but remains not fully understood and certainly very difficult to predict. In essence, stress corrosion cracking involves a material, with some level of stress within the material, attacked by chemicals that are corrosive to that material.  Examples of chemicals that have been shown to be associated with stress corrosion cracking in brasses include ammonia, nitrates and certain sulfide compounds.  Such chemicals may sometimes be found in the groundwater in rural areas, where there may be large quantities of bacteria or the residues of agricultural chemicals in the aquifers.  Testing for such chemicals may or may not be productive, as the chemical composition of the water in a plumbing system can vary at different times and at different locations.

Where fittings do fail, each individual fitting tells its own individual story.  An installer may make a crimp that is crooked or otherwise improper, imposing unanticipated

stresses in the material.  A plumbing system may be designed in an unusual manner, that

imposes unusual stress at a particular location.  And, of course, a plumbing system may be

exposed to water that is unusually aggressive and corrosive, for reasons well beyond the

knowledge or control of the fitting manufacturer.  The nation's water supply is extremely

complex and extremely localized, meaning that no manufacturer can anticipate all possible

localized conditions to which its products will be exposed.  Zurn Pex provides training, free

of charge, to all plumbers who wish it, and indeed Minnesota and some other states actually

require plumbers to be certified by such training prior to installing this PEX system.

The legal implications of this universe of facts include the following:

1.  Because of the unpredictable and varying water supplies all over this country, Zurn

Pex excludes failure due to corrosion from the 25 year warranty that is provided with its

piping and fittings.  While Zurn Pex has often made exceptions or settled claims despite this

limitation, in the interest of customer good will, the limitation is still an effective and

enforceable one.  Plaintiffs' contentions that the warranty exclusion is unenforceable

(although apparently they seek to rely on the warranty to which it is appended) are incorrect,

for reasons that will be briefed at the appropriate time.

2.  Many of the claims made in the Complaint will be barred by the economic loss

doctrine.

3.  This case is particularly insusceptible to certification as a class action.  Each claim

involves its own individual story that may implicate installation issues, localized water

conditions, statute of limitations problems, conflict of laws problems, and the rest of the

panoply of Rule 23 issues that have led more and more federal courts to find cases of this

general sort not to be certifiable as class actions.  This litigation should properly involve the

property damage claims of Denise and Terry Cox, and no other claims.

## STATUTES

The Complaint makes a variety of claims, including statutory claims under various Minnesota consumer statutes (Minn. Stat. § 325F.69; Minn. Stat. § 325D.13; Minn. Stat. § 325D.44 and Minn. Stat. § 325F.67) and the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.*).   Defendants deny liability under these and all other claims.

## DAMAGES

At this early stage of the litigation, defendants have no information as to the plaintiffs' claimed damages herein.

Dated: October 19, 2007                      FAEGRE & BENSON LLP


                                             s/ James A. O'Neal
                                             _____
                                             James A. O'Neal, #8248X
                                             Daniel J. Connolly, #197427
                                             Amy R. Freestone, #285493
                                             Catherine G. Davis, #0386635
                                             2200 Wells Fargo Center
                                             90 South Seventh Street
                                             Minneapolis, MN  55402-3901
                                             (612) 766-7000
                                             Attorneys for Defendants

fb.us.2348127.01

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

      v.

Zurn PEX, Inc. and Zurn Industries, Inc.,

      Defendants.

**CERTIFICATE OF SERVICE**

Case No.: 07-3652 (ADM/RLE)

I hereby certify that on October 19, 2007,  I caused the following document(s):

    1.    Statement of the Case

to be filed electronically with the Clerk of Court through ECF, and that ECF will send an
e-notice of electronic filing to the following:

- **Shawn M Raiter**
  sraiter@larsonking.com,lselman@larsonking.com,lburks@larsonking.com

- **T Joseph Snodgrass**
  jsnodgrass@larsonking.com,pnally@larsonking.com,rmerrill@larsonking.com

- **Derek A Trosvig**
  dat@alexandriamnlaw.com

Date:  October 19, 2007_____

s/James A. O'Neal_____
James A. O'Neal, #8248X
Attorney for Defendants
Faegre & Benson LLP
2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, MN 55402
(612) 766-7000
joneal@faegre.com

fb.us.2366896.01

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT N

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Denise and Terry Cox, on behalf
of themselves and all others
similarly situated,

　　　　　　　　Plaintiff,

vs.

Zurn Pex, Inc.; and Zurn Industries, Inc.,

　　　　　　　　Defendants.　　　　　　Civ. No. 07-3652 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following

Motions:

　　1.　　The Defendants' Motion to Enjoin the Filing of
　　　　　Related Lawsuits [Docket No. 24].

　　2.　　The Plaintiffs' Motion to Compel Unredacted
　　　　　Warranty Claim Forms [Docket No. 33].

A Hearing on the Motions was conducted on December 17, 2007, at which time, Shawn M. Raiter, and T. Joseph Snodgrass, Esqs., appeared on behalf of the Plaintiffs; and Daniel J. Connolly, Amy R. Freestone, and James A. O'Neal, Esqs., appeared on behalf of the Defendants.   For reasons which follow, we recommend that the Defendants' Motion be denied, and that the Plaintiffs' Motion be denied.[1]

## II. Factual and Procedural Background

This is a putative class action, which the Plaintiffs bring against Zurn Pex, Inc., and Zurn Industries, Inc. (collectively, "Zurn"), alleging that Zurn manufactured deficient brass plumbing systems that are subject to premature failure. The Plaintiffs allege a violation of the Magnuson-Moss Warranty Act, Title 15 U.S.C. §§2301, et seq., as well as several State law claims, and they seek damages, as well as declaratory and injunctive relief.  See, Complaint, Docket No. 1, Attachment No. 1.

According to the Plaintiffs, Zurn started selling plumbing systems, which consist of cross-linked polyethylene ("Pex") tubing and brass crimp fittings, around

---

[1]The Defendants' Motion is plainly dispositive in nature, while the Plaintiffs' Motion to Compel falls directly within our nondispositive Motion jurisdiction. Given the constraints of electronic filing, where we are not allowed the convenience of joining the disposition of a nondispositive Motion with one for dispositive relief, we express our ruling on the Plaintiff's Motion as a "recommendation" only to obviate the need to issue an Order that duplicates, in no small part, the content of our Recommendation on the dispositive Motion.

2001 in Minnesota, and subsequently began receiving reports of the premature failure

of the crimp fittings due to stress corrosion cracking ("SCC").  The Plaintiffs further

allege that the SCC-induced failures in the crimp fittings have not been limited to

Minnesota, but have been found in several other States, and they seek class

certification that is either limited to customers in Minnesota, or expanded to include

customers in some or all of the United States.[2]  As related by the Plaintiffs, the crimp

fittings were sold with a twenty-five (25) year Warranty that expressly covered

consequential damages, and Zurn initially honored that Warranty, and paid for failures

that it attributed to SCC.  The Plaintiffs contend that, as the number of SCC-related

---

[2]The first proposed class is defined as:

> [A]ll persons and entities that own a structure located
> within the State of Minnesota that contains a Zurn Pex
> plumbing system with brass crimp fittings.  The proposed
> class includes, without limitation, all such persons or
> entities who contacted Zurn or its representatives about
> their Zurn Pex plumbing system * * * and were denied or
> partially denied warranty coverage for failure of the Zurn
> Pex plumbing system on the grounds based on a claim that
> "corrosion" was not covered by the warranty or that other
> warranty limitations applied.

Complaint, Docket No. 1, Attachment No. 1, at ¶37.

The additional proposed classes are substantively similar, but are defined as consisting
of residents either of all of the United States, or of some of the United States.  Id. at
¶¶38-39.

claims increased, Zurn began to deny warranty claims routinely, including the claims tendered by the Plaintiffs, after they experienced water damage to their house, which they attribute to the failure of their Zurn-manufactured crimp fittings.

By way of additional background, we have previously denied the Plaintiffs' Motion for a Single-Phase Discovery Plan, and we directed the parties to engage in focused discovery, on the issue of class certification.[3] See, <u>Minute Order</u>, <u>Docket No. 22</u>, at 8. We noted, in our Order, that Zurn had "pledged" to allow discovery on "product design, testing, customer complaints, and the like," from readily available sources which, it advised, would mostly be in hard copy. <u>Id.</u> at 7. Specifically, Zurn agreed to produce "copies of its claim files; a sampling of the actual clamp fittings that had been returned from the field, for the purposes of non-destructive testing and evaluation; sales data from October of 2002, to the present; design drawings and

---

[3]In addition, on December 7, 2007, we denied Zurn's informal request for a Rule 26 Protective Order, which would govern discovery in this matter. See, <u>Minute Order</u>, <u>Docket No. 39</u>. We directed the parties to continue their negotiation of the Protective Order, in order to resolve the remaining, disputed terms. <u>Id.</u> At the Hearing on the current Motions, the parties again raised several concerns, relating to a potential Protective Order, for our consideration. However, after the Hearing, the parties reached an agreement concerning the terms of a Protective Order, and accordingly, on December 26, 2007, we issued a Protective Order, which was based upon their agreement. See, <u>Order</u>, <u>Docket No. 50</u>; <u>Stipulation</u>, <u>Docket No. 49</u>.

industry standards for the contested clamp fittings; and final versions of the relevant product literature." Id.

On November 16, 2007, Zurn filed a Motion, in which it asks the Court to enjoin the Plaintiffs' counsel from filing similar lawsuits against the Defendants, in any other Court, until the issue of class certification has been resolved before this Court. See, Docket No. 24. The Plaintiffs oppose the Motion, and contend that compelling circumstances do not exist, which would support the extraordinary remedy of an anti-suit injunction. See, Plaintiffs' Memorandum in Opposition, Docket No. 44, at 5.

On December 3, 2007, the Plaintiffs filed a Motion to Compel the Production of Unredacted Warranty Claim Files. See, Docket No. 33. Zurn has provided the Plaintiffs with its claim files, but it redacted the names and street addresses of the claimants, and the Plaintiffs seek the unredacted forms. See, Plaintiffs' Memorandum in Support, Docket No. 37, at 1. Zurn opposes the Plaintiffs' Motion, and argues that the redacted information is not relevant to the issue of class certification. See, Defendants' Memorandum in Opposition, Docket No. 40, at 2. We address each Motion in turn.

## III.  Discussion

A.    The Defendants' Motion to Enjoin the Filing of Related Lawsuits.

1.    Standard of Review. In determining whether to grant a preliminary injunction, Courts consider the following factors:

    1)    the probability of the movant's success on the merits;

    2)    the threat of irreparable harm to the movant;

    3)    the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and

    4)    whether the issuance of the preliminary injunction is in the public interest.

Emerson Electric Co. v. Rogers, 418 F.3d 841, 844 (8th Cir. 2005), citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981).

None of the Dataphase factors is determinative, but each must be weighed to determine if injunctive relief is appropriate.  See, Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006).

"These factors are not a rigid formula." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999).  Rather, when applying these factors, "'a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene.'"

Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999), quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998), quoting, in turn, Dataphase Sys. v. CL Sys., Inc., supra at 113; see also, General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 624 (8th Cir. 1987)("[C]are must be exercised in balancing the equities, especially since a preliminary injunction motion is too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with mathematical precision."). "[T]he party seeking injunctive relief bears the burden of proving all the Dataphase factors." Education Minnesota Lakeville v. Indep. Sch. Dist. No. 194, 341 F. Supp.2d 1071, 1073 (D. Minn. 2004); see also, Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)("[T]he burden of establishing the propriety of an injunction is on the movant."), citing Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995).

We are obligated to closely examine each of the requisite factors, in order to determine if this is one of those instances in which the "extraordinary remedy" of an injunction is warranted. See, Watkins, Inc. v. Lewis, supra at 844, citing Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987). Of course, if preliminary injunctive relief is warranted, the grant of the Motion "does not bind the District Court or the parties in any further proceedings in [the] case, for adjudication

of a motion for a preliminary injunction is not a decision on the merits of the underlying case." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 603.

The "[moving party] must first establish that irreparable harm will result without injunctive relief and that such harm will not be compensable by money damages." Northland Ins. Cos. v. Blaylock, 115 F. Supp.2d 1108, 1116 (D. Minn. 2000). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." Id., citing Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." Id., citing Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989). Moreover, the "unrecoupable expense of litigation * * * is not the irreparable injury contemplated as a prerequisite to equitable relief." West v. Bergland, 611 F.2d 710, 718 (8th Cir. 1979), cert. denied, 449 U.S. 821 (1980), citing Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974). "Once a court determines that the movant has failed to show irreparable harm absent an injunction, the inquiry is finished and the denial of the injunctive request is warranted." Gelco Corp. v. Coniston Partners, 811 F.2d 414, 420 (8th Cir. 1987).

2.    Legal Analysis.  Zurn first argues that the Dataphase factors are inapposite to this case, given that it seeks an order "enjoining a party from proceeding with a duplicative, second-filed lawsuit in another forum[.]"  See, Defendants' Memorandum in Support, Docket No. 26, at 6, quoting Northwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1004 (8th Cir. 1993).  However, we find Zurn's reliance on the Northwest Airlines case to be misplaced.

There, Northwest Airlines filed suit against American Airlines, in the United States District Court for the District of Minnesota, and sought a Declaratory Judgment that it had lawfully hired several at-will employees from American Airlines' workforce.  Id. at 1003.  Six (6) weeks later, American Airlines filed suit against Northwest Airlines, in the United States District Court for the Northern District of Texas, and sought injunctive relief on its claims of unfair competition and tortious interference with contractual relationships, which arose out of the same dispute between the parties.  Id. at 1003-04.  Upon Northwest Airlines' Motion, the District Court in Minnesota enjoined American Airlines from proceeding with its suit in Texas.  Id. at 1004.  On appeal, our Court of Appeals affirmed, but did not apply the Dataphase test.

- 9 -

The present case, however, is distinguishable from <u>Northwest Airlines</u>. Here, nearly four (4) months after the Plaintiffs filed the instant action -- and three (3) months after the case was removed to our Court -- the Plaintiffs' counsel filed another putative class action in the United States District Court for the District of North Dakota, asserting identical claims against Zurn, based upon the failure of the same type of allegedly defective brass fittings. However, the North Dakota case involves different named plaintiffs, and putative class representatives, than this action. This is unlike the <u>Northwest Airlines</u> case, which was concerned with the same dispute and the same two (2) parties. As stated by our Court of Appeals:

> In a case of this kind, the <u>Dataphase</u> factors are inapposite, since the question has nothing to do with the merits of the underlying controversy and is simply whether, as between two courts both having jurisdiction over the parties and the subject matter of the dispute, the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action.

<u>Id.</u>

Here, we do not have jurisdiction over the North Dakota plaintiffs, and indeed, will not unless a class is certified which would extend to putative class members in that State. Accordingly, this case does not involve a single controversy, as between the same named parties, as did the case in <u>Northwest Airlines</u>. Therefore, we find no

reason not to ignore the precedent of <u>Dataphase</u> as it would otherwise apply to this case, nor has Zurn cited any other authority for its contention that <u>Dataphase</u> is inapplicable.

 Next, Zurn focuses primarily on the <u>Dataphase</u> factors relating to the balance of harms, and the public interest, in order to support its request for a Preliminary Injunction.  See, <u>Defendants' Memorandum in Support</u>, <u>Docket No. 26</u>, at 7-9.  Zurn contends that a Preliminary Injunction will conserve scarce judicial resources, until we determine if this action will proceed with one of the proposed classes.[4]  <u>Id.</u> at 7, 9. Zurn also contends that its proposed Preliminary Injunction will not harm the rights of the Plaintiffs, or their counsel, and that the Plaintiffs' counsel should be required

---

[4]Here, Zurn quotes from the Manual for Complex Litigation, as follows:

> A federal district judge asked to certify a class action that overlaps with, duplicates, or competes with cases pending in other federal or state courts may face conflicts involving rulings on discovery or substantive motions, timetables for discovery, selection of class counsel, certification rulings, trial, and settlement, and may also face duplicative work and expense.

<u>Defendants' Memorandum in Support</u>, <u>Docket No. 26</u>, at 7, quoting <u>Manual for Complex Litigation (4th Ed. 2004), Section 21.15</u>.

However, Zurn cites no part of the Manual which would support its contention that a District Court should enjoin the filing of actions in other Courts, in order to avoid such duplicative work and expense.

to shepherd their first-filed action through the pre-certification stage, before filing any additional actions against the Defendants, on behalf of other potential plaintiffs. Id. at 8. Zurn further argues that, if the Plaintiffs' counsel are permitted to file additional actions, particularly in State Courts, Zurn will suffer harm, given the additional time and expense it will incur if required to defend against multiple lawsuits, in multiple forums. Id. at 9.

In effect, the only harm alleged by Zurn amounts to ordinary litigation costs, which -- even if unrecoupable -- do not justify the extraordinary remedy of a preliminary injunction. See, West v. Bergland, supra at 718. Accordingly, whether Zurn's alleged harm outweighs any potential harm to the Plaintiffs, or their counsel -- a claim we find doubtful, given that the proposed Preliminary Injunction would prevent other potential plaintiffs from pursuing their claims against Zurn in any forum, at least through the Plaintiffs' counsel, and at least during the pendency of the pre-certification stage -- we conclude that Zurn's alleged harm does not amount to the sort of irreparable harm contemplated by the Dataphase case.[5]

---

[5]As we expressed at the Hearing, we remain concerned that issuing a Preliminary Injunction could preclude other potential plaintiffs, who wish to retain counsel for the Plaintiffs as their own legal representation, from filing an action against these Defendants, within the necessary statute of limitations.  Neither party addressed this
(continued...)

Moreover, we express some doubt that we would be justified in enjoining the filing of State Court actions, at this early stage of a putative class action.  Zurn contends that the All Writs Act, Title 28 U.S.C. §1651, bestows that authority.  See, Defendants' Memorandum in Support, Docket No. 26, at 4-5.  The All Writs Act is constrained by the Anti-Injunction Act, Title 28 U.S.C. §2283, but, as acknowledged by both parties, the Anti-Injunction Act generally prevents Federal Courts only from enjoining **pending** proceedings in State Courts, and not from preventing the filing of such actions.  Id. at 5, 8; Plaintiffs' Memorandum in Opposition, Docket No. 44, at 6 n. 3; see also, Kansas Pub. Employees Ret. Sys. v. Reimer & Koger Assocs., 77 F.3d 1063, 1068 (8th Cir. 1996), cert. denied, 519 U.S. 948 (1996).  Accordingly, since no State Court action is yet pending, Zurn may be correct that the Anti-Injunction Act would not prevent us from issuing its requested injunction.  See, Newby v. Enron Corp., 302 F.3d 295, 301 (5th Cir. 2002)(stating that the Anti-Injunction Act "does not

---

[5](...continued)
issue in their supporting papers, and our research has failed to reveal a definitive answer to the question.  See, LeBeau v. United States, 215 F. Supp.2d 1046, 1059 n. 5 (D.S.D. 2002)(observing that equitable tolling may apply when a Preliminary Injunction precludes potential plaintiffs from pursuing their claims).  However, at the Hearing, counsel for the Plaintiffs expressed concern that the Defendants asked for a Preliminary Injunction, without agreeing that the statute of limitations for any claims would be tolled during the pendency of such an Injunction -- a concern that mirrors our own.

preclude injunctions against a lawyer's filing of **prospective** state court actions.")[emphasis in original], citing, in part, <u>Dombrowski v. Pfister</u>, 380 U.S. 479, 484 n. 2 (1965); <u>Nat'l City Lines, Inc. v. LLC Corp.</u>, 687 F.2d 1122, 1127 (8th Cir. 1982)("The Anti-Injunction Act is inapplicable when a federal court has first obtained jurisdiction of a matter in controversy by the institution of suit," and "the federal court may in these circumstances restrain subsequently filed state court proceedings involving the same subject matter.").

However, Zurn has not provided any case -- and our research has revealed none -- in which a Federal Court has issued such an anti-suit injunction, prior to the certification of a class, and at least one Federal District Court has concluded that it was without authority to do so, whether under the All Writs Act, or through its inherent powers.  See, <u>Peters v. Brants Grocery</u>, 990 F. Supp. 1337, 1342 (M.D. Ala. 1998)("The cases which have allowed injunctions against state court proceedings are cases in which a judgment had been entered by the federal court or is imminent, or where the federal court had spent so much time on a case that the lengthy litigation has become the virtual equivalent of a res," and "[t]he court knows of no case which holds that an injunction against other litigation may issue because the defendants will

be called upon to defend their conduct in other states where they do business.")
[citations omitted].

No judgment, or settlement, is imminent in this case, and there is nothing in the
Record to suggest that we should enjoin the commencement of State Court
proceedings, in order to protect our own jurisdiction, or to aid it.  See, Anti-Injunction
Act, Title 28 U.S.C. §2283; see also, Peters v. Brants Grocery, supra at 1341
("[F]ederal courts may properly enjoin state proceedings 'in aid of [their] jurisdiction'
only when a state court so interferes with the federal court's consideration or
disposition of a case as to 'seriously impair the federal court's flexibility and authority
to decide that case.'"), quoting Atl. Coast Line R.R. Co. v. Bhd. of Locomotive
Eng'rs, 398 U.S. 281, 295 (1970); 7B Wright and Miller, Federal Practice and
Procedure, §1798.1 (3rd ed. 1998)("[A]lthough a federal district court in a class action
that is not part of multidistrict litigation cannot enjoin state-court litigation at the
outset of the federal suit, if that action proceeds to the settlement stage, then an
injunction to protect the court's power to effectuate a settlement may be upheld, and
may be particularly appropriate once a settlement has been reached and judgment
entered as a part of that settlement.")[footnotes omitted].

Lastly, we agree with the analysis of the <u>Peters</u> Court, which concluded that "[t]he fact that other litigation may be filed will not affect the ability of this court to hear and determine the motions to dismiss * * * or the motion for class certification." <u>Peters v. Brants Grocery</u>, supra at 1343. In sum, we conclude that Zurn has not made the requisite showing to justify the issuance of a preliminary injunction in this action, and therefore, we recommend that the Defendants' Motion be denied.

B.   <u>The Plaintiffs' Motion to Compel Production of Unredacted Warranty Claims Files.</u>

1.   <u>Standard of Review</u>. Under Rule 26(b)(1), Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party[.]" So long as relevant, parties may obtain discovery by several methods, including: "depositions upon oral examination or written questions; written interrogatories; production of documents * * * and requests for admission." <u>Rule 26(a)(5), Federal Rules of Civil Procedure</u>. "The overriding purpose of the federal discovery rules is to promote full disclosure of all facts to aid in the fair, prompt and inexpensive disposition of lawsuits." <u>Woldum v. Roverud Const., Inc.</u>, 43 F.R.D. 420, 420 (N.D. Iowa 1968). Accordingly, since "[m]utual knowledge of all the relevant facts * * * is essential to proper litigation,"

"either party may compel the other to disgorge whatever facts he has in his possession." Hickman v. Taylor, 329 U.S. 495, 507 (1947). Normally, "[t]he party opposing discovery shoulders the burden of showing that discovery request is overly broad and burdensome." Mead Corp. v. Riverwood Natural Res. Corp., 145 F.R.D. 512, 515 (D. Minn. 1992). Similarly, "[o]ne objecting to discovery on the grounds of relevancy carries the burden to sustain the objection." Kramer v. Boeing Co., 126 F.R.D. 690, 692 (D. Minn. 1989).

"At the same time, 'discovery, like all matters of procedure, has ultimate and necessary boundaries.'" Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). "While the standard of relevance in the context of discovery is broader than in the context of admissibility, this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery." Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992). Instead, "[s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." Id.; see also, Wacker v. Gehl Company, 157 F.R.D. 58, 58 (W.D. Mo. 1994).

   2. Legal Analysis.  On November 30, 2007, Zurn provided the Plaintiffs with a number of warranty claim forms, on which it had redacted the names

- 17 -

and street addresses of the claimants.[6]  The Plaintiffs acknowledge that Zurn did not,

however, redact the city, state, and country, that is listed on each warranty claim.  See,

Plaintiffs' Memorandum in Support, Docket No. 37, at 3.  The Plaintiffs contend that,

in order to contest class certification, Zurn plans to assert that its brass plumbing

systems failed due to aggressive, corrosive water, which exists in the groundwater of

particular locations.[7]  Id. at 2-3.  Accordingly, the Plaintiffs argue that they are entitled

to unredacted warranty claim forms, because Zurn knows the particular locations, at

which its fittings have failed, and because it can, therefore, investigate the water

conditions at those locations, in order to support its groundwater theory and defeat

class certification.  Id. at 5.  The Plaintiffs argue that they are entitled to equal access

to those operative facts, in order to similarly investigate, and to rebut Zurn's theory.

_____

[6]Zurn also redacted the names of any contractors, who were involved in the plumbing or remediation of the property, from the forms.   See, Plaintiff's Memorandum in Support, Docket No. 37, at 3.

[7]In support of their contentions, the Plaintiffs quote Zurn's Statement of the Case, in which it argued that "[e]ach claim involves its own individual story that may implicate installation issues, [and] localized water conditions."  See, Docket No. 17, at 3.  In its Statement of the Case, Zurn also stated that the "nation's water supply is extremely complex and extremely localized, meaning that no manufacturer can anticipate all possible localized conditions to which its products will be exposed."  Id.

Id., citing Onwuka v. Fed. Express Corp., 178 F.R.D. 508, 516 (D. Minn. 1997); see also, Hickman v. Taylor, supra at 507.

For its part, Zurn argues that the Plaintiffs' request amounts to inappropriate, pre-certification discovery of putative class members.[8]   See, Defendants' Memorandum in Opposition, Docket No. 40, at 4, 6-7.  Zurn argues that the Plaintiffs do not need to investigate the water conditions at each location where its fittings failed, in order to resolve class certification, because they do not need to wholly disprove Zurn's theory of aggressive, corrosive water.[9]  Id. at 6.  Instead, Zurn contends that the Plaintiffs only need to prove that the claims of putative class members, and Zurn's defenses to such claims, will satisfy the requirement of

---

[8]Although the Plaintiffs claim that Zurn has failed to allege an appropriate basis for privilege, in support of its redactions on the warranty claims, see, Plaintiffs' Memorandum in Support, Docket No. 37, at 2, we do not understand Zurn to object to the Plaintiffs' discovery request on the grounds of any privilege.  Nor does Zurn appear to object to the discovery request on the grounds of undue burden, as suggested by the Plaintiffs.  Id. at 9-10.  Rather, we understand Zurn's objection to be only that the names and street addresses of its warranty claimants is wholly irrelevant to the issue of class certification.

[9]Zurn also contends that the Plaintiffs already have access to numerous homes, at which the fittings allegedly failed, through a number of known putative class members.  See, Defendants' Memorandum in Opposition, Docket No. 40, at 8.

- 19 -

commonality, under Rule 23, Federal Rules of Civil Procedure.[10]  Id.  Zurn cites

several District Court cases, from this Circuit and others, in which Courts have

concluded that the names and addresses of putative class members are not

discoverable prior to class certification.  See, Bird Hotel Corp. v. Super 8 Motels, Inc.,

2007 WL 404703 at *4 (D.S.D., February 1, 2007)(The Plaintiffs made no showing

that identity of class members was necessary to determination of class certification,

but "after certification, as it relates to notification of members of the class, this

category of information is discoverable."); Robbins v. NCO Fin. Sys., Inc., 2006 WL

3833352 at *5 (N.D. Ind., December 12, 2006)(At pre-certification stage, the plaintiff

could discover the number of putative class members, in order to show numerosity,

---

[10]Rule 23(a), Federal Rules of Civil Procedure, establishes the following
prerequisites for any class action:

> (1) [T]he class is so numerous that joinder of all members
> is impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the
> representative parties will fairly and adequately protect the
> interests of the class.

Once a Motion for certification is filed, the Plaintiffs will have the burden of showing
that the prerequisites are satisfied.  Coleman v. Watt, 40 F.3d 255, 259 (8th Cir. 1994),
citing Smith v. Merchants & Farmers Bank of West Helena, 574 F.2d 982, 983 (8th
Cir. 1978), overruled on other grounds, Gardner v. Westinghouse Broadcasting Co.,
437 U.S. 478 (1978).

but not their identifying information, where not relevant to any issues of certification);

Dziennik v. Sealift, Inc., 2006 WL 1455464 at *1 (E.D.N.Y., May 23, 2006)("Courts

have ordinarily refused to allow discovery of class members' identities at the pre-

certification stage out of concern that plaintiffs' attorneys may be seeking such

information to identify potential new clients, rather than to establish the

appropriateness of certification."); Palmer v. Stassinos, 2005 WL 3868003 at *4 (N.D.

Cal., May 18, 2005)("[I]t does not appear that the identities of putative class members

are required to enable plaintiffs to file a motion for class certification."); Brinkerhoff

v. Rockwell Int'l Corp., 83 F.R.D. 478, 480-81 (N.D. Tex. 1979) ("Defendants have

failed to show why they need the names of these putative class members to defend

against Plaintiff's claims of numerosity and commonality," and "[r]esemblance and

characteristics of a claim can be evaluated without knowing the identity of the

claimant.").

   The question, then, is whether the names and street addresses of warranty

claimants would help the Plaintiffs meet their burden of proving commonality, with

respect to the putative class members' claims, and Zurn's likely defenses. "As a

general rule, the commonality requirement imposes a very light burden on plaintiff

seeking to certify a class and is easily satisfied," and "to satisfy the commonality

requirement under Rule 23(a), a party need simply show that 'the legal question linking the class members is substantially related to the resolution of the litigation.'" In re Hartford Sales Practices Litigation, 192 F.R.D. 592, 603 (D. Minn. 1999), quoting DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1174 (8th Cir. 1995), cert. denied, 517 U.S. 1156 (1996).  Stated otherwise, "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'" Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1148 (8th Cir. 1999), quoting 7A Wright and Miller, Federal Practice and Procedure: Civil 2d §1769 at 367 (2nd ed. 1986).

Accordingly, it is unlikely that the Plaintiffs need to know the names and street addresses of **all** of the warranty claimants in order to sustain their burden under Rule 23.  In addition, the Supreme Court's ruling, in Oppenheimer Fund, Inc. v. Sanders, supra, is instructive on the issue of when, and how, the identities of putative class members may be discovered.  In Oppenheimer, the plaintiffs sought the names and addresses of putative class members from the defendants, pursuant to a Rule 26(b)(1) discovery request, solely for the purpose of providing notice to the class.  The Supreme Court concluded that the plaintiffs' discovery request was properly denied, under Rule 26, where the identity information was not necessary in order to clarify

any substantive issues in the case:  "Although [the plaintiffs'] request resembles discovery in that it seeks to obtain information, we are convinced that it more properly is handled under Rule 23(d)." Id. at 350.  The Oppenheimer Court observed, however, that "discovery often has been used to illuminate issues upon which a district court must pass in deciding whether a suit should proceed as a class action under Rule 23, such as numerosity, common questions, and adequacy of representation." Id. at 351 n. 13.

Here, the names of warranty claimants do not have any direct relevance to the Plaintiffs' arguments for class certification, for they already have the number of warranty claims to support their allegations of numerosity, and the identities of putative class members will not lend further support to their arguments.  However, the Plaintiffs allege that they need the precise locations at which the fittings failed, in order to overcome Zurn's arguments against class certification, as they pertain to Zurn's theory of corrosive groundwater.  The Plaintiffs' argument is unpersuasive, given the low threshold for proving commonality, under Rule 23, particularly since they have enough information -- from the known putative class members, and from the general location information which was not redacted from the warranty claims -- to investigate and address Zurn's groundwater theory.

In sum, we conclude that the Plaintiffs have failed to make a threshold showing that the redacted names and addresses are relevant to the issue of class certification. Accordingly, we recommend that their Motion to Compel be denied.[11]

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendants' Motion to Enjoin the Filing of Related Lawsuits [Docket No. 24] be DENIED.

2.     That the Plaintiffs' Motion to Compel Production of Unredacted Warranty Claims Files [Docket No. 33] be DENIED.


BY THE COURT:


Dated:  February 19, 2008                    s/Raymond L. Erickson
                                             Raymond L. Erickson
                                             CHIEF U.S. MAGISTRATE JUDGE

---

[11]Moreover, neither party addresses the relevance, or lack thereof, of the redacted names of contractors on the warranty claim forms, with respect to class certification. Accordingly, the Plaintiffs have failed to show the relevance of the contractors' names, and their Motion to Compel should also be denied in this respect.

NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than**

**March 7, 2008,** a writing which specifically identifies those portions of the Report to

which objections are made and the bases of those objections.  Failure to comply with

this procedure shall operate as a forfeiture of the objecting party's right to seek review

in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing **by no later than March 7, 2008,** unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORDER

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Denise and Terry Cox, on
behalf of themselves and
all others similarly situated,

                Plaintiff,

   vs.

Zurn Pex, Inc.; and Zurn
Industries, Inc.,

                Defendants.         Civ. No. 07-3652 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to the provisions of Title 28 U.S.C. §636(b)(1)(A), upon the Plaintiffs'

Motion to Compel.  A Hearing on the Motion was conducted on February 13, 2008,

at which time, Shawn M. Raiter, and T. Joseph Snodgrass, Esqs., appeared on behalf

of the Plaintiffs, and Amy R. Freestone, and James A. O'Neal, Esqs., appeared on

behalf of the Defendants.

For reasons which follow, we defer our resolution of the Plaintiffs' Motion, and direct the parties to engage in a responsible meet and confer, by no later than April 7, 2008, given the guidance we provide in this Order. Absent an amicable resolution of their differences, the parties are then directed to submit any remaining documents in dispute to this Court for an in camera review, following which, we will issue a ruling on the Plaintiffs' Motion.

## II. Factual and Procedural Background

This is a putative class action, which the Plaintiffs Denise and Terry Cox bring on behalf of themselves, and all others similarly situated, against Zurn Pex, Inc., and Zurn Industries, Inc. (collectively, "Zurn"), alleging that Zurn manufactured deficient brass plumbing systems that are subject to premature failure. The Plaintiffs allege several State law claims, as well as a violation of the Magnuson-Moss Warranty Act, Title 15 U.S.C. §§2301, et seq., and they seek damages, as well as declaratory and injunctive relief. See, Complaint, Docket No. 1, Attachment No. 1.

According to the Plaintiffs, Zurn started selling in Minnesota, in about 2001, plumbing systems which consist of cross-linked polyethylene ("Pex") tubing, and brass crimp fittings, and later began receiving reports of the premature failure of the crimp fittings owing to stress corrosion cracking ("SCC"). The Plaintiffs further

- 2 -

allege that the SCC-induced failures in the crimp fittings have not been limited to

Minnesota, but have been found in several other States, and they seek class

certification that is either limited to customers in Minnesota, or that is expanded to

include customers in some or all of the United States.[1]  As related by the Plaintiffs, the

crimp fittings were sold with a twenty-five (25) year Warranty, which expressly

covered consequential damages, and Zurn initially honored that Warranty, and paid

for the failures that it attributed to SCC.  The Plaintiffs contend that, as the number of

SCC-related claims increased, Zurn began to deny Warranty claims routinely,

including the claims tendered by the Plaintiffs, after they experienced water damage

---

[1]The first proposed class is defined as:

> [A]ll persons and entities that own a structure located
> within the State of Minnesota that contains a Zurn Pex
> plumbing system with brass crimp fittings.  The proposed
> class includes, without limitation, all such persons or
> entities who contacted Zurn or its representatives about
> their Zurn Pex plumbing system * * * and were denied or
> partially denied warranty coverage for failure of the Zurn
> Pex plumbing system on the grounds based on a claim that
> "corrosion" was not covered by the warranty or that other
> warranty limitations applied.

Complaint, Docket No. 1, Attachment No. 1, at ¶37.

The additional proposed classes are substantively similar, but are defined as consisting
of residents either of all of the United States, or of some of the United States.  Id. at
¶¶38-39.

- 3 -

to their house, which they attributed to the failure of their Zurn-manufactured crimp

fittings.

By way of additional background, we have previously denied the Plaintiffs'

Motion for a Single-Phase Discovery Plan, and we directed the parties to engage in

focused discovery, on the question of class certification.[2]  See, Minute Order, Docket

No. 22, at 8.  We noted, in our Order, that Zurn had "pledged" to allow discovery on

"product design, testing, customer complaints, and the like," from readily available

sources which, it advised, would mostly be in hard copy.  Id. at 7.  Specifically, Zurn

agreed to produce "copies of its claim files; a sampling of the actual clamp fittings that

had been returned from the field, for the purposes of non-destructive testing and

evaluation; sales data from October of 2002, to the present; design drawings and

industry standards for the contested clamp fittings; and final versions of the relevant

product literature."  Id.

---

[2]In addition, on December 7, 2007, we denied Zurn's informal request for a Rule
26 Protective Order, which would govern discovery in this matter.  See, Minute Order,
Docket No. 39.  We directed the parties to continue their negotiation of the Protective
Order, in order to resolve the remaining, disputed terms.  Id.  The parties subsequently
reached an agreement concerning the terms of a Protective Order, and accordingly, on
December 26, 2007, we issued a Protective Order, which was based upon that
agreement.  See, Order, Docket No. 50; Stipulation, Docket No. 49.

On November 16, 2007, Zurn filed a Motion, in which it asked the Court to enjoin the Plaintiff's counsel from filing similar lawsuits against the Defendants, in any other Court, until the issue of class certification had been resolved before this Court, see, Docket No. 24, and on December 3, 2007, the Plaintiffs filed a Motion to Compel the Production of Unredacted Warranty Claims, arguing that the names and street addresses of the claimants was relevant to the issue of class certification.  See, Docket No. 33.  On February 19, 2008, we issued a Report and Recommendation, see, Docket No. 64, which was adopted by the District Court, the Honorable Ann. D. Montgomery presiding, such that the Motion to Enjoin was denied, as was the Motion to Compel unredacted discovery responses.

On January 30, 2008, the Plaintiffs filed a Motion to Compel, see, Docket No. 51, in which they seek to compel the production of certain documents that were withheld by Zurn from discovery on the ground of attorney-client privilege, and the work product doctrine, or in the alternative, they seek an in camera review of those documents.  Zurn opposes the Motion.

III. <u>Discussion</u>

<u>The Plaintiffs' Motion to Compel</u>.

A.    <u>Standard of Review</u>.   Since this is an action based on diversity

jurisdiction, Rule 501, Federal Rules of Evidence, requires that Minnesota law govern

our analysis of the attorney-client privilege, while we apply Federal law in our

analysis of work product claims.[3]  See, <u>PepsiCo, Inc. v. Baird, Kurtz, & Dobson LLP</u>,

305 F.3d 813, 817 (8th Cir. 2002), citing <u>Baker v. Gen. Motors Corp.</u>, 209 F.3d 1051,

1053 (8th Cir. 2000); <u>Simon v. G.D. Searle & Co.</u>, 816 F.2d 397, 402 (8th Cir. 1987),

cert. denied, 484 U.S. 917 (1987); <u>Baker v. General Motors Corp.</u>, 209 F.3d 1051,

1053 (8th Cir. 2000).

---

[3]As previously noted, the Plaintiffs allege several State law causes of action, and
also allege a Federal claim pursuant to the Magnuson-Moss Warranty Act, <u>Title 15
U.S.C. §§2301</u> et <u>seq</u>.  To vest a United States District Court with jurisdiction
pursuant to the Magnuson-Moss Warranty Act, the amount of each individual claim
must be at least $25.00, the total amount in controversy must exceed $50,000.00, and
if the claim is brought as a class action, there must be at least one hundred (100)
named plaintiffs.  See, <u>Title 15 U.S.C. §2310(d)(3)</u>.  In <u>Watts v. Volkswagen
Artiengesellschaft</u>, 488 F. Supp. 1233, 1236 (W.D. Ark. 1980), the Court found that,
in order to exercise Federal jurisdiction over a class action brought under Section
2310(d), there must be one hundred (100) named plaintiffs at the time that the Federal
jurisdiction is invoked.  Here, as in <u>Watts</u>, only two (2) named Plaintiffs presently
purport to bring this class action, and we find that the Magnuson-Moss Warranty Act
does not provide us with Federal Question jurisdiction, and therefore, this matter is
before us on the basis of our diversity jurisdiction.  See also, <u>Notice of Removal</u>,
<u>Docket No. 1</u>.

The Minnesota attorney-client privilege Statute provides that "[a]n attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty * * * without the client's consent." Minnesota Statutes Section 595.02, Subdivision 1(b); see also, Prior Lake American v. Mader, 642 N.W.2d 729, 738 n.7 (Minn. 2002). The party seeking to assert the attorney-client privilege has the burden of establishing that privilege. See, City Pages v. State, 655 N.W.2d 839, 845 (Minn. App. 2003), citing Kobluk v. Univ. of Minnesota, 574 N.W.2d 436, 440 (Minn. 1998); Leininger v. Swadner, 156 N.W.2d 254, 258 (Minn. 1968). Moreover, since the privilege operates to exclude potentially truthful evidence, it must be narrowly construed. See, Marvin Lumber v. PPG Industries, Inc., 168 F.R.D. 641, 644 (D. Minn. 1996), citing Bituminous Casualty Corp. v. Tonka Corp., 140 F.R.D. 381, 386 (D. Minn. 1992); see also, United States v. Bonnell, 483 F. Supp. 1070, 1076 (D. Minn. 1979).

In contrast, the work product doctrine is "distinct from and broader than the attorney-client privilege." In re Grand Jury Proceedings, 492 F.3d 976, 980 (8th Cir. 2007), quoting In re Murphy, 560 F.2d 326, 337 (8th Cir. 1977). The work product doctrine is codified in Rule 26(b)(3), Federal Rules of Civil Procedure, which

provides, in pertinent part, that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." "In order to protect work product, the party seeking protection must show the materials were prepared in anticipation of litigation, i.e., because of the prospect of litigation." PepsiCo, Inc. v. Baird, Kurtz, & Dobson LLP, supra at 817, citing Binks Mfg. Co. v. Nat'l Presto Industries, Inc., 709 F.2d 1109, 1118-19 (7th Cir. 1983).

Two different kinds of work product are encompassed in the language of the rule -- namely, ordinary work product, which includes "raw factual information," and opinion work product, which includes an attorney's "mental impressions, conclusions, opinions or legal theories." Baker v. General Motors Corp., supra at 1054. As the language of the Rule, and of the relevant case law makes clear, the privilege which attaches to ordinary work product may be defeated by an appropriate showing that "the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means." Id.; see also, Marvin Lumber v. PPG Indus., Inc., supra at 644, citing Petersen v. Douglas County Bank & Trust Co., 967 F.2d 1186, 1189 (8th Cir. 1992).

Thus, "while Rule 26(b)(3) affords protection for documents and tangible things, the underlying facts are not protected by the work-product doctrine." <u>Onwuka v. Federal Express Corp.</u>, 178 F.R.D. 508, 512-13 (D. Minn. 1997), and cases cited therein.  As we explained, in <u>Onwuka</u>:

> Only when the party seeking discovery attempts to ascertain "historical" facts, which inherently reveal the attorney's mental impressions, does the ordinary work-product privilege extend to protect the intangible interests. See, Shelton v. American Motors Corp., 805 F.2d 1323, 1326 (8th Cir. 1986).  While the distinction is a fine one, it represents a tenable footing between "unwarranted inquiries into the files and the mental impressions of an attorney," Hickman v. Taylor, supra at 510, 67 S.Ct. at 393, and the intolerable prospect that the work-product protections will be employed to shroud otherwise discoverable corporate affairs in a veil of secrecy.

<u>Id.</u> at 513.

Unlike ordinary work product, "opinion work product enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances." <u>Baker v. General Motors Corp.</u>, supra at 1054; see also, <u>In re Chrysler Motors Corp. Overnight Evaluation</u>, 860 F.2d 844, 846 (8th Cir. 1988), quoting <u>In re Murphy</u>, supra at 336.

B.    <u>Legal Analysis</u>.  In their Motion to Compel, the Plaintiffs seek the production of three (3) classes of documents that were listed in Zurn's privilege log:

(1) Barbara Cass ("Cass") source documents that constitute edited drafts of promotional, and Warranty material; (2) Lillian Macia ("Macia"), and Mark Samples ("Samples") source documents, which relate to processed Warranty claims; and (3) testing documents, communications and reports from three (3) metallurgical testing companies.  We address each category of discovery in turn.

      1.   <u>Cass Source Documents</u>.  The Plaintiffs ask for the production of several documents that, they allege, are ordinary business documents; namely, first drafts and edits to manuals, the Warranty, and Zurn promotional materials that contain annotations by Mark Weintrub ("Weintrub"), who was an attorney for Eljer Industries, Inc., which was the predecessor company to Zurn Industries, Inc.  Zurn opposes the production of those documents and argues that they are protected by the attorney-client privilege, as they represent an exchange of documents requesting legal advice between Weintrub ("Weintrub"), and his corporate clients.[4]

Zurn argues that an exchange of drafts of the documents, even if those documents are ultimately published to a third party, should be characterized as a privileged communication between attorney and client.  "Minnesota adheres to

---

[4]We note that Zurn only alleges that the Cass source documents are protected by attorney-client privilege, and does not claim that they are attorney work product.  See, <u>Affidavit of Amy R. Freestone</u>, <u>Docket No. 60</u>, at Exhibit 3.

Professor Wigmore's classic statement of the attorney-client privilege, which requires that an attorney-client communication relate to the purpose of obtaining legal advice before it is protected." Simon v. G.D. Searle & Co., supra at 403, citing Brown v. St. Paul City Ry., 62 N.W.2d 688, 700 (Minn. 1954); see also, Marvin Lumber v. PPG Industries, Inc., supra at 644. In Kobluk v. University of Minnesota, supra at 440, quoting In re Arnold & MacDowell, 566 F. Supp. 752, 755 (D. Minn. 1983), the Court noted that, although the privilege did not apply when the attorney acted as a "mere scrivener" in drafting a document, drafts of a letter denying tenure to a university professor, that were exchanged between the university and its counsel, were protected, since they came into existence as a result of an attorney-client relationship. Id. at 442; cf., State ex rel. Humphrey v. Philip Morris, Inc., 606 N.W.2d 676, 696 (Minn. App. 2000)(objective portions of attorney notes are not protected as attorney-client communication). This was true, even though the intended recipient of the letter was a third party, as the ultimate publication of the final version of the letter did not constitute a waiver of its earlier versions, that were created in concert with counsel. Id.

According to Zurn, the Cass source documents, that it has withheld, represent a request by a corporate client for legal advice from counsel regarding the effect of

- 11 -

language in the Warranty, advertisements, and promotional materials, and so are privileged. The Plaintiffs counter that those documents are discoverable, as the Warranty is ambiguous, and its drafting history is relevant to its interpretation. We note that the Plaintiffs have not supported, with any case law, their position that -- absent some waiver of the attorney-client privilege -- attorney-generated drafts of documents, such as contracts or warranties, are discoverable when the Court finds the content of those documents to be ambiguous.

On this Record, we are not able to determine if the annotations that Weintrub made on the Cass source documents constitute mere grammatical corrections, which would not be privileged, or instead, represent his advice as an attorney to his corporate client as to the legal implications of certain language choices, which would invoke the protections of the attorney-client privilege. We are hopeful that the parties can resolve this relatively straightforward dispute during their meet and confer. If, after discussing the nature of Weintrub's annotations, the parties continue to be unable to agree on the appropriate nature of their privilege status, then we will undertake an <u>in camera</u> review of those documents.

2.    <u>Macia and Samples Source Documents</u>. Next, the Plaintiffs argue that Zurn should be compelled to produce documents relating to Warranty claims that

were submitted to Zurn, and processed by Macia, who is Zurn's General Counsel. See, Affidavit of Macia, Docket No. 58, at ¶1. Specifically, the Plaintiffs seek Macia and Samples source documents in three (3) different categories: (1) documents that were drafted by warranty claimants, or unidentified claims handling representatives; (2) documents for which Zurn has failed either to identify the author, or the recipient; and (3) documents that involve warranty processing.[5] See, Plaintiffs' Memorandum in Support, Docket No. 53, at pp. 5, 8. Zurn has declined to produce those documents, and claims that they are protected by attorney-client privilege.[6] See, Affidavit of T. Joseph Snodgrass ("Snodgrass"), Docket No. 55, at Exhibits N and O.

As a threshold matter, we share the Plaintiffs' concern that some of the documents at issue were listed in the privilege log without the inclusion of an author,

---

[5]The Plaintiffs note that they do not seek production of a fourth category of Macia and Samples source documents -- namely, documents identifying outside counsel.

[6]Although both parties confine their discussion of these documents to the applicability of the attorney-client privilege, we note that in the privilege log, that was produced by Zurn, at least some of these documents were withheld as attorney work-product, or on the basis of both the attorney-client privilege and as work-product. See, Affidavit of T. Joseph Snodgrass, Docket No. 55, at Exhibits A, N and O. As we ultimately direct the parties to meet and confer, as to the claimed privileges for each of these documents, we do not decide here, which privilege, if any, applies, but direct the parties to ensure that they have addressed all claimed bases for withholding the documents, prior to submitting any remaining documents to the Court for an in camera review.

- 13 -

or a recipient, or with both fields missing.  In its Memorandum, and at the Hearing,

Zurn justified that failure by explaining that, for materials such as photographs, forms,

invoices, and promotional materials, it had not always able to provide the date, author,

or recipient of each document, and therefore, in those instances it had, instead,

described the subject matter and the reason for asserting the privilege.    See,

Defendants' Memorandum in Opposition, Docket No. 57, at p. 5; Affidavit of Amy

R. Freestone, Docket No. 60, at ¶¶8(b)-(c).  While we accept Zurn's assurance, as

made in good faith, we are uncomfortable with the idea of documents being withheld

as privileged when no substantive information about the nature of their contents has

been provided to the Plaintiffs.  Hopefully, as with the other documents at issue in this

matter, Zurn can clarify, during the meet and confer with the Plaintiffs' counsel, the

bases on which it claims privilege, with respect to those documents with an unknown

author or recipient but, absent such a clarification, we will review those documents

in camera.

   As to the remaining Macia and Samples source documents, Zurn argues that

Macia's exclusive involvement in the review of Warranty claims was in her capacity

as an attorney, and as an advisor who provided legal advice on those claims to Zurn

employees, and therefore, none of the documents, which she generated in that

capacity, are discoverable.  As noted by Zurn, in Rabushka ex rel. United States v. Crane Co., supra at 565, the Court found that a party had properly asserted a claim of attorney-client privilege where the opposing party had not submitted any evidence that would contradict an Affidavit submitted by the corporate counsel stating that the requested documents had been prepared in his capacity as a legal advisor, rather than in his capacity as corporate secretary.  See also, Triple Five of Minnesota, Inc. v. Simon, 212 F.R.D. 523, 528 (D. Minn. 2002)(finding that the attorney-client privilege applied to documents produced by corporate counsel in his capacity as a legal advisor, when the attorney also served, on occasion, as a business advisor).

In support of its claim of privilege, Zurn has submitted an Affidavit of Macia, see, Docket No. 58, in which she attests that her involvement with Warranty claims "is always in [her] capacity as general legal counsel."  Id. at ¶3.  Zurn has also submitted the deposition transcript of Samples, who is a non-attorney Zurn employee who also handled Warranty claims, which records his belief that Macia was "always acting as the attorney" in her involvement with claim processing.  See, Affidavit of Catherine G. Davis ("Davis"), Docket No. 59, at Exhibit A, pages 168-69.

The Plaintiffs acknowledge that the documents that were generated by Macia in the capacity of a legal advisor to Zurn are privileged, but they argue that, when an

attorney performs the task of claims adjusting, claims process supervising, or claim investigation monitoring, her role changes from legal counsel to that of a corporate decision maker, and relevant documents, which were generated by her in that capacity, are discoverable as routine business documents.  See, Mission National Ins. Co. v. Lilly, 112 F.R.D. 160, 163 (D. Minn. 1986).

Moreover, the Plaintiffs note that "[a] more or less routine investigation of a possibly resistible claim is not sufficient to immunize an investigative report developed in the ordinary course of business," Mission National Ins. Co. v. Lilly, supra at 163, and they cite to our decision, in Marvin Lumber v. PPG Industries, Inc., supra at 646, where we found that a business could not withhold documents, as attorney work-product, merely by choosing to have a law firm conduct its claim investigations.  The Plaintiffs argue that the assertion, in Macia's Affidavit, that she was always acting in her capacity as an attorney, is merely conclusory, and they have submitted a series of letters, which were drafted by Macia, and which, they suggest, reveal that Macia regularly engaged in Warranty claims processing without referring to any legal principles, or the provision of any legal advice.  See, Affidavit of Snodgrass, supra at Exhibits K-L.

- 16 -

As we advised the parties at the Hearing, on the Record before us, which does not include the contested documents, we are not in a position to make a determination concerning the applicability of either attorney-client or work product privilege, as to the Macia and Samples source documents. However, as we also noted, we are reluctant to take on the in camera review of a large number of documents, when the parties possess superior knowledge of the individuals, and the historical circumstances, involved in their generation. If Macia was acting as a legal advisor to Zurn, when she reviewed Warranty claims, then the attorney-client privilege would attach to her correspondence; whereas, if she was acting solely as a business advisor, and reviewing claims to determine if settlement was appropriate, then those documents are probably discoverable. When the parties assemble for their meet and confer, we trust that they will work together in an attempt to honestly and forthrightly address the specific nature of the privilege that is being asserted.

We understand that Zurn is concerned that the Plaintiffs have taken the position that the disclosure of any communication of a particular type would constitute a waiver of all privileges relating to that general communication, or to communications between those individuals or parties and, apparently as a consequence, counsel for Zurn has previously declined to meet and confer, as he was concerned that if he agreed

- 17 -

to meet with the Plaintiffs, he could be forced into making "snap decisions" as to privilege, which could later be employed against Zurn as a waiver of privilege, or of the work product protections.  See, <u>Affidavit of James A. O'Neal</u>, <u>Docket No. 61</u>, at ¶3.

Rule 26(b)(5), Federal Rules of Civil Procedure, provides the mechanism by which an inadvertent disclosure of a document, which the disclosing party claims is privileged or is protected work product, can be submitted to the Court for a determination of the waiver of that privilege.  Although "the attorney client privilege and the work product doctrine have different standards of waiver," which must be considered separately, <u>Minnesota Speciality Crops, Inc. v. Minnesota Wild Hockey Club, L.P.</u>, 210 F.R.D. 673, 675 (D. Minn. 2002), quoting <u>SNK Corp. of America v. Atlus Dream Ent. Co., Ltd.</u>, 188 F.R.D. 566, 570 (N.D. Cal. 1999), "when framing Orders which compel the disclosure of privileged documents, Courts should do so 'on a case by case basis consistent with the principles of fundamental fairness.'"  <u>Id.</u>, quoting <u>Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.</u>, 202 F.R.D. 418, 420 (E.D. Pa. 2001).  We anticipate that the process of meeting to discuss each claim of privilege will lessen the number of contested issues, and will simplify,

rather than complicate, the issues of privilege that are involved in this matter, which counsels a narrow application of the waiver of privilege doctrine.

Finally, the Plaintiffs allege that, even if the documents produced by Macia were privileged, the "factual, business and technical data," which underlie the Warranty claims, are discoverable. Specifically, the Plaintiffs seek disclosure of "the facts underlying Zurn's testing and analyses of failed fittings as well as Zurn's factual investigations into various warranty claims." Plaintiffs' Memorandum, Docket No. 53, at p. 23. Zurn represents that it has, in fact, disclosed all underlying factual information, and have declined to produce only those documents which were generated by an attorney, or were attached to an attorney communication. See, Defendants' Memorandum, supra at pp. 11-12. Absent some showing by the Plaintiffs, that Zurn has withheld inappropriate information, we consider that question resolved.

3.    Metallurgical Laboratories Source Documents.    Finally, the Plaintiffs seek to compel various documents that they describe as "analyses of failed fittings, e-mails, transmittal documents, handwritten notes of third-party consultants' employees, and communications concerning unidentified claims," which relate to metallurgical analyses that were performed by three (3) outside consulting

- 19 -

metallurgical laboratories that were retained by Zurn; namely, IMR Test Labs

("IMR"), AADFW, Inc. ("AADFW"), and Metallurgical Engineering Services, Inc.

("MES")(collectively, the "Laboratories").  The Plaintiffs initially sought to obtain

those documents directly from the Laboratories by serving each of them with a

Subpoena duces tecum in October of 2007.  However, Zurn obtained copies of the

requested documents before they were produced to the Plaintiffs, and withheld some

of the documents, which are listed in a Third Party Privilege Log.  See, Affidavit of

Snodgrass, supra at Exhibit F.  Zurn argues that those documents are protected as

work product, because they were created by Zurn, and the metallurgical laboratories

under the direction of Macia, and in anticipation of litigation.

The Plaintiffs argue that many of the documents, which have been withheld by

Zurn, predate the present litigation by several years, were authored primarily by non-

attorneys, or were not always communicated to counsel.  Zurn counters that the

Laboratories were retained to perform consulting work relating to brass fittings,

including the potential for litigation that often accompanies Warranty claims.  See,

Affidavit of Davis, supra at Exhibit A, at pages 112-13 ("Typically, with any product

claim or product failure, there is the potential for litigation to take place * * * [a]nd

because of that, we wanted to have an expert's analysis of the cause of failure").  Zurn

claims that it is not required to disclose that the work of the Laboratories was performed in anticipation of this litigation, but only was in anticipation of some litigation, see, Marvin Lumber v. PPG Industries, Inc., supra at 645, and it asserts that it has not withheld any actual analyses, or testing procedures, that were performed by the Laboratories, but only communications that related to the consulting relationship between Zurn, and the Laboratories, that developed in anticipation of litigation.

 As with the other documents at issue, we decline to make a ruling on the basis of the submissions before us, but instead, we will await the result of the parties' meet and confer.  However, we note that Zurn's assertion, that it contracted with the Laboratories in anticipation that, at some point, it would be involved in litigation relating to Warranty claims, paints the work-product doctrine with a very broad brush. Notably, Zurn has not pointed to any other litigation that took place between the time that it formed a relationship with the Laboratories, and the initiation of the present lawsuit.  See, Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 604 (8th Cir. 1977); Mission National Ins. Co. v. Lilly, supra at 163 ("A more or less routine investigation of a possibly resistible claim is not sufficient to immunize an investigative report in the ordinary course of business."); Onwuka v. Federal Express Corp., supra at 512 ("In the corporate setting, all documents which are generated in the ordinary course

- 21 -

of business hold some potential for serving as evidence in some future litigation."). Moreover, and as the parties are aware, test results would not be privileged merely because they were forwarded to Macia, or even if she ordered those tests, unless they were performed in anticipation of litigation.

As we explained at the Hearing, having participated in complex litigation for over thirty-five (35) years, we have found that the only means of providing the detail necessary to a determination concerning the privileged status of a particular document, without expensive, labor-intensive, and voluminous documentation, is to require the party claiming the privilege to sit on one side of a table, with the challenging party on the other, in order to allow the claiming party to hold the document up, with its back facing the challenging party, so the claiming party can detail the document's author, date, general subject matter, and the specific reasons why the document is privileged. As the Advisory Committee Notes for the 1993 Amendment of Rule 26(b)(5) optimistically reflect, "[p]roviding information pertinent to the applicability of the privilege or protection should reduce the need for in camera examination of the documents."

We note that our direction, that the parties engage in a face-to-face meet and confer, in order to discuss the claims of attorney-client and work product privilege as

- 22 -

to the contested documents, is not intended as a reflection on the adequacy of the privilege logs that Zurn has produced. The Plaintiffs have alleged that Zurn's failure to disclose the author and recipient of each document listed on the privilege log, and to provide the factual background necessary to sustain a claim of privilege, should be fatal to its claim of privilege, and they ask that we compel the production of all of the documents included by Zurn in its privilege log. However, this is a draconian measure, and even the Court, in the case cited by the Plaintiffs, <u>Kephart v. National Union Fire Insurance Co.</u>, 2007 WL 2253608 (D. Mont., August 2, 2007), declined to impose such a sanction. Zurn has in good faith produced a privilege log to support its refusal to produce a number of documents in this matter. The next step in this litigation is for the parties to meet and confer for a frank discussion of each of the documents, for which privilege is claimed. If the meet and confer leaves document requests unresolved, we will undertake the burdensome, labor-intensive task of an <u>in camera</u> review.

NOW, THEREFORE, It is --

ORDERED:

1.   That the Plaintiffs' Motion to Compel [Docket No. 51] is DEFERRED.

2.     That the parties are directed to engage in a responsible meet and confer, by no later than April 7, 2008, and, absent an amicable resolution of their differences, the parties are then directed to submit any documents, which remain in dispute, to this Court for an in camera review, following which, we will issue a ruling on the Plaintiffs' Motion.

BY THE COURT:

Dated:  March 31, 2008

s/Raymond L. Erickson
Raymond L. Erickson
CHIEF U.S. MAGISTRATE JUDGE

BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT O

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

---

Beverly Barnes and Brian Johnston, on behalf
of themselves and all others similarly situated,

           Plaintiffs and Proposed Class
           Representatives,

    vs.

Zurn Pex, Inc. and Zurn Industries, Inc.,

        Defendants

Court File No.

**COMPLAINT IN CLASS ACTION
AND DEMAND FOR JURY TRIAL**

---

Plaintiffs Beverly Barnes and Brian Johnston, on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this Complaint in class action and state and allege as follows:

### THE PLAINTIFFS

1.     Plaintiffs and proposed class representatives Beverly Barnes and Brian Johnston ("Plaintiffs") are residents of Bismarck, North Dakota.

2.     Plaintiff Brian Johnston is the owner of a home in Bismarck, North Dakota at which he and Beverly Barnes reside.  Plaintiffs are both insureds under the policy of insurance issued to cover the home referenced herein.

3.     Plaintiffs and proposed class representatives bring this case on behalf of themselves and a class of similarly situated persons in the State of North Dakota.

4.     In the alternative, Plaintiffs and proposed class representatives bring this case on behalf of themselves and a class of similarly situated persons in the United States.

5.      In the alternative, Plaintiffs and proposed class representatives bring this case on behalf of themselves and a class of similarly situated persons in certain, but not all, of the United States.

### THE DEFENDANTS

6.      Defendant Zurn Pex, Inc. is a privately-held foreign entity that is in the business, among other things, of advertising, warranting, manufacturing, selling and servicing plumbing components.

7.      On information and belief, Zurn Pex, Inc. has its principle place of business in Texas.

8.      On information and belief, Zurn Pex, Inc. is responsible for some or all of the acts and omissions alleged herein.

9.      Defendant Zurn Industries, Inc. is a privately-held foreign entity that is in the business, among other things, of advertising, warranting, manufacturing, selling and servicing plumbing components.

10.      On information and belief, Zurn Industries, Inc. has its principle place of business in Pennsylvania.

11.      On information and belief, Zurn Industries, Inc. is responsible for some or all of the acts and omissions alleged herein.

12.      On information and belief, Zurn Pex, Inc. and Zurn Industries, Inc. have acted in concert with each other with the respect to the actions and omissions alleged herein.

13.      At various times in marketing and advertising, in addressing quality control issues, warranty issues, manufacturing issues and legal issues associated with the subject matter of this Complaint, the Defendants have used literature and correspondence that reference "Zurn

Pex, Inc.", "Zurn Industries, Inc.", "Zurn Plumbing Products Group", "Qest, Inc. a division of Zurn Industries, Inc." and "Zurn Industries, Inc. Qest Operations."

14.     The products at issue are advertised at websites with URL addresses www. Zurn.com and www.zurnpex.com.

15.     On information and belief, "Qest, Inc." and "Qest Operations" are not separate legal entities.

16.     On information and belief, "Zurn Plumbing Products Group" is not a separate legal entity.  Rather, "Zurn Plumbing Products Group" is a trade name used by both "Zurn Industries, Inc." and "Zurn Pex, Inc."

17.     On information and belief, Zurn Pex, Inc. and Zurn Industries, Inc. are jointly and/or severally liable to the Plaintiffs and putative class members as joint venturers, or in the alternative, operate such that any pretend corporate formalities amongst and between the two should be disregarded or pierced, or in the alternative, are subject to an agency relationship, or in the alternative, are subject to predecessor and successor liability theories, or in the alternative, are otherwise jointly and severally liable for all acts and omissions alleged herein.

18.     Throughout the remainder of this Complaint, Zurn Pex, Inc. and Zurn Industries, Inc. and their respective predecessors will be collectively referred to as "Zurn."

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the parties, the proposed class, and the causes of action asserted herein pursuant to Rule 23 of the Federal Rules of Civil Procedure, pursuant to 28 U.S.C. § 1332 (d).

20.     This district is the proper venue for this case under 28 U.S.C. § 1391 in that the proposed class representatives reside in North Dakota, certain putative class members reside in

North Dakota, the causes of action for the class representatives arose, in part, in North Dakota, the causes of action for certain putative class members arose, in part, in North Dakota, and Zurn transacts business within North Dakota.

21.    Upon information and belief, there exists one prior-filed class action or proposed class action against Zurn relating to the subject matter of this Complaint. *Cox v. Zurn Pex, Inc. and Zurn Industries, Inc.*, No. 07-3652 (ADM/RLE) (D. Minn.).

## SUMMARY OF CLASS ACTION

22.    Plaintiffs on behalf of themselves and all other persons similarly situated bring this action for and on behalf of the owners of homes and buildings with Zurn plumbing systems with cross-linked polyethylene ("Pex") tubing.  These systems are defective.

23.    Plaintiffs and putative class members have been damaged as a result of the design, development, advertisement, marketing, sale and warranty misconduct of Zurn in connection with Zurn Pex plumbing systems installed with Zurn's brass crimp fittings.

24.    Zurn has sold brass crimp fittings for its Pex plumbing systems in North Dakota and in each of the United States.

25.    Zurn warrants and advertises that its brass crimp fittings provide "a worry free" plumbing system.

26.    Zurn warrants and advertises that, with its brass crimp fittings, "you can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

27.    Zurn warrants and advertises its brass crimp fittings as having a 25-year warranty – that expressly covers consequential damages arising from leaks or failures in the plumbing system.

4

28.     Zurn's brass crimp fittings, however, are defectively designed and manufactured and have failed only months after being put into service.

29.     The failures of the Zurn brass crimp fittings have and will in the future cause water leaks.  These leaks have and will in turn cause extensive damage to other property including the homes and personal property of the owners.  Such water leaks can result in mold and other water damage which can be harmful to the health of putative class members.

30.     The foregoing types of damages arising from Zurn's defective brass crimp fittings are reasonably foreseeable at the time of design and manufacture of the brass crimp fittings.

31:     The foregoing types of damages are reasonably foreseeable at the time of sale of the brass crimp fittings.

32.     Zurn's brass crimp fittings have been prematurely failing by the hundreds, if not thousands despite being used for potable water systems in the state of North Dakota for only a few years.

33.     The foregoing brass fitting failures have included premature failures in the State of North Dakota.

34.     After convincing consumers to purchase the Zurn brass crimp fittings based in part on the 25-year warranty, Zurn now refuses to honor the warranty because the failures are allegedly not "covered in [Zurn's] cost structure."

35.     Plaintiffs and putative class members seek damages arising from and proximately caused by Zurn's breach of consumer protection statutes, fraud and misrepresentations, negligence, breach of contract and breach of warranties.  The Plaintiffs and putative class members also seek declaratory and injunctive relief, as described below.

## DEFINITION OF PROPOSED CLASSES

36.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The first proposed class is defined as:

> All persons and entities that own a structure located within the State of North Dakota that contains a Zurn Pex plumbing system with brass Qicksert fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claims that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

37.     In the alternative, Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The second proposed class is defined as:

> All persons and entities that own a structure located within the United States that contains a Zurn Pex plumbing system with brass Qicksert fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claims that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

38.     In the alternative, Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The third proposed class is defined as:

> All persons and entities that own a structure located within certain, but not all, of the United States, all as may be more specifically identified in subsequent motions to certify a class, that contains a Zurn Pex plumbing system with brass Qicksert fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claims that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

6

39.     For all proposed classes, Plaintiffs specifically exclude Zurn or its related entities from the proposed class, all subsidiaries or affiliates of Zurn; any entity in which Zurn has a controlling interest; and any and all of Zurn's employees, affiliates, legal representatives, heirs, successors or assignees.

40.     Plaintiffs also specifically exclude from the Class any person or entity that has previously commenced and concluded a lawsuit against Zurn arising out of the subject matter of this lawsuit.

41.     Plaintiffs also specifically exclude from the Class the judge assigned to this case and any member of the judge's immediate family.

42.     For all proposed classes, Plaintiffs specifically include the claims of all persons or entities, like insurance companies, that have paid for the repair, replacement and / or damage caused by prematurely failed Zurn brass crimp fittings.

## FACTUAL BACKGROUND

**Zurn Pex Plumbing Background**

43.     Zurn is the manufacturer and seller of various plumbing products including Pex plumbing materials.

44.     Pex is an acronym for cross-linked polyethylene.  Polyethylene is the raw material and the "X" refers to the cross-linking of the polyethylene across its molecular chains

45.     For decades, plumbers and homeowners have used copper piping for potable water plumbing systems.

46.     Copper is and has been accepted by virtually all plumbing codes throughout the United States.

7

47.     In the 1990's, manufacturers in the United States began selling and plumbers began installing potable water plumbing systems with tubing made from polybutylene plastic.

48.     Zurn was a manufacturer, seller and distributor of plumbing systems using tubing made from polybutylene plastic.

49.     Plumbing systems using tubing made from polybutylene plastic were touted by manufacturers as being easier to install, cheaper and longer-lasting than copper plumbing systems.

50.     Polybutylene plumbing systems quickly proved to be poorly conceived, designed and manufactured systems.

51.     Those polybutylene systems began to fail prematurely in the field causing substantial property damage.

52.     A substantial amount of litigation ensued as a result of the widespread, premature failure of polybutylene plumbing systems.

53.     Several class actions were filed and settlements in those cases exceeded several billion dollars.

54.     At least in part in response to the failure of polybutylene plumbing systems, virtually all manufacturers ceased manufacturing polybutyene plumbing systems for sale in the United States.  In addition, most plumbing codes eventually prohibited the installation of polybutylene plumbing systems.

55.     In recent years, Zurn and other manufacturers developed alternative, non-copper plumbing products.

56.     Specifically, Zurn designed, manufactured and marketed a plumbing system using Pex tubing for use in residential and commercial settings.

57.     Zurn and other manufacturers of Pex plumbing products have touted Pex plumbing systems as being easier to install, cheaper and longer-lasting than copper plumbing systems.

58.     In recent years, more plumbing state and local plumbing codes have allowed for the installation of Pex plumbing products in addition to copper piping.

59.     Installation of Pex plumbing systems, however, remains prohibited in certain areas of the United States.

**Zurn Pex Brass Crimp Fittings**

60.     Zurn's Pex plumbing system uses a crimp connection design in which insert fittings made of brass alloy are inserted into the Pex tubing.  The brass fittings are secured by using a special tool that crimps copper rings around the outside of the tubing, which in turn, creates a seal between the Pex tubing and the brass fittings.

61.     Zurn has used different names for its brass crimp fittings since 2002, including referring to them as "QestPEX Crimp System," "Qicksert fittings," and "Qick/Sert insert fittings."

62.     The crimp system design chosen by Zurn for its Pex plumbing systems places a great deal of stress on the brass crimp fittings once the system is assembled as intended.

63.     The design, choice of material and manufacturing methods of the Zurn brass crimp fittings also result in residual stress on the fittings following the manufacturing process but before the system is assembled in the field.

64.     Zurn was negligent in its design and manufacture of the brass crimp fittings for a number of reasons, including Zurn's choice of a high zinc content brass alloy as the material used for the fittings.

9

65.     Zurn knew or should have known that the brass alloy it chose for the brass crimp fittings made the fittings susceptible to premature failure through various processes like dezincification and stress corrosion cracking.

66.     Zurn knew or should have known that its crimp fitting design, Pex system design, and choice of brass alloy also made the brass crimp fittings susceptible to premature failure through stress corrosion cracking.

67.     Zurn's design and materials choices have created a product that begins to fail on its first day of use, even if perfectly installed in its intended environment.

68.     Because of their defective design and manufacture, Zurn's brass crimp fittings failed in their intended purpose.

69.     Because of their defective design and manufacture, Zurn's brass crimp fittings are inherently defective and are substantially certain to fail within the 25 year express warranty provided by Zurn and / or the useful life of the fittings.

70.     All class members own Zurn Pex plumbing systems with brass crimp fittings that have already or are in the process of failing prematurely and thus have suffered or are reasonably certain to suffer actual injury well in advance of the warranted and expected life of their plumbing systems.

**Inadequate Testing of Zurn Brass Crimp Fittings**

71.     Zurn did not test the brass crimp fittings in their anticipated environments before selling those brass crimp fittings to the public.

72.     In an effort to save time and money, Zurn did not end use test the brass crimp fittings in Pex systems.

73.    Zurn conducted inadequate testing on its brass crimp fittings and failed to test things that it knew or should have known would lead to premature failure of the brass crimp fittings.

74.    Zurn also failed to investigate or test whether well-known and expected water conditions would lead to premature failure of the brass crimp fittings.

**False Advertising of Zurn Pex Systems**

75.    Zurn falsely advertised that the Pex plumbing system – including its brass crimp fitting components -- was reliable despite never testing and determining the reliability of its product when used in real world conditions.

76.    Zurn holds itself out as a "proven leader in the plumbing industry" and as a manufacturer of reliable plumbing products.

77.    Zurn also advertises itself as being "the time tested and proven leader in the flexible plumbing industry."

78.    Among other false and inaccurate representations of its Pex plumbing systems with brass crimp fittings, Zurn falsely advertised and represented that the system "resists mineral buildup, rust, corrosion, and electrolysis," had "No exotic parts to fail," and made "More positive connections, quicker, easier."

79.    Zurn also falsely represented its QestPEX Crimp System as "utilizes high quality brass fittings and copper crimp rings to provide a connection which is stronger than the pipe itself" and that "When properly installed, the QestPEX Crimp System is a worry free system!"

80.    Zurn also falsely represented that owners of its Pex plumbing systems "can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

81.     Zurn falsely advertises its QickSert crimp fitting system as "the most time tested and reliable fitting system available."

82.     Zurn also falsely advertises that its QickSert crimp fittings "are actually stronger than the pipe itself and once crimped, they can not be pulled apart or blown out."

83.     Zurn also falsely advertises that its QickSert crimp fittings and ease of installation will provide "perfect connections every time, giving you a plumbing system that will be worry free for a lifetime."

84.     Zurn also falsely marketed its Pex plumbing systems as being safe, reliable, and corrosion-resistant.

85.     Zurn also falsely marketed its Pex plumbing systems as being proven, time-tested and worry free.

86.     Zurn also falsely marketed and warranted its Pex plumbing systems as being extensively tested, and that based on the results of those tests, the Pex plumbing system and its brass crimp fittings were properly designed, developed, marketed, and manufactured so as to perform adequately, reliably and as represented.

87.     Zurn also falsely marketed and warranted that its Pex plumbing systems were superior to copper plumbing systems.

88.     Zurn also falsely marketed and warranted that its Pex plumbing systems and the brass crimp fittings were of superior design and materials than similar products made by competitors.

89.     Zurn and its authorized agents and distributors made each of the above described assertions, statements, representations and warranties with the intent and purpose of inducing plumbing suppliers, builders, plumbers, and consumers to purchase and install Zurn Pex

plumbing systems and its brass crimp fittings in their properties in the state of Minnesota and elsewhere.

90.     Zurn also made numerous material omissions and uniformly withheld important information relating to the design, reliability and performance of its brass crimp fittings and Pex plumbing systems.

91.     Had Zurn not withheld and omitted important information about the design, reliability and performance of its brass crimp fittings and Pex plumbing systems, Plaintiffs and the members of the putative class would not have purchased those products.

**Field Failures of Zurn Pex Systems**

92.     By 2003 at the latest, Zurn began receiving notice from the field that its brass crimp fittings were failing prematurely.

93.     Zurn brass crimp fittings have failed prematurely in numerous locations throughout the country.

94.     By July 1, 2005, Zurn had admitted that two to three years earlier it had noticed increased failure rates of its brass crimp fittings in the State of Minnesota.

95.     By July 1, 2005, Zurn had admitted that "the majority of fittings that are cracking are tees and elbows."

96.     By July 1, 2005, Zurn had admitted that "the majority of these fittings are cracking from inside the wall cavity of the fittings."

97.     As but one example of the high number of premature failures of Zurn's brass crimp fittings, one Minnesota plumbing company alone had reported over 150 failures of Zurn brass crimp fittings by the end of 2006.

98.     Because of the unacceptable rate of premature failure, that plumbing company stopped using Zurn's Pex systems and brass crimp fittings and switched to a competitor's product.  The competitor's product has performed well without failure, in the same installation area.

99.     By early 2005, Zurn directed certain of its distributors to stop selling the brass crimp fittings.

100.    By early 2005, Zurn directed certain of its distributors to sell only its Poly Alloy fittings for Pex systems used in Minnesota.

101.    By early 2005, certain of Zurn's distributors sent back their remaining inventory of Zurn brass crimp fittings.

102.    By early 2005, Zurn provided credits to certain of its distributors for the returned brass crimp fittings.

103.    Zurn has received reports that its brass crimp fittings have failed prematurely throughout the country.

104.    Zurn has now stopped selling brass crimp fittings in Minnesota.

105.    Zurn has not stopped selling brass crimp fittings in other parts of the country.

106.    Zurn has received reports that its brass crimp fittings have failed in the Bismarck, North Dakota area.

107.    Zurn has received reports that its brass crimp fittings have failed elsewhere in North Dakota.

**Competitors' Use of Different Product Materials and Designs**

108.   Several of Zurn's competitors in the Pex plumbing market chose designs and materials that are much more resistant to the premature failure problems that have plagued the Zurn Pex brass crimp fittings.

109.   For example, some of Zurn's competitors in the Pex plumbing market chose fitting and assembly designs that exert less stress on the fittings than the Zurn Pex brass crimp fittings.

110.   Some of Zurn's competitors in the Pex plumbing market chose fitting materials like copper, bronze and plastic that are less susceptible to premature failure than the Zurn Pex brass crimp fittings in residential plumbing applications.

111.   Zurn itself now sells plastic fittings and advertises those fittings as being more resistant to corrosion and stress corrosion cracking than brass crimp fittings.

**Plaintiffs' Circumstances**

112.   Plaintiff Brian Johnston, through his licensed plumber, purchased and had a Zurn Pex plumbing system installed in his home located in Bismarck, North Dakota.

113.   Just several years after installation, one of the Zurn brass crimp fittings failed at Plaintiffs' home causing damage to property other than the Pex plumbing system.

114.   Only two months later, another Zurn brass crimp fitting failed at Plaintiffs' home causing damage to property other than the Pex plumbing system.  Thereafter, additional Zurn brass crimp fittings began leaking at Plaintiffs' home.

115.   Plaintiffs, like many class members, have already suffered out-of-pocket damage to repair their home following the premature failures of the Zurn pex brass crimp fittings. Likewise, all putative class members have incurred or are reasonably certain to incur, the cost of

repairing their homes because of fittings failures and / or prematurely replacing their plumbing systems.

116.    The failure of the Zurn brass crimp fittings caused approximately $11,000 in damage to Plaintiffs' home.  Plaintiffs' property insurance company covered approximately $8,000 of the damage leaving Plaintiffs responsible to pay their deductible and any uncovered damage.

117.    Plaintiffs and the proposed class members suffered general and specific compensatory and contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

**Zurn's Warranty Misconduct**

118.    Following the failures of the Zurn brass crimp fittings, Plaintiff Beverly Barnes spoke with Zurn representatives and presented a warranty claim to Zurn for the damage caused by the premature failure of the brass crimp fittings.

119.    Zurn denied the warranty claim and alleged that the failure of Plaintiffs' Zurn brass crimp fittings was not covered by Zurn's 25-year warranty.

120.    Zurn denied Plaintiffs' warranty claim because of alleged limitations and disclaimers Zurn contended were part of its warranty.

121.    Zurn's brass crimp fittings, however, were uniformly sold without any limitations of warranties because Zurn and / or its distributors failed to provide any alleged warranty limitations or disclaimers at the time of the sale of the brass crimp fittings.

122.    In fact, Zurn brass crimp fittings are provided to plumbers and / or consumers in plastic bags without any warranty disclaimers.

123.    Zurn did not provide any alleged warranty disclaimers or limitations at the time of sale of the brass crimp fittings used in Plaintiffs' home.

124.    Zurn did not provide any alleged warranty disclaimers or limitations at the time of sale of the brass crimp fittings used in the structures of any of the members of the putative class.

125.    North Dakota law, and the laws of other states, requires a seller of a product to provide the purchaser of the product with any alleged warranty disclaimers or limitations. Failure to provide the alleged warranty limitations or disclaimers at the time of sale renders such attempted disclaimers and limitations invalid.

126.    As a result, Zurn well knew that it was legally obligated to compensate all consumers for their full measure of damages arising out of brass crimp fitting failures.

127.    Pursuant to uniform company policy, Zurn provided false, deceptive, misleading and fraudulent information to consumers with failed Zurn Pex systems by advising them that the Zurn warranty was subject to vague and ambiguous limitations about "corrosion" and "corrosive water."

128.    In response to the claims of its customers, Zurn has adopted a uniform company policy not to pay customers their full measure of damages.

129.    Zurn's attorneys and corporate executives were aware of this misconduct and condoned the misconduct because the flood of warranty claims Zurn has received were not included in Zurn's "cost structure" for these systems.

130.    Beginning in at least 2002 or soon thereafter, Zurn became aware through various claims and reports that the Zurn Pex plumbing and brass crimp system that it was

manufacturing, distributing and advertising was subject to premature failures, problems and deterioration.

131.    Despite the fact that Zurn knew its product was defective and that its system would not perform as advertised, warranted or otherwise expressly represented, Zurn continued to sell the product to the public without correction and, in fact, concealed from the public the fact that its Pex system and brass crimp fittings were defective, not durable and would begin to fail immediately upon being placed into service.

132.    Because the Zurn Pex plumbing system related to the habitability of persons' homes, Zurn had a duty to the consumer and to the public to disclose the defective nature of its system and not to conceal and suppress the defective nature of the product from the Plaintiffs and putative class representatives.

133.    Zurn, however, has engaged in a scheme to cover up the true nature of the problem with its brass crimp fittings and Pex plumbing system.

134.    Consistent with the usage in the plumbing trade, Zurn originally covered warranty claims for the premature failures of its brass crimp fittings but, after realizing the magnitude of the problem, began denying the warranty claims blaming the premature failures on "aggressive water."

135.    Zurn knew the cause of the premature failures was not "aggressive water" and has fraudulently concealed and suppressed from the Plaintiffs and putative class the true nature of the problems with the Pex plumbing and brass crimp fitting system.

136.    To this date, Zurn continues in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the public the true nature of the problems with the

18

brass crimp fittings.  In fact, many members of the putative class are still unaware that their plumbing system has and will continue to fail due to its design defect.

## SATISFACTION OF CLASS PREREQUISITES

137.    This class action satisfies numerosity, commonality, typicality, adequacy and superiority requirements for maintaining a class.

138.    **Numerosity.**  Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the proposed class "is so numerous that joinder of all members is impracticable."  The number of members of the proposed class is believed to be tens of thousands of individuals and/or entities that own properties with Zurn Pex plumbing systems.

139.    Zurn's own representatives have publicly stated that Zurn has sold millions of brass crimp fittings in the last six years.  Joinder of the persons and entities into whose properties the Zurn pex plumbing systems were installed is impractical and not feasible.

140.    **Commonality.**  Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the proposed class shares "questions of law or fact" that predominate and individualized issues.  The common questions include, but are not limited to, the following:

- Were Zurn Qick/Sert fittings defectively designed for their intended application?

- If so, what is the nature of the design defect?

- Did Zurn fail to warn consumers that the Qick/Sert fittings were not properly tested during design and development process?

- Did Zurn adequately warn consumers about any types of installations that may cause premature failure of the fittings?

- Did Zurn make fraudulent, false, deceptive and/or misleading statements in connection with the sale of Zurn Pex plumbing systems in its product literature, including those relating to standards and reliability?

- Did Zurn properly account for foreseeable variations in installation in the development and design of the Zurn Pex plumbing system?

19

- Did Zurn exercise reasonable care in the design, manufacture and testing of the Zurn Pex plumbing system?

- Are the Qick/Sert fittings progressively deteriorating at an accelerated rate?

- Will the Qick/Sert fittings fail prematurely?

- Did Zurn deliberately sell or allow Qick/Sert fittings to be distributed after it knew the fittings were defective?

- Did Zurn engage in fraudulent, false, deceptive and/or misleading misconduct with respect to the handling of warranty claims?

- What categories of damages are recoverable for owners of structures with Zurn Pex plumbing systems, e.g., replacement, consequential, incidental or other damages?

- Are the Plaintiffs entitled to relief under the U.C.C. for breach of the implied warranty of merchantability?

- Are the Plaintiffs entitled to relief under the U.C.C. for breach of the implied warranty of fitness for a particular purpose?

- Are the Plaintiffs entitled to relief under consumer protection statutes?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

- Should Zurn be enjoined from denying warranty claims based on alleged warranty disclaimers or limitations that were not provided to the purchaser at the time of sale of the products?

- Are Plaintiffs' claims barred in whole or in part by any of Zurn's affirmative defenses?

141.    **Typicality.** Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure,

the claims of the proposed class representatives, Plaintiffs "are typical of the claims … of the

class." Plaintiffs and all members of the proposed class who own Zurn's defective Pex plumbing

systems with brass crimp fittings have suffered damages as a result of Zurn's wrongful acts and

misconduct. Pursuant to corporate directives, Zurn engaged in a similar pattern of misconduct

towards both the Plaintiffs and all other putative class members.

142.   **Adequacy.**  Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, the proposed class representatives "will fairly and adequately protect the interests of the class." The Plaintiffs have no adverse interests to the proposed class members.  Plaintiffs were sold a defective plumbing system.  The Plaintiffs have retained a national litigation firm, Larson • King, LLP, whose attorneys have substantial resources, experience and success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

143.   **Superiority.**  Pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons:  A class action in this instance conserves the resources of the proposed class, Zurn and the Court.  The damages of most putative class members are not, in isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for the Plaintiffs and most putative class members, makes it difficult if not impossible for the class members to seek redress.  On information and belief, the Attorney General has not brought an enforcement action against Zurn to remedy the claims asserted herein.

Because the nature of the claims involved, the class members need swift and uniform resolution of their claims before additional damage is caused by failures.  Zurn has been uniformly refusing to pay the Plaintiffs and putative class members their full damages.

Further, there may be other cases pending against Zurn.  Serial adjudications in numerous venues is not efficient, timely, or proper.  Judicial resources throughout North Dakota and United States will be unnecessarily depleted by resolution of individual claims.  Joinder on an individual basis of thousands of claimants in any one suit would be impractical or impossible. Individualized judgments and rulings could result in inconsistent relief for similarly situated

plaintiffs. Individualized suits could also establish incompatible standards of conduct for Zurn in creating, marketing, sale and post-sale conduct in connection with Zurn's Pex plumbing systems.

## COUNT I

### (CONSUMER FRAUD)

144.     Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

145.     North Dakota Century Code § 51-15-02 makes it unlawful for any person by use of "any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby...." Consumer protection laws of other states make similar conduct unlawful.

146.     By engaging in the conduct described herein, Zurn violated and continues to violate N.D. Cent. Code § 51-15-02 and the similar laws of other states.

147.     Zurn's wrongful conduct and use of false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others relied on those statements, includes, by way of example and not by limitation:

    a.     Zurn's fraudulent, misleading, and deceptive statements and practices relating to Zurn's Pex plumbing system;

    b.     Zurn's warranty related misconduct, including its fraudulent, deceptive and unfair practice of lying about warranty limitations;

    c.     Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system, the improper design of the system, and Zurn's knowledge of those defects, and

    d.     Zurn's concealment of the true nature of its defective plumbing system.

148.   Zurn engaged in the above-mentioned misconduct with the intent that third parties, including the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, the Plaintiffs and putative class), would rely on the misrepresentations and omissions.

149.   As a result of Zurn's practices relating to the sale of its Pex plumbing systems, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

150.   As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

151.   That as a direct, proximate and foreseeable result of Zurn's violation of statute, the Plaintiffs and putative class members sustained damages, in the aggregate, in excess of $50,000.00.

## COUNT II

### (FALSE ADVERTISING)

152.   Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

153.   That North Dakota Century Code § 51-12-01 provides in part:

> 1. No person with intent to sell, dispose of, increase the consumption of, or induce the public to enter an obligation relative to or to acquire title or interest in any . . . merchandise, . . . or anything offered to the public may make, publish, disseminate, circulate, or place before the public, or directly or indirectly shall cause to be made, published, disseminated, circulated, or placed before the public in a newspaper, or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, tab, label, letter, or in any other way, an advertisement that contains any assertion, representation, or statement of fact, including

23

the price thereof, which is untrue, deceptive, or misleading regarding such . . . merchandise, . . . or anything offered to the public.

Similarly, that North Dakota Century Code § 51-12-08 provides in part:

It is unlawful for any person with intent, directly or indirectly, to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation thereto, to make or disseminate or cause to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

Any person who violates the foregoing provisions of the North Dakota Century Code is guilty of a class B misdemeanor. N.D. Cent. Code §§ 51-12-02, 51-12-13. In addition, any person who violates or proposes to violate any of the provisions of § 51-12-08 may be enjoined by any court of competent jurisdiction. N.D. Cent. Code § 51-12-14. Consumer protection laws of other states make similar conduct unlawful.

154.    That by engaging in the conduct described herein, Zurn violated and continues to violate N.D. Cent. Code §§ 51-12-01, 51-12-08 and the similar laws of other states.

155.    Zurn's untrue, deceptive, and misleading assertions and representations about its Pex plumbing systems and brass crimp fittings, include, by way of example and not by limitation:

a.    Zurn's fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of Zurn's Pex plumbing system;

b.    Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system, the improper design of the system, and Zurn's knowledge of those defects, and

c.    Zurn's concealment of the true nature of its defective plumbing system

156.    Zurn and its agents and distributors also made untrue, deceptive, and misleading assertions and representations about the Zurn Pex plumbing system and its brass crimp fittings by making the various statements about the alleged quality of the system and brass crimp fittings referenced herein.

157.    As a result of Zurn's untrue, deceptive, and misleading assertions and representations about the Pex plumbing systems, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

158.    As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

159.    Plaintiffs seek to enjoin Zurn from untrue, deceptive, and misleading assertions and representations about the Pex plumbing systems.

## COUNT III

### (NEGLIGENCE)

160.    Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

161.    Zurn was negligent in that it failed to use reasonable care when it created, marketed and sold its Pex plumbing system with brass crimp fittings.

162.    Zurn owed a duty to the Plaintiffs and proposed class members to provide a safe and quality product, and a duty to provide a product that would perform as it was advertised. Zurn breached those duties.

163.    That as a result of Zurn's negligence, the Plaintiffs and putative class members sustained injuries.

164.    That as a direct and proximate result of Zurn's negligence, lack of care, and other wrongful acts, the Plaintiffs and proposed class members sustained and will sustain damages.

165.    As a result of Zurn's negligence, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in their homes and structures a plumbing system that is defective.

166.    As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace brass crimp fittings, but also include, without limitation, consequential and incidental damages.

167.    That as a direct, proximate and foreseeable result of Zurn's negligence, the Plaintiffs and proposed class members have been damaged, in the aggregate, in an amount to be determined at trial.

## COUNT IV

## (NEGLIGENT FAILURE TO WARN)

168.    Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

169.    As the manufacturer of a product, Zurn had a duty to provide instructions for proper use of its products.

170.    As the manufacturer of a product, Zurn had a duty to warn of foreseeable dangers inherent in the proper use of its products and also had a duty to warn of dangers associated with foreseeable misuse of its products.

171.    That to the extent Zurn claims in this lawsuit that the premature failures of its Pex plumbing brass crimp fittings was the result of characteristics of the water chemistry present in the Plaintiffs or the members of the putative class's water supply, Zurn failed to warn of those characteristics or dangers.

172.    That as a direct, proximate and foreseeable result of Zurn's failure to warn, Plaintiffs and proposed members of the class suffered damage.

173.    As a result of Zurn's failure to warn, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

174.    As a result of Zurn's failure to warn, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace brass crimp fittings, but also include, without limitation, consequential and incidental damages.

175.    That as a direct, proximate and foreseeable result of Zurn's failure to warn, the Plaintiffs and proposed class members sustained damages, in an amount to be determined at trial.

## COUNT V

### (NEGLIGENT MISREPRESENTATION)

176.    Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

177.    Negligent misrepresentation is a statutory claim under N.D. Cent. Code § 9-03-08(2), which provides, in relevant part:

> Actual fraud within the meaning of this title consists of any of the following acts committed by a party to the contract, or with the party's connivance, with intent to deceive another party thereto or to induce the other party to enter into the contract:
>
> . . .

2.  The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though that person believes it to be true; . . . .

178.    That by engaging in the conduct described herein, Zurn violated and continues to violate N.D. Cent. Code §§ 9-03-08(2) and the similar laws of other states.

179.    In making material misrepresentations of material facts regarding the characteristics and capabilities of its Pex plumbing system through its advertising and product information and through its internet website, Zurn induced the Plaintiffs and members of the putative class to enter into contracts relating to the purchase and installation of the Zurn pex systems.

180.    Similarly, in making material misrepresentations of material facts regarding the characteristics and capabilities of its Pex plumbing system through its advertising and product information and through its internet website, Zurn knew or should have known it was misrepresenting material facts and that the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, the Plaintiffs and putative class), would be relying on Zurn's representations to their detriment and damage; the Plaintiffs and putative class in fact relied on Zurn's misrepresentations and omissions.

181.    In concealing material facts regarding the characteristics and capabilities of its Pex plumbing system, Zurn knew or should have known it was not disclosing material facts and that the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, the Plaintiffs and putative class), would be relying on Zurn's representations to their detriment and damage; the Plaintiffs and putative class in fact relied on Zurn's misrepresentations and omissions.

182.    That as a direct, proximate and foreseeable result of Zurn's failure to fully disclose material facts and Zurn's making misrepresentations of material fact, Plaintiffs and proposed members of the class suffered damage.

183.    As a result of Zurn's negligence, the Plaintiffs and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

184.    As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace brass crimp fittings, but also include, without limitation, consequential and incidental damages.

185.    That as a direct, proximate and foreseeable result of Zurn's negligent misrepresentations, the Plaintiffs and proposed class members sustained damages, in an amount to be determined at trial.

<u>COUNT VI</u>

**(DECEIT, MISREPRESENTATION AND CONCEALMENT)**

186.    Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

187.    North Dakota's Century Code § 9-10-03 provides that "[o]ne who willfully deceives another with intent to induce that person to alter that person's position to that person's injury or risk is liable for any damage which that person thereby suffers."

188.    North Dakota Century Code § 9-10-02 defines actionable "deceit" as follows:

A deceit within the meaning of North Dakota Century Code § 9-10-03 is:

1.      The suggestion as a fact of that which is not true by one who does not believe it to be true;

2.     The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

3.     The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4.     A promise made without any intention of performing.

189.     North Dakota Century Code § 9-10-04 further provides that "[o]ne who practices a deceit with intent to defraud the public or a particular class of persons is deemed to have intended to defraud every individual in that class who actually is misled by the deceit."

190.     By engaging in the conduct described herein, Zurn violated and continues to violate N.D. Cent. Code § 9-10-02 and the similar laws of other states.

191.     Zurn's direct and indirect representations through its advertising and product information and through its internet website regarding the quality, durability and efficiency of its product were false and misleading, were material facts, and were made willfully and intentionally with the intent to deceive the public.

192.     Zurn knew or should have known it was intentionally and fraudulently misrepresenting material facts and that the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, the Plaintiffs and putative class), would be relying on Zurn's representations to their detriment and damage.

193.     Zurn fraudulently concealed the nature of its Pex plumbing and brass crimp fitting system from the Plaintiffs and putative class, both in pre-sale communications and by its post-sale misconduct, as alleged above.

194.     Zurn engaged in the above-mentioned misconduct with the intent to induce third parties, including the Plaintiffs and putative class (and also Zurn's distributors and installers, and

30

through them, the Plaintiffs and putative class), to purchase and install in homes and structures a plumbing system that is defective.

195.    As a result of Zurn's practices, and the Plaintiff class' reliance thereon, the Plaintiff class has suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective.

196.    As a result of Zurn's misconduct, the Plaintiff class is entitled to a statutory presumption that Zurn intended to defraud every individual in the class who was actually misled by the deceit.

197.    As a result of Zurn's misconduct, the Plaintiffs and putative class will suffer damages that include not only the full cost to replace their brass crimp fittings, but also include, without limitation, consequential and incidental damages.

198.    That, as a direct, proximate and foreseeable result of Zurn's deceit and misrepresentations, the Plaintiffs and proposed class members have been damaged, in the aggregate, in an amount to be determined at trial.

## COUNT VII

### (BREACH OF IMPLIED WARRANTY – MERCHANTABILITY)

199.    Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

200.    Zurn was at all relevant times a merchant with respect to its Pex plumbing system and that there was implied in the agreements between Zurn, Zurn's representatives and the Plaintiffs and putative class that such goods would be of merchantable quality pursuant to N.D. Cent. Code § 41-02-31(1)-(2).

201.    Zurn breached such warranties implied in the agreements and contracts by producing, marketing and selling a defective plumbing system.  As a result thereof, the Plaintiffs and the putative class did not receive goods as impliedly warranted by Zurn to be merchantable. The Plaintiffs and proposed class members are beneficiaries of the contracts.  N.D. Cent. Code § 41-02-35.

202.    That as a direct, proximate and foreseeable cause of Zurn's breach of implied warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in an amount to be determined at trial.

## COUNT VIII

### (BREACH OF IMPLIED WARRANTY – FITNESS FOR PARTICULAR PURPOSE)

203.    Plaintiffs and putative class members re-allege foregoing paragraphs, inclusive, as though fully set forth herein.

204.    The Plaintiffs and putative class members relied upon Zurn's claimed skill, expertise and quality assurance to provide suitable goods for such purposes.

205.    At the time Zurn sold the goods to the Plaintiffs and the putative class, Zurn knew of the particular purpose for which the goods were required and knew that the Plaintiffs and proposed class members were relying on Zurn to provide goods suitable for their purpose, including all foreseeable variances in conditions and installation.  Accordingly, there was an implied warranty that the plumbing systems were fit for their particular purpose.  N.D. Cent. Code § 41-02-32.

206.    Zurn breached such warranty implied in the agreements and contracts by providing defective plumbing systems.  The beneficiaries of the contracts, including the Plaintiffs and putative class members, did not receive goods as impliedly warranted by Zurn to

be fit for their particular purpose.  N.D. Cent. Code §§ 41-02-32, 41-02-35.  Proper presuit notification, to the extent required, has been provided.

207.   That as a direct, proximate and foreseeable result of Zurn's breach of the implied warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in an amount to be determined at trial.

## COUNT IX

### (BREACH OF IMPLIED WARRANTY – COURSE OF DEALING/USAGE OF TRADE)

208.   Plaintiffs and putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

209.   It is the course of dealing and usage of trade in the plumbing industry to deliver brass fittings for plumbing systems that have sufficient specifications to avoid stress corrosion cracking in residential applications.

210.   Zurn breached such warranty implied in the agreements and contracts by providing defective plumbing systems in violation of industry standards.  N.D. Cent. Code § 41-02-31(3).

211.   Proper presuit notification, to the extent required, has been provided.

212.   That as a direct, proximate and foreseeable result of Zurn's breach of the implied warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in an amount to be determined at trial.

## COUNT X

### (BREACH OF EXPRESS WARRANTIES)

213.   Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

33

214.     On information and belief, and in the alternative, Zurn made certain express warranties to distributors relating to the goods it would provide.  N.D. Cent. Code § 41-02-30.

215.     On information and belief, the express warranties provided by Zurn include warranties that it would provide properly designed plumbing systems and a 25 year warranty on such systems.

216.     Through distributors, the Plaintiffs and putative class members relied upon Zurn's express warranties.  N.D. Cent. Code § 41-02-35.

217.     Zurn breached such express warranties by providing defective plumbing systems that have or are reasonably certain to fail well before the 25 year warranty or useful life of the product.

218.     That as a direct, proximate and foreseeable cause of Zurn's breach of express warranty, the Plaintiffs and proposed class members sustained damages, in the aggregate, in an amount to be determined at trial.

## COUNT XI

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

219.     Plaintiffs and proposed class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

220.     Plaintiffs and the Class members are consumers within the meaning of 15 U.S.C. § 2301 et seq.

221.     As described herein, Defendants, who are warrantors within the meaning of 15 U.S.C. § 2301 et seq., have committed several violations of state law, including breach of contract and breach of warranties.

222.   Plaintiffs and the class members have sustained damages in excess of $50,000 by

Defendants' breach of their warranties, implied warranties, and contracts, 15 U.S.C. §

2310(d)(1), and are entitled to recover reasonable attorney's fees and costs.

## COUNT XII

## (DECLARATORY RELIEF)

223.   Plaintiffs and proposed class members re-allege the foregoing paragraphs,

inclusive, as though fully set forth herein.

224.   Plaintiffs and putative class members seek a declaratory judgment as follows:

    a.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because Zurn at the time of sale and thereafter concealed and suppressed that the system was defective, and because the provisions are otherwise unconscionable;

    b.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate remedies because the defect in the plumbing system is latent and because the Plaintiffs lack sufficient bargaining power;

    c.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is unlawful and unenforceable;

    d.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is barred by Zurn's failure to provide the alleged warranty disclaimers at the time of sale of the product;

    e.    Any releases obtained by Zurn, that did not otherwise provide full compensation to the putative class, were fraudulently induced, are unconscionable, were obtained by suppression and concealment, were obtained under duress by persons needing to repair their plumbing systems, and are null and void; and

g.   To the extent Zurn has had an adverse adjudication against it arising from the subject matter of this Complaint, that the putative class may use offensive collateral estoppel against Zurn for the rulings and determinations therein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Zurn as follows:

1.   Certification of this plaintiff class and appointing Plaintiffs and their counsel to represent the class;

2.   Compensation for damages suffered by Plaintiffs and the proposed class members;

3.   Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.   Enjoin Zurn from engaging in any conduct in violation of statute;

5.   Declaring the rights and obligations of the parties as prayed for; and

6.   Such other and further relief the Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury for all matters at issue in this case for which a jury trial is available.

Dated:  October 22, 2007.

LARSON · KING, LLP

By
Shawn M. Raiter, Esq. (No. Dak. #05712)
T. Joseph Snodgrass (Mn #231071)
2800 Wells Fargo Place
30 E. 7th Street
St. Paul, MN 55102
Telephone: (651) 312-6500

**ATTORNEYS FOR PLAINTIFFS AND PUTATIVE CLASS**

1214042

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT P

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jody and Brian Minnerath, on behalf of
themselves and all others similarly situated,

Court File No.

      Plaintiffs and Proposed Class
      Representatives,

**CLASS ACTION COMPLAINT**

   vs.

Zurn Industries, LLC and Zurn Pex, Inc.

      Defendants

Plaintiffs Jody and Brian Minnerath, on behalf of themselves and all others similarly situated, by and through their attorneys, Zimmerman Reed, P.L.L.P., for this Complaint against Defendants, state as follows:

## NATURE OF ACTION

1.    This is a class action against Zurn Pex, Inc. and Zurn Industries, Inc. (collectively "Defendants" or "Zurn") on behalf of all persons who own a home or other structure containing a Zurn plumbing system with cross-linked polyethelene ("Pex") tubing and brass Qicksert fittings and who suffered damages as a result of the Zurn Pex system's failure. Zurn's Pex plumbing systems are defective and have been routinely failing for years. Though warranted, Zurn has routinely denied warranty coverage by claiming its warranties do not cover "corrosion" or otherwise misrepresenting the scope of the operative warranties.

2.    Plaintiffs and the putative class members have been damaged as a result of Zurn's design, development, advertisement, marketing, sale and warranty misconduct in connection with its Zurn Pex plumbing systems installed with Zurn's brass crimp fittings.

3.     Plumbing manufacturers such as Zurn began marketing Pex plumbing systems in the 1990's as cheaper, simpler, longer-lasting alternatives to traditional copper systems. However, it turned out that Pex plumbing systems, including Zurn's, were not superior systems and began failing pervasively wherever the systems were sold mere months after installation, including throughout Minnesota and across the Nation.

4.     Zurn's Pex plumbing systems have failed in part due to the failure of the systems' brass crimp fittings.  Zurn's brass crimp fittings were unsuitable for use in systems and have caused failure or a substantial risk of failure in all Zurn Pex plumbing systems during the relevant period.

5.     Zurn's brass crimp fittings were defectively designed and manufactured. The fittings have been failing as early as less than one year after being put into service, including multiple failures throughout the state of Minnesota.

6.     The failures of Zurn's brass crimp fittings have and will in the future cause leaking and extensive damage to property in which they are contained.  Such water leaks can result in mold and other water damage which can be harmful to the health of putative class members.

7.     At all relevant times, Zurn sold its Zurn Pex plumbing systems as defect free and warranted the systems for twenty-five years against failure and all consequential damages arising from any leak or failure.

8.     Despite its warranties, Zurn predominantly denied warranty claims arising from its failing Zurn Pex systems, claiming its warranties did not cover "corrosion" or otherwise misrepresenting the scope of its warranties.

9.    Zurn has refused to honor its warranties in part because the failures are allegedly not "covered in [Zurn's] cost structure."

10.    This action seeks damages and equitable relief for the harm arising from the failure of Zurn Pex plumbing systems and Zurn's improper refusals to honor its warranties. As set forth more fully below, Zurn's misconduct: (1) breached its express warranties; (2) breached its implied warranties of merchantability; (3) violated Minnesota's Consumer Fraud Statute, Minn. Stat. §325F.69; (4) violated Minnesota's Unlawful Trade Practices Act, Minn. Stat. §325D.13; (5) violated Minnesota's Deceptive Trade Practices Act, Minn. Stat. §325D.44; (6) violated Minnesota's False Advertising Statute, Minn. Stat. §325.67; (7) amounted to actionable negligence; (8) amounted to an actionable negligent failure to warn; (9) amounted to negligent misrepresentation; (10) violated the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*; and (11) entitles Plaintiffs to declaratory relief.

## PARTIES

11.    Plaintiffs Jody and Brian Minnerath reside at 121148 Maple Springs Drive SE, Hudson Township, MN  56308

12.    Plaintiffs purchased a Zurn Pex plumbing system in 2003.  Plaintiffs' system first began noticeably failing in 2006 when the system began leaking through the interior ceiling of their home.  Since then, Plaintiffs' Pex plumbing system has leaked elsewhere throughout the house.  Plaintiffs have suffered considerable damage to their home as a result of the failure of the Pex plumbing system.

13.    Defendant Zurn Industries, LLC is a privately held entity in the business of advertising, warranting, manufacturing, selling and servicing plumbing components.

14.    Zurn Industries, LLC, on information and belief, maintains its principal place of

business in the state of Pennsylvania.

15.    Defendant Zurn Pex, Inc. is a privately-held foreign entity that is in the business, among other things, of advertising, warranting, manufacturing, selling and servicing plumbing components.

16.    Zurn Pex, Inc., on information and belief, maintains its principal place of business in the state of Texas.

17.    On information and belief, Zurn Industries, LLC and Zurn Pex, Inc. have acted in concert with each other with the respect to the actions and omissions alleged herein.

18.    At various times in marketing and advertising, in addressing quality control issues, warranty issues, manufacturing issues and legal issues associated with the subject matter of this Complaint, Defendants have used literature and correspondence that reference "Zurn Pex, Inc.", "Zurn Industries, Inc.", "Zurn Plumbing Products Group", "Qest, Inc. a division of Zurn Industries, Inc." and "Zurn Industries, Inc. Qest Operations."

19.    On information and belief, "Qest, Inc." and "Qest Operations" are a part of and are not separate legal entities from Zurn Industries, LLC and Zurn Pex, Inc.

20.    On information and belief, "Zurn Plumbing Products Group" is not a separate legal entity.  Rather, "Zurn Plumbing Products Group" is a trade name used by both "Zurn Industries, LLC." and "Zurn Pex, Inc."

21.    On information and belief, Zurn Industries, LLC and Zurn Pex, Inc. and their legal predecessors, successors, assigns, and current and former corporate parents are jointly and severally liable to the Plaintiffs and putative class members as joint venturers, or in the alternative, operate such that any pretend corporate formalities amongst and between the two should be disregarded or pierced, or in the alternative, are subject to an agency relationship, or

in the alternative, are subject to predecessor and successor liability theories, or in the alternative, are otherwise jointly and severally liable for all acts and omissions alleged herein.

## JURISDICTION AND VENUE

22.   This Court has jurisdiction over the causes of action asserted herein pursuant to 28 U.S.C. §1332(d)(2) in that there is diversity of citizenship between the named Plaintiffs and Zurn, and the aggregate amount in controversy exceeds $5 million.

23.   This district is the proper venue for this case under 28 U.S.C. § 1391 in that the Plaintiffs and proposed Class representative reside in Minnesota, certain putative class members reside in Minnesota, the causes of action for the class representatives arose, in part, in Minnesota, the causes of action for certain putative class members arose, in part, in Minnesota, and Zurn transacts business within Minnesota.

## FACTUAL BACKGROUND

**Zurn's Pex Plumbing Systems**

24.   Zurn manufactures and sells of a wide array of plumbing products including Pex plumbing materials.

25.   "Pex" is an abbreviation for cross-linked polyethylene.  Polyethylene is the raw material and the "X" refers to the cross-linking of the polyethylene across its molecular chains.

26.   For decades, plumbers and homeowners used copper piping for potable water plumbing systems.

27.   Copper is and has been accepted by virtually all plumbing codes throughout the United States.

28.   In the 1990's, manufacturers in the United States, including Zurn, began selling and plumbers began installing potable water plumbing systems with tubing made from

5

polybutylene plastic.

29.    Plumbing systems using tubing made from polybutylene plastic were touted by manufacturers as being easier to install, cheaper and longer-lasting than copper plumbing systems.

30.    Polybutylene plumbing systems quickly proved to be poorly conceived, designed and manufactured and began to fail prematurely, causing substantial property damage.

31.    A substantial amount of litigation ensued as a result of the widespread, premature failure of polybutylene plumbing systems.  Several class actions were filed and settlements in those cases exceeded several billion dollars.

32.    Because of the dramatic failure of polybutylene plumbing systems, most plumbing codes in the United States prohibited the installation of polybutylene plumbing systems and virtually all manufacturers ceased manufacturing polybutylene systems for sale in the United States.

33.    As an alternative to the both costly copper and now prohibited polybutylene systems, Zurn and other manufacturers developed alternative, non-copper plumbing products.

34.    Specifically, Zurn designed, manufactured and marketed a plumbing system using Pex tubing for use in residential and commercial structures, touting it as cheaper, easier to install, and longer-lasting than copper plumbing systems.

35.    State and local plumbing codes have increasingly authorized the installation of Pex plumbing products in addition to copper, though Pex plumbing systems remain prohibited in certain areas of the United States.

**Zurn's Brass Crimp Fittings**

36.    Zurn's Pex plumbing systems employ a crimp connection design in which fittings

made of brass alloy are inserted into the Pex tubing. The brass fittings are secured with a special tool that crimps copper rings around the outside of the tubing, which in turn, creates a seal between the Pex tubing and the brass fittings.

37. Zurn has used different names for its brass crimp fittings since 2002, including but not limited to the "QestPEX Crimp System," "Qicksert fittings," and "Qick/Sert insert fittings."

38. Zurn's chosen crimp system design for its Pex plumbing systems places a great deal of stress on the brass crimp fittings once the system is properly assembled.

39. Zurn's design, choice of material and manufacturing methods for its brass crimp fittings cause residual stress on the fittings following the manufacturing process- even before the system is assembled in the field.

40. Zurn was negligent in its design and manufacture of the brass crimp fittings for a number of reasons including its decision to construct its brass fittings with a high zinc content, which subjected the fittings to premature failure due to dezincification even if perfectly installed in the intended environment.

41. Zurn knew or should have known that its crimp fitting design, Pex system design, and choice of brass alloy also made the brass crimp fittings susceptible to premature failure through stress corrosion cracking, even if perfectly installed in the intended environment.

42. Because of their defective design and manufacture, Zurn's brass crimp fittings failed in their intended purpose.

43. Zurn conducted inadequate testing on its brass crimp fittings and failed to test things that it knew or should have known would lead to premature failure of the brass crimp fittings.

44.   To save time and money Zurn did not end-use test the brass crimp fittings in Pex systems in their anticipated environments before selling those brass crimp fittings to the public.

45.   Zurn also failed to investigate or test whether well-known and expected water conditions would lead to premature failure of the brass crimp fittings.

46.   Because of their defective design and manufacture, Zurn's brass crimp fittings are inherently defective and are substantially certain to fail within the 25 year express warranty provided by Zurn and / or the useful life of the fittings.

47.   Plaintiffs and all putative class members purchased Zurn Pex plumbing systems with brass crimp fittings that have already or are in the process of failing prematurely and thus have suffered or are reasonably certain to suffer actual injury well in advance of the warranted and expected life of their plumbing systems.

**Zurn's False Advertising of Its Pex Systems**

48.   Zurn holds itself out as a "proven leader in the plumbing industry," "the time tested and proven leader in the flexible plumbing industry," and as a manufacturer of reliable plumbing products.

49.   Zurn falsely advertised that its Pex plumbing systems – including its brass crimp fitting components -- were reliable despite never testing and determining the reliability of its products when used in real world conditions.

50.   Among other false and inaccurate representations of its Pex plumbing systems with brass crimp fittings, Zurn falsely advertised and represented that:

 a.  Its Pex plumbing system "resists mineral buildup, rust, corrosion, and electrolysis," had "No exotic parts to fail," and made "More positive connections, quicker, easier.

    b.   Its QestPEX Crimp System "utilizes high quality brass fittings and copper crimp rings to provide a connection which is stronger than the pipe itself" and that "When properly installed, the QestPEX Crimp System is a worry free system!"

c.    Owners of Pex plumbing systems "can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

d.    Zurn's QickSert crimp fitting system was "the most time tested and reliable fitting system available."

e.    Zurn's QickSert crimp fittings "are actually stronger than the pipe itself and once crimped, they can not be pulled apart or blown out."

f.    Zurn's QickSert crimp fittings and ease of installation will provide "perfect connections every time, giving you a plumbing system that will be worry free for a lifetime."

g.    Zurn's Pex plumbing systems were safe, reliable, and corrosion-resistant.

h.    Zurn's Pex plumbing systems were proven, time-tested and worry free.

i.    Zurn's Pex plumbing systems were extensively tested and that based on the results of those tests, Zurn's Pex plumbing system and its brass crimp fittings were properly designed, developed, marketed, and manufactured so as to perform adequately, reliably and as represented.

j.    Pex plumbing systems were superior to copper plumbing systems.

k.    Pex plumbing systems and brass crimp fittings were of superior design and materials than similar products made by competitors.

51.   Zurn and its agents and distributors made each of the above described assertions, statements, representations and warranties with the intent and purpose of inducing plumbing suppliers, builders, plumbers, and consumers to purchase and install Zurn Pex plumbing systems and brass crimp fittings in their properties in the state of Minnesota and elsewhere.

52.   Throughout the relevant period, Zurn also made numerous material omissions and uniformly withheld important information relating to the design, reliability and performance of its brass crimp fittings and Pex plumbing systems.

53.   Had Zurn not withheld and omitted important information about the design, reliability and performance of its brass crimp fittings and Pex plumbing systems, Plaintiffs and the members of the putative class would not have purchased those products.

**Field Failures of Zurn's Pex Systems**

54.   By 2003 at the latest, Zurn began receiving notice from the field that its brass crimp fittings were failing prematurely.

55.   Zurn brass crimp fittings have failed prematurely throughout the state of Minnesota.

56.   By July 1, 2005, Zurn admitted that two to three years earlier it had noticed increased failure rates of its brass crimp fittings in Minnesota and that "the majority of fittings that are cracking are tees and elbows." Zurn further admitted that "the majority of these fittings are cracking from inside the wall cavity of the fittings."

57.   As but one example of the high number of premature failures in Minnesota, one plumbing company alone reported over 150 failures of Zurn brass crimp fittings by the end of 2006.

58.   Because of the unacceptable rate of premature failure, that plumbing company

stopped using Zurn's Pex systems and brass crimp fittings and switched to a competitor's product. The competitor's product has performed well and without failure in the same installation area.

59. By early 2005, Zurn directed its Minnesota distributors to stop selling the brass crimp fittings and to sell only its Poly Alloy fittings for Pex systems used in Minnesota.

60. As a result of Zurn's directive, Minnesota distributors returned to Zurn their remaining inventory of Zurn brass crimp fittings. Zurn provided credits to its Minnesota distributors for these returned brass crimp fittings.

61. Zurn also received reports that its brass crimp fittings were failing prematurely in states other than Minnesota.

### Zurn's Competitors' Used Different Product Materials and Designs

62. Several of Zurn's competitors in the Pex plumbing market chose designs and materials that were much more resistant to the premature failures that have plagued the Zurn's Pex brass crimp fittings.

63. For example, some of Zurn's competitors chose fitting and assembly designs that exert less stress on the fittings than Zurn's Pex brass crimp fittings.

64. Some of Zurn's competitors in the Pex plumbing market also chose to compose their fittings of materials like copper, bronze and plastic that are less susceptible to premature failure than the Zurn Pex brass crimp fittings in residential plumbing applications.

### Named Plaintiffs' Experience With Zurn's Pex Plumbing Systems.

65. In 2003, Plaintiffs, in connection with the purchase of their new home, purchased and had a Zurn Pex plumbing system installed in the home located in Hudson Township, Minnesota.

66.   Plaintiffs' plumber, Ellingson's Plumbing, installed in Plaintiffs' home a Zurn Pex plumbing system with brass crimp fittings.

67.   Approximately three years after installation, one of the Zurn brass crimp fittings failed at Plaintiffs' home causing damage to property other than the Pex plumbing system.

68.   Only months later, other Zurn brass crimp fittings failed at Plaintiffs' home causing damage to property other than the Pex plumbing system.

69.   Plaintiffs, like many class members, have already suffered out-of-pocket damage to repair their home following the premature failures of the Zurn Pex brass crimp fittings. Likewise, all putative class members have incurred or are reasonably certain to incur, the cost of repairing their homes because of fittings failures and / or prematurely replacing their plumbing systems.

70.   Plaintiffs and the proposed Class members suffered general and specific compensatory and contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

**Zurn's Warranty Misconduct**

71.   Zurn's brass crimp fittings were uniformly sold without any limitations of warranties because Zurn and / or its distributors failed to provide any alleged warranty limitations or disclaimers at the time of the sale of the brass crimp fittings.

72.   Zurn did not provide any alleged warranty disclaimers or limitations at the time of sale of the brass crimp fittings used in the structures of any of the members of the putative class.

73.   Minnesota law, and the laws of other states, require a seller of a product to provide the purchaser of the product with any alleged warranty disclaimers or limitations.

Failure to provide the alleged warranty limitations or disclaimers at the time of sale renders such attempted disclaimers and limitations invalid.

74.     Zurn's brass crimp fittings were and are provided to plumbers and / or consumers in plastic bags without any warranty disclaimers of any kind.

75.     Zurn knew that it was legally obligated to compensate all consumers for their full measure of damages arising out of brass crimp fitting failures.  However, pursuant to uniform company policy, Zurn provided false, deceptive, misleading and fraudulent information to consumers with failed Zurn Pex systems by advising them that Zurn's warranties were subject to vague and ambiguous limitations about "corrosion" and "corrosive water."

76.     Zurn was aware of this misconduct and condoned it because the flood of warranty claims Zurn has received were not included in Zurn's "cost structure" for its Pex systems.

77.     Beginning in at least 2002 or soon thereafter, Zurn became aware through various claims and reports that the Pex plumbing and brass crimp systems it was manufacturing, distributing and advertising were suffering premature failures, problems and deterioration.

78.     Despite the fact Zurn knew its products were defective and that its systems would not perform as advertised, warranted or otherwise expressly represented, Zurn continued to sell the products to the public without correction and, in fact, concealed from the public the fact that its Pex systems and brass crimp fittings were defective, not durable and would begin to fail immediately upon being placed into service.

79.     Because the Zurn Pex plumbing system related to the habitability of consumers' homes, Zurn had a duty to consumers and to the public to disclose the defects in its systems and not to conceal and suppress the defects in its product from the Named Plaintiffs and putative class members.

80.   Consistent with the usage in the plumbing trade, Zurn originally covered warranty claims for the premature failures of its brass crimp fittings but, after realizing the magnitude of the problem, began denying the warranty claims blaming the premature failures on "aggressive water."

81.   Zurn knew the cause of the premature failures was not "aggressive water" and has fraudulently concealed and suppressed from Plaintiffs and the putative class the true nature of the problems with the Pex plumbing and brass crimp fitting system.

82.   To this date, Zurn continues in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the public the true nature of the problems with its Pex plumbing systems and brass crimp fittings.  In fact, many members of the putative class are still unaware that their plumbing system has and will continue to fail due to its inherent defects.

## CLASS ACTION ALLEGATIONS

83.   Plaintiffs reallege all previous paragraphs as if fully stated herein.

84.   Plaintiffs brings this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to all applicable provisions of Rule 23 of the Federal Rules of Civil Procedure.

85.   The class which Plaintiffs seek to represent ("Class") is composed of:

All persons and entities who own a structure located within the State of Minnesota that contains a Zurn Pex plumbing system with brass Qicksert fittings. The proposed Class also includes but is not limited to all persons or entities that contacted Zurn or its representatives about the Zurn Pex plumbing system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claim that the warranty did not cover "corrosion" or that other alleged warranty limitations applied.

86.   In the alternative, Plaintiffs bring this class action on behalf of themselves and all

others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules

of Civil Procedure. The second proposed Class is defined as:

> All persons and entities who own a structure located within the United States that contains a Zurn Pex plumbing system with brass Qicksert fittings. The proposed Class also includes but is not limited to all persons or entities that contacted Zurn or its representatives about the Zurn Pex plumbing system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claim that the warranty did not cover "corrosion" or that other alleged warranty limitations applied.

87. In the alternative, Plaintiffs brings this class action on behalf of themselves and all

others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules

of Civil Procedure. The third proposed Class is defined as:

> All persons and entities that own a structure located within certain, but not all, of the United States, all as may be more specifically identified in subsequent motions to certify a class, that contains a Zurn Pex plumbing system with brass Qicksert fittings. The proposed Class also includes but is not limited to all persons or entities that contacted Zurn or its representatives about the Zurn Pex plumbing system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claims that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

88. For all proposed classes, Plaintiffs specifically exclude Zurn or its related entities

from the proposed Class, all subsidiaries or affiliates of Zurn; any entity in which Zurn has a

controlling interest; and any and all of Zurn's employees, affiliates, legal representatives, heirs,

successors or assignees.

89. Plaintiffs also specifically exclude from all proposed classes any person or entity

that has previously commenced and concluded a lawsuit against Zurn arising out of the subject

matter of this lawsuit.

90. Plaintiffs also specifically exclude from all proposed classes the Judge assigned to

this case and any member of the Judge's immediate family.

91. For all proposed classes, Plaintiffs specifically include the claims of all persons or

entities, like insurance companies and plumbers, that have paid for the repair, replacement and / or damage caused by prematurely failed Zurn brass crimp fittings.

92.    As shown below, this class action satisfies all requirements under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, including but not limited to as numerosity, commonality, typicality, adequacy and superiority.

93.    **Numerosity.** Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the proposed Class "is so numerous that joinder of all members is impracticable." The number of members of the proposed Class is believed to be tens of thousands of individuals and/or entities that own properties with Zurn Pex plumbing systems.

94.    Zurn's own representatives have publicly stated that Zurn sold more than two million fittings in the State of Minnesota alone from 2003 to 2006. Joinder of all persons and entities who purchased Zurn Pex plumbing systems with Qicksert fittings is impractical.

95.    **Commonality.** Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the proposed Class shares "common questions of law or fact." Zurn engaged in a common course of misconduct toward Plaintiffs and the other members of the proposed classes, including but not limited to defectively designing, manufacturing and testing its Zurn Pex plumbing and Qicksert brass fitting products, misrepresenting its obligations under its governing warranties for its Zurn Pex plumbing and Qicksert brass fitting products, wrongfully denying warranty coverage for its Zurn Pex plumbing and Qicksert brass fitting products. This common course of misconduct, resultant injury to Plaintiffs and the other members of the proposed classes and the remedies available to all such persons demonstrate the propriety of class certification.

96.    **Typicality.** Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the

claims of the proposed Class representative, "are typical of the claims ... of the class." Plaintiffs and all members of the proposed Class who own Zurn's defective Pex plumbing systems with brass crimp fittings have suffered damages as a result of Zurn's wrongful acts and misconduct. The named plaintiffs' factual and legal claims arise out of the same uniform misconduct perpetrated by Zurn in a similar manner against both the named plaintiffs and members of the putative class. Thus, the evidence and legal theories underlying the named plaintiffs' claims are identical to those underlying the claims of all members of the putative class.

97. **Adequacy**. Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, the named plaintiffs "will fairly and adequately protect the interests of the class." Plaintiffs have no adverse or conflicting interests to the proposed Class members. The named plaintiffs have retained the law firm of Zimmerman Reed, P.L.L.P., who are competent counsel experienced in class action and consumer product defect litigation and possessing the necessary financial resources to adequately and vigorously litigate this class action.

98. **Predominance**. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, common questions of law and fact predominate over individual issues. Common questions include but are not limited to the following:

- Were Zurn's Pex plumbing systems defectively designed for their intended application?

- Were Zurn's Pex plumbing systems defectively manufactured for their intended application?

- Did Zurn inadequately and/or improperly test its Pex plumbing systems during the design and development process?

- Were Zurn's Qicksert fittings defectively designed for their intended application?

- Were Zurn's Qicksert fittings defectively manufactured for their intended application?

- Did Zurn inadequately and/or improperly test its Qicksert fittings during the design and development process?

- Did Zurn fail to warn consumers that its Pex plumbing systems and/or Qicksert fittings were not properly tested during design and development process?

- Did Zurn adequately warn consumers about any types of installations that may cause premature failure of the fittings?

- Did Zurn make express warranties related to the performance and/or quality of its Pex plumbing systems and/or Qicksert fittings?

- Did Zurn make fraudulent, false, deceptive and/or misleading statements in connection with the sale of Zurn Pex plumbing systems in its product literature, including those relating to standards and reliability?

- Did Zurn properly account for foreseeable variations in installation in the development and design of the Zurn Pex plumbing system?

- Did Zurn exercise reasonable care in the design, manufacture and testing of the Zurn Pex plumbing system?

- Are the Qick/Sert fittings progressively deteriorating at an accelerated rate?

- Will the Qick/Sert fittings fail prematurely?

- Did Zurn deliberately sell or allow Qick/Sert fittings to be distributed after it knew the fittings were defective?

- Did Zurn engage in fraudulent, false, deceptive and/or misleading misconduct with respect to the handling of warranty claims?

- What categories of damages are recoverable for owners of structures with Zurn Pex plumbing systems, e.g., replacement, consequential, incidental or other damages?

- Are Plaintiffs entitled to relief under the U.C.C. for breach of the implied warranty of merchantability?

- Are Plaintiffs entitled to relief under the U.C.C. for breach of the implied warranty of fitness for a particular purpose?

- Are Plaintiffs entitled to relief under consumer protection statutes?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

- Were Zurn's express warranties related to its Pex plumbing systems and Qicksert fittings limited in any way?

- Should Zurn be enjoined from denying warranty claims based on alleged warranty disclaimers or limitations that were not provided to the purchaser at the time of sale of the products?

- Are Plaintiffs' claims barred in whole or in part by any of Zurn's affirmative defenses?

99.   **Superiority.**  Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action.  The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for the party opposing the class and would lead to repetitious trials of the numerous common questions of law and fact.  Plaintiffs know of no difficulty of any kind would make a class action in this case unmanageable.

100.  Pursuant to Federal Rule of Civil Procedure 23(b)(2), Zurn has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

101.  Proper and sufficient notice of this action may be provided to the Class members through actual notice to purchasers tracked by Zurn and by the posting of notice on Zurn's websites and at retail locations, among other methods of notice.

102.  Plaintiffs and the members of the Class have suffered harm and damages as a result of Zurn's wrongful conduct as alleged herein.  Absent representative action, Plaintiffs and the members of the Class will continue to suffer losses thereby allowing Zurn's violation of law to proceed without remedy, and allowing Zurn to retain the proceeds of its ill-gotten gains.

## COUNT I

## VIOLATIONS OF MINN. STAT. § 326F.69

## (MINN. PREVENTION OF CONSUMER FRAUD ACT)

103. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

104. Minn. Stat. § 325F.69, subd. 1 provides:

> The act, use or employment by any persons of any fraud, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

Consumer protection laws of other states make similar conduct unlawful.

105. Zurn sells plumbing systems, plumbing fittings and other plumbing materials, all of which fall within the meaning of "merchandise" under Minn. Stat. § 325F.68, subd. 2.

106. Zurn, in engaging in the policies, acts and practices alleged above intended to cause the sale of Pex plumbing systems fitted with Qicksert brass fittings to Plaintiffs and other purchasers and members of the proposed Class.

107. Zurn's policies, acts and practices alleged above violated and continue to violate the Minnesota Consumer Fraud Act in at least the following respects:

   a.   Zurn made fraudulent, misleading, and deceptive statements relating to the design, manufacturing, testing, quality, nature and performance of its Pex plumbing systems and brass fittings;

   b.   Zurn made fraudulent, misleading and deceptive statements regarding its warranty obligations, including but not limited to its fraudulent, deceptive and unfair practice of misrepresenting scope of its warranties and the limitations pertaining to its warranties;

c.     Zurn engaged in fraud by omission by fraudulently failing to disclose the true, defective nature of its Pex plumbing system, the improper design of the system, and its knowledge of those defects;

d.     Zurn engaged in fraud by omission by fraudulently failing to disclose the true, defective nature of its brass crimp fittings, the improper design of the fittings, and Zurn's knowledge of those defects;

e.     Zurn fraudulently concealed the defective nature of its plumbing systems and components thereof, including Zurn's defectively designed and manufactured brass crimp fittings.

108. As a result of Zurn's practices relating to the sale of its Pex plumbing systems, Plaintiffs and putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

109. As a result of Zurn's misconduct, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and brass crimp fittings, but also include, without limitation, consequential and incidental damages.

110. As a direct, proximate and foreseeable result of Zurn's conduct, Plaintiffs and all putative class members sustained damages and are entitled to injunctive and equitable relief, including but not limited to restitution and disgorgement, and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT II

### VIOLATIONS OF MINN. STAT. § 325D.13

### (MINN. UNLAWFUL TRADE PRACTICES ACT)

111. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

112. Minnesota Statutes § 325D.13 provides: "No person shall, in connection with the

sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise." Consumer protection laws of other states make similar conduct unlawful.

113. Zurn's policies, acts, and practices in its design, manufacturing, marketing and sale of Pex plumbing systems and brass crimp fittings constitute unlawful trade practices in violation of Minn. Stat. § 325D.13 and similar laws in other states because Zurn misrepresented the true quality of such products.

114. Zurn's wrongful conduct and misrepresentation of the true quality of its Pex plumbing systems and brass crimp fittings, includes but is not limited to:

    a.    Zurn's fraudulent, misleading, and deceptive statements relating to the true quality of Zurn's Pex plumbing system;

    b.    Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system, the improper design of the system, and Zurn's knowledge of those defects, and

    c.    Zurn's concealment of the true nature of its defective plumbing system

115. Zurn and its agents and distributors also misrepresented the true quality of the Zurn Pex plumbing system and its brass crimp fittings by making various statements about the alleged quality of the system and brass crimp fittings referenced herein.

116. As a result of Zurn's practices relating to the sale of its Pex plumbing systems, the Plaintiffs and putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

117. As a result of Zurn's misconduct, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and brass crimp fittings, but also include, without limitation, consequential and incidental damages.

118.  Zurn's conduct described herein constitutes a violation of Minnesota's Unlawful Trade Practices Act, Minn. Stat. § 325D.13 injuring Plaintiffs and the proposed Class and entitling them to damages, injunctive and equitable relief, including but not limited to, restitution and disgorgement and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT III

## VIOLATIONS OF MINN. STAT. §325D.44)

## (MINN. DECEPTIVE TRADE PRACTICES ACT)

119.  Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

120.  Minnesota Statutes § 325D.44, subd. 1 provides:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> ...(5)  Represents that goods or services have...characteristics, ingredients, uses, benefits...that they do not have;
>
> ...(7)  Represents that goods or services are of a particular standard, quality, or grade,...if they are of another...
>
> ...(9)  Advertises goods or services with the intent not to sell them as advertised;
>
> ...(13)  Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

121.  Consumer protection laws of other states make similar conduct unlawful;

122.  By engaging in the conduct described herein, Zurn violated and continues to violate Minn. Stat. § 325D.44 and the similar laws of other states.

123. Zurn's policies, acts, and practices in its design, manufacturing, marketing and sales of Pex plumbing systems and brass crimp fittings amount to wrongful conduct and misrepresentation of the true characteristics, standards, quality, and grade of its Pex plumbing systems and brass crimp fittings, including but not limited to:

    a.    Zurn's fraudulent, misleading and deceptive statements and misrepresentations by omission regarding the characteristics and uses of its Pex plumbing systems and brass crimp fittings;

    b.    Zurn's fraudulent, misleading, and deceptive statements and misrepresentations by omission relating to the true standards, quality, and grade of its Pex plumbing systems and brass crimp fittings;

    c.    Zurn's marketing and advertisement of its Pex plumbing systems and brass crimp fittings with the intent not to sell such products as advertised;

    d.    Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system, the improper design of the system, and Zurn's knowledge of those defects, and

    e.    Zurn's concealment of the true nature of its defective plumbing system.

124. As a result of Zurn's practices relating to the sale of its Pex plumbing systems, the Plaintiffs and putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

125. As a result of Zurn's misconduct, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and brass crimp fittings, but also include, without limitation, consequential and incidental damages.

126. Because Zurn willfully engaged in such trade practices knowing them to be deceptive, Plaintiffs and the proposed Class are entitled to recover their costs and attorneys' fees under Minn. Stat. § 325D.45, subd. 2.

## COUNT IV

## VIOLATIONS OF MINN. STAT. § 325F.67

## (FALSE ADVERTISING)

127. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

128. Minn. Stat. § 325F.67 provides:

> Any person, firm, corporation, or association who, with intent to sell or in any way dispose of merchandise, …service, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or places before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise,…service or anything so offered to the public for use, consumption, purchase, or sale, which advertising contains any material assertion, representation or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any other person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

Consumer protection laws of other states make similar conduct unlawful.

129. By engaging in the conduct described herein, Zurn violated and continues to violate Minn. Stat. § 325F.67 and the similar laws of other states.

130. Zurn's untrue, deceptive, and misleading assertions and representations about its Pex plumbing systems and brass crimp fittings, include but are not limited to:

    a.    Zurn's fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of Zurn's Pex plumbing system;

    b.    Zurn's fraud and misrepresentation by omission, of information about the defective nature of Zurn's Pex plumbing system, the improper design of the system, and Zurn's knowledge of those defects, and

c.      Zurn's concealment of the true nature of its defective plumbing system.

131.   Zurn and its agents and distributors also made untrue, deceptive, and misleading assertions and representations about its Pex plumbing systems and its brass crimp fittings by making various statements about the alleged quality of the system and brass crimp fittings referenced herein.

132. As a result of Zurn's untrue, deceptive, and misleading assertions and representations about its Pex plumbing systems and brass crimp fittings, Plaintiffs and the putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

133.  As a result of Zurn's misconduct, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and/or brass crimp fittings, but also include, without limitation, consequential and incidental damages.

134.  As a direct, proximate and foreseeable result of Zurn's conduct, Plaintiffs and all putative class members sustained damages and are entitled to injunctive and equitable relief, including but not limited to restitution and disgorgement, and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT V

### (NEGLIGENCE)

135.  Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

136.  Zurn owed a duty to Plaintiffs and all proposed Class members to provide a safe and quality product, and a duty to provide a product that would perform as it was advertised.

Zurn breached those duties.

137.  Zurn breached its duties and was negligent because it failed to use reasonable care when it designed, manufactured, marketed and sold its Pex plumbing systems with brass crimp fittings.

138.  As a result of Zurn's negligence, Plaintiffs and all proposed Class members sustained injuries.

139.  That as a direct and proximate result of Zurn's negligence, lack of care, and other wrongful acts, Plaintiffs and all proposed Class members sustained and will sustain damages.

140.  As a result of Zurn's negligence, Plaintiffs and the putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

141.  As a result of Zurn's negligence, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and brass crimp fittings, but also include, without limitation, consequential and incidental damages.

142.  As a direct, proximate and foreseeable result of Zurn's negligence, Plaintiffs and all putative class members sustained damages.

## COUNT VI

### (NEGLIGENT FAILURE TO WARN)

143.  Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

144.  As the manufacturer of a product, Zurn had a duty to provide instructions for proper use of its products.

145.  As the manufacturer of a product, Zurn had a duty to warn of foreseeable dangers inherent in the proper use of its products and also had a duty to warn of dangers associated with foreseeable misuse of its products.

146.  By way of example only, to the extent Zurn claims in this lawsuit that the premature failures of its Pex plumbing systems and/or brass crimp fittings were the result of characteristics of the water chemistry present in the Plaintiffs or the members of the putative class's water supply, Zurn failed to warn of those characteristics or dangers.

147.  As a direct and proximate result of Zurn's failure to warn, Plaintiffs and all proposed Class members sustained and will sustain damages.

148.  As a result of Zurn's failure to warn, the Plaintiffs and putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

149.  As a result of Zurn's failure to warn, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and brass crimp fittings, but also include, without limitation, consequential and incidental damages.

150.  As a direct, proximate and foreseeable result of Zurn's failure to warn, Plaintiffs and all putative class members sustained damages.

## COUNT VII

### (NEGLIGENT MISREPRESENTATION)

151.  Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

152.  In making material misrepresentations of material facts regarding the

characteristics and capabilities of its Pex plumbing system and brass crimp fittings through its advertising and product information and through its internet website, Zurn knew or should have known it was misrepresenting material facts and that Plaintiffs and the putative class (and also Zurn's distributors and installers, and through them, Plaintiffs and the putative class), would be relying on Zurn's representations to their detriment and damage.

153. In concealing material facts regarding the characteristics and capabilities of its Pex plumbing systems and brass crimp fittings, Zurn knew or should have known it was not disclosing material facts and that the Plaintiffs and putative class (and also Zurn's distributors and installers, and through them, Plaintiffs and the putative class), would be relying on Zurn's representations to their detriment and damage.

154. As a direct and proximate result of Zurn's failure to fully disclose material facts and Zurn's misrepresentations of material fact, Plaintiffs and all proposed Class members sustained and will sustain damages.

155. As a result of Zurn's negligent misrepresentations, Plaintiffs and the putative class have suffered actual damages in that they purchased and installed in their homes and structures the defective plumbing systems complained of herein.

156. As a result of Zurn's negligent misrepresentations, Plaintiffs and the proposed Class members have suffered and will continue to suffer damages that include not only the full cost to replace their defective Pex plumbing systems and brass crimp fittings, but also include, without limitation, consequential and incidental damages.

157. As a direct, proximate and foreseeable result of Zurn's negligent misrepresentations, Plaintiffs and all putative class members sustained damages.

COUNT VIII

VIOLATIONS OF MINN. STAT. § 336.2-314

(BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

158. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

159. Minn. Stat. § 336.2-314 provides:

(1) Unless excluded or modified..., a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified... other implied warranties may arise from course of dealing or usage of trade.

160. Zurn was at all relevant times a merchant with respect to its Pex plumbing systems and brass crimp fittings. As such, Zurn warranted to Plaintiffs and the putative class that such goods would be fit for their ordinary purpose for which such goods are used and otherwise as statutorily defined.

30

161. Zurn breached its implied warranties of merchantability by designing, manufacturing, marketing and selling a defective plumbing system. As a result, Plaintiffs and the putative class did not receive goods that were fit for their ordinary purpose for which such goods are used and were otherwise not merchantable as defined by statute and warranted by Zurn.

162. Plaintiffs and the proposed Class members are beneficiaries of any contracts between Zurn and its distributors in which any implied warranties of merchantability arose.

163. As a direct, proximate and foreseeable cause of Zurn's breach of its implied warranty of merchantability, Plaintiffs and the proposed Class members sustained damages.

## COUNT IX

### (BREACH OF IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING AND USAGE OF TRADE)

164. Plaintiffs and the putative class members reallege foregoing paragraphs, inclusive, as though fully set forth herein.

165. It is the course of dealing and usage of trade in the plumbing industry to deliver brass fittings for plumbing systems that have sufficient specifications to avoid stress corrosion cracking in residential applications.

166. Zurn breached such warranties implied in the agreements and contracts by providing defective plumbing systems in violation of industry standards.

167. Proper presuit notification, to the extent required, has been provided.

168. As a direct and proximate result of Zurn's breach of its implied warranties, Plaintiffs and the proposed Class sustained damages.

## COUNT X

## VIOLATIONS OF MINN. STAT. § 336.2-315

## (BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE)

169.  Plaintiffs and the putative class members reallege foregoing paragraphs, inclusive, as though fully set forth herein.

170.  Minn. Stat. § 336.2-315 provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

171.  Plaintiffs and all proposed Class members relied upon Zurn's claimed skill, expertise and quality assurance to provide suitable goods for such purposes.

172.  At the time Zurn sold the goods to the Plaintiffs and the putative class, Zurn knew of the particular purpose for which the goods were required and knew that Plaintiffs and the proposed Class members were relying on Zurn to provide goods suitable for their purpose, including all foreseeable variances in conditions and installation.  Accordingly, there was an implied warranty that the plumbing systems were fit for their particular purpose.

173.  Zurn breached such warranty implied in the agreements and contracts by providing defective plumbing systems.  The beneficiaries of the contracts, including the Plaintiffs and putative class members, did not receive goods as impliedly warranted by Zurn to be fit for their particular purpose.  Proper presuit notification, to the extent required, has been provided.

174. That as a direct, proximate and foreseeable result of Zurn's breach of the implied warranty of fitness for a particular purpose, Plaintiffs and all proposed Class members sustained damages.

**COUNT XI**

**VIOLATIONS OF MINN. STAT. §§336.1-101 *et seq.***

**(BREACH OF EXPRESS WARRANTIES)**

175. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

176. In the alternative, Zurn made certain express warranties to Plaintiffs, the proposed Class members and its distributors relating to the goods it would provide.

177. Zurn represented that its Pex plumbing systems and/or its brass crimp fittings were manufactured to exacting specifications, that such products were free from defects in design, manufacturing, materials and workmanship for twenty-five (25) years from the date of purchase and that, if any products were found defective during this period, that Zurn would bring such products up to its specifications and representations of quality.

178. Through distributors, Plaintiffs and the putative class members relied upon Zurn's express warranties.

179. Zurn breached such express warranties by designing, manufacturing, marketing and selling defective Pex plumbing systems and/or brass crimp fittings that have or are reasonably certain to fail well before the 25 year warranty or useful life of the product.

180. As a direct and proximate cause of Zurn's breach of its express warranties Plaintiffs and all proposed Class members sustained damages.

## COUNT XII

## VIOLATIONS OF 15 U.S.C. § 2301 *et seq.*

## (THE MAGNUSON-MOSS WARRANTY ACT)

181. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

182. Plaintiffs and the Class members are consumers within the meaning of 15 U.S.C. § 2301 *et seq.*

183. As described herein, Defendants, are warrantors within the meaning of 15 U.S.C. § 2301 *et seq.* and have committed several violations of state law, including breach of contract and breach of warranties.

184. Plaintiffs and all proposed Class members have sustained damages by Defendants' breach of their warranties, implied warranties, and contracts, 15 U.S.C. § 2310(d)(1), and are entitled to recover reasonable attorney's fees and costs.

## COUNT XIII

## (DECLARATORY RELIEF)

185. Plaintiffs and the proposed Class incorporate here by reference all preceding paragraphs.

186. Plaintiffs and the putative class seek a declaratory judgment as follows:

    a.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because Zurn at the time of sale and thereafter concealed and suppressed that the system was defective, and because the provisions are otherwise unconscionable;

    b.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the

same is unconscionable because the warranties do not provide adequate remedies because the defect in the plumbing system is latent and because the Plaintiffs lack sufficient bargaining power;

c.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is unlawful and unenforceable;

d.    To the extent Zurn alleges that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is barred by Zurn's failure to provide the alleged warranty disclaimers at the time of sale of the product;

e.    Any releases obtained by Zurn, that did not otherwise provide full compensation to the putative class, were fraudulently induced, are unconscionable, were obtained by suppression and concealment, were obtained under duress by persons needing to repair their plumbing systems, and are null and void; and

f.    To the extent Zurn has had an adverse adjudication against it arising from the subject matter of this Complaint, that the putative class may use offensive collateral estoppel against Zurn for the rulings and determinations therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Zurn as follows:

1.    Certify a plaintiff Class as defined herein;

2.    Appoint Plaintiffs Jody and Brian Minnerath as Class Representatives;

3.    Appoint Plaintiffs' counsel Zimmerman Reed, P.L.L.P. as Class counsel;

4.    Award Plaintiffs and the proposed Class damages, as well as injunctive relief, including but not limited to restitution and disgorgement, as allowed by law;

5.    Award Plaintiffs and the proposed Class costs and attorneys' fees against Defendants as allowed by law;

6.    Declare the rights and obligations of the parties as fully pled herein;

7. Enjoin Zurn from further engaging in any of the conduct described herein; and

8. Grant such other or further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

Dated: December 13, 2007.

ZIMMERMAN REED, P.L.L.P.


By s/J. Gordon Rudd, Jr.
J. Gordon Rudd (MN #222082)
Brian C. Gudmundson (MN #336695)
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
TEL: (612) 341-0400
FAX: (612) 341-0844

**ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE CLASS**

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. \_\_\_\_

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT Q

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,

      Plaintiffs and Proposed
      Class Representatives,

vs.

Zurn PEX, Inc. and Zurn Industries, Inc.,

      Defendants.

Court File No. 07-3652
(ADM/RLE)

**DEFENDANT'S MOTION TO
ENJOIN FILING OF RELATED
LAWSUITS**

      Defendants Zurn Pex, Inc. and Zurn Industries, LLC (improperly named in the

Complaint as Zurn Industries, Inc.) (collectively referred to herein as "Defendants"), by

their undersigned counsel, hereby move the Court for an order enjoining plaintiffs'

counsel from filing additional actions against Defendants which seek similar relief until

this Court rules on class certification.   The grounds for the Defendants' motion are set

forth in the accompanying Memorandum, which is incorporated by reference.

Dated: November 16, 2007

**FAEGRE & BENSON LLP**

s/James A. O'Neal
James A. O'Neal, #8248X
Daniel J. Connolly, #197427
Amy R. Freestone, #285493
Catherine G. Davis, #0386635
2200 Wells Fargo Center
90 South Seventh Street

Minneapolis, MN  55402-3901
(612) 766-7000

**Attorneys for Defendants Zurn Pex, Inc.
and Zurn Industries, LLC**

fb.us.2427079.02

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Denise and Terry Cox, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs and Proposed<br>      Class Representatives,<br><br>vs.<br><br>Zurn PEX, Inc. and Zurn Industries, Inc.,<br><br>      Defendants. | Court File No. 07-3652 (ADM/RLE)<br><br>**DEFENDANTS' NOTICE OF MOTION TO ENJOIN FILING OF RELATED LAWSUITS** |

TO:   Plaintiffs Denise and Terry Cox and their attorneys, Shawn M. Raiter and T. Joseph Snodgrass, Larson King, LLP, 2800 Wells Fargo Place, 30 East Seventh Street, St. Paul, MN 55101; Derek A. Trosvig, Swenson, Lervick, Syverson, Trosvig, Jacobson, P.A., Box 787, 710 Broadway, Alexandria, MN 56308

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that Defendants Zurn Pex, Inc. and Zurn Industries, LLC hereby bring their Motion to Enjoin Filing of Related Lawsuits to be heard December 17, 2007, at 9:00 a.m., Room 14E, at the United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, before the United States District Court, District of Minnesota, Magistrate Judge Raymond Erickson presiding.

Dated:  November 16, 2007

**FAEGRE & BENSON LLP**

s/James A. O'Neal
James A. O'Neal, #8248X
Daniel J. Connolly, #197427
Amy R. Freestone, #285493
Catherine G. Davis, #0386635
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000

**Attorneys for Defendants Zurn Pex, Inc.
and Zurn Industries, LLC**

fb.us.2413143.07

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Denise and Terry Cox, on behalf of themselves and all others similarly situated, | Court File No. 07-3652 (ADM/RLE) |
| Plaintiffs and Proposed Class Representatives, | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO ENJOIN FILING OF RELATED LAWSUITS** |
| vs. | |
| Zurn PEX, Inc. and Zurn Industries, Inc., | |
| Defendants. | |

Defendants Zurn Pex, Inc. and Zurn Industries, LLC (improperly named in the Complaint as Zurn Industries, Inc.) (collectively referred to herein as "Defendants") respectfully submit this memorandum in support of their motion to enjoin plaintiffs' counsel from filing additional actions against Defendants which seek similar relief until this Court rules on class certification.  Less than four months after serving the Complaint ("Cox Complaint") in this action, plaintiffs' counsel filed a virtually identical putative class action against Defendant in the District of North Dakota ("Barnes Complaint").[1]  By this motion, Defendants seek to prevent further forum shopping and duplicative litigation.

---

[1] By contemporaneous motion, Defendants are asking the Federal District Court for the District of North Dakota to stay further proceeding in the North Dakota case pending this Court's certification decision.

## BACKGROUND AND FACTS

### I.     ACTION PENDING IN THIS DISTRICT.

On July 10, 2007, Defendants were served with a Summons and Complaint for a putative class action commenced in Becker County District Court, Seventh Judicial District, State of Minnesota.  Plaintiffs Denise and Terry Cox alleged a variety of claims related to brass crimp fittings sold by Zurn Pex, Inc., including: (1) consumer fraud, (2) false advertising, (3) negligence, (4) negligent failure to warn, (5) negligent misrepresentation, (6) breach of implied warranties, (7) breach of express warranties, and (8) violation of the Magnuson-Moss Warranty Act.  Plaintiffs are represented by Larson King, LLP, a firm located in St. Paul, Minnesota.

In this matter, Plaintiffs seek the certification of a class of  "all persons and entities that own a structure located within the State of Minnesota that contains a Zurn PEX plumbing system with brass crimp fittings."  Complaint ¶ 37.  The Plaintiffs also propose two alternate classes.  The first alternate class includes "all persons and entities that own a structure located within the United States that contains a Zurn PEX plumbing system with brass crimp fittings." *Id.* ¶ 38.  The second alternate class includes "all persons and entities that own a structure located within certain, but not all, of the United States, all as may be more specifically identified in subsequent motions to certify a class,  that contains a Zurn PEX plumbing system with brass crimp fittings." *Id.* ¶ 39.  Each of the three proposed classes includes "…all such persons or entities who contacted Zurn or its representatives about their Zurn PEX plumbing system and were denied or partially denied warranty coverage for failure of the Zurn PEX plumbing system based on a claim

2

that 'corrosion' was not covered by the warranty or that other alleged warranty

limitations applied." *Id.* ¶ 37-39.

On August 8, 2007, Defendants removed the case to United States District Court

for the District of Minnesota.  On October 24, 2007, the parties appeared at a pre-trial

hearing before Magistrate Judge Erickson to address Plaintiffs' motion for a single phase

discovery plan.  On October 26, 2007, Magistrate Judge Erickson issued a Minute Order

denying Plaintiffs' motion for a single phase discovery plan. *See* Minute Order dated

October 26, 2007, Docket #22.  At this time, both Plaintiffs and Defendants have served

their initial disclosures and are preparing their initial productions pursuant to that Order.

## II.    ACTION PENDING BEFORE THE DISTRICT OF NORTH DAKOTA.

On October 26, 2007, these Defendants were served with a Complaint filed in the

District of North Dakota alleging nearly identical claims related to brass crimp fittings

which are manufactured and sold by Zurn Pex, Inc., including: (1) consumer fraud, (2)

false advertising, (3) negligence, (4) negligent failure to warn, (5) negligent

misrepresentation, (6) breach of implied warranties, (7) breach of express warranties, and

(8) violation of the Magnuson-Moss Warranty Act. *See* Affidavit of James A. O'Neal,

Exh. A.  The plaintiffs in this action, Beverly Barnes and Brian Johnston, are also

represented by Shawn Raiter and Larson King, LLP.  According to the Complaint filed,

the plaintiffs allege they are both residents of North Dakota.  They bring their action on

behalf on themselves and three alternative putative classes.  The putative classes are

described using language identical to the *Cox* Complaint filed here in the District of

Minnesota, except that the first class is limited to persons or entities owning structures in

North Dakota (instead of Minnesota).  O'Neal Aff., Exh. A ¶ 36-38.  However, the

*Barnes* plaintiffs, as North Dakota residents, also fall within the second and third putative

classes proposed in the currently pending *Cox* matter before this Court.

## ARGUMENT

I.    **THE COURT HAS THE POWER TO ENJOIN THE FILING OF RELATED LAWSUITS.**

A.    **General Authority.**

Pursuant to the All-Writs Act, 28 U.S.C. § 1651, "the Supreme Court and all

courts established by Act of Congress may issue all writs necessary or appropriate in aid

of their respective jurisdictions and agreeable to the usages and principles of law."  A

district court therefore has the power to enjoin repetitive and vexatious litigation

concerning an issue. *See, e.g., Ruderer v. United States*, 462 F.2d 897, 899 (8th Cir. 1972)

(affirming injunction preventing plaintiff from further related filings in a particular

federal district); *Lacks v. Fahmi*, 623 F.2d 254, 257 (2nd Cir. 1980) (injunction against

any and all future filings seeking similar relief was proper under 28 U.S.C. § 1651(a)).

Further, a district court possesses the power to enjoin the filing of related lawsuits in

other federal or state courts.  *Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d

1515, 1523 (9th Cir. 1983) (citing *Kerotest Manufacturing Co. v. C-O-Two Fire

Equipment Co.,* 342 U.S. 180 (1952)) (federal); *National City Lines v. LLC Corp.*, 687

F.2d 1122, 1127 (8th Cir. 1982) (state).

Injunctive relief concerning related filings can be fashioned in many ways.  For

example, a district court can enjoin a party or their counsel from filing additional related

lawsuits. *See Kansas Pub. Empl. Retirement Sys. v. Reimer & Koger Assocs.*, 77 F.3d 1063, 1067, 1071 (8th Cir. 1996) (affirming preliminary injunction preventing plaintiff from filing any further related lawsuits against particular defendants).  Nor does the Anti-Injunction Act pose any impediment to this Court's ability to grant Defendants' motion for injunctive relief when no state court proceedings are in progress at the time at the relief is sought.  *See* 22 U.S.C. § 2283; *National City Lines v. LLC Corp.*, 687 F.2d 1122, 1127-28 (8th Cir. 1982); *Barancik v. Investors Funding Corp.*, 489 F.2d 933, 937 (7th Cir. 1973) (per Stevens, J.).  *See also Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965) ("This statute and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted."); 17A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 422 ("[T]he [Anti-Injunction Act] has no application until the proceedings have begun.  An injunction can issue from a federal court restraining a party from instituting state proceedings.").

**B.     The First-Filed Court Has Interest in Preventing Duplicative Federal Litigation.**

Between federal courts, discretionary power of the court where first-filed action is pending to enjoin parties from proceeding with a later-filed action in federal court is well established.  *Northwest Airlines v. American Airlines*, 989 F.2d 1002, 1004 (8th Cir. 1993).  Duplicative litigation in federal courts is disfavored.  *See Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*, 259 F.3d 949, 953-54 (8th Cir. 2001); *accord Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976) ("As

between federal district courts, . . . though no precise rule has evolved, the general principle is to avoid duplicative litigation.").

Accordingly, "the well-established rule is that in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case.'" *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir. 1990) (citing *Orthmann v. Apple River Campground Inc.*, 765 F.2d 119, 121 (8th Cir. 1985)). Courts will enjoin later cases involving the same issues and parties. *See Minnesota Mining & Mfg. Co. v. Rynne*, 661 F.2d 722, 723-24 (8th Cir. 1981) (affirming injunction against second-filed action where case arose out of the same operative facts).

**C.      Consideration of <u>Dataphase</u> Factors Are Not Necessary.**

Ordinarily, the grant or denial of preliminary injunctive relief in this Circuit is determined upon consideration of the factors stated in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  However, the Eighth Circuit has held that when considering the merits of actions like "orders enjoining a party from proceeding with a duplicative, second-filed lawsuit in another forum," the court is not bound by the *Dataphase* standards for injunctive relief.  *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1004 (8th Cir. 1993).  In this kind of case, the *Dataphase* factors are inapposite, since the question has nothing to do with the merits of the underlying controversy." *Id.*  Considerations of the public interest and balance of harms are still relevant as a court considers this type of injunctive relief.

## II.    THE COURT SHOULD ENJOIN PLAINTIFFS AND PLAINTIFFS' COUNSEL FROM FILING RELATED LAWSUITS.

### A.    Injunction Will Promote Judicial Economy and Prevent Interference with Court's Ability to Manage the Case.

The Manual for Complex Litigation states that "[a] federal district judge asked to certify a class action that overlaps with, duplicates, or competes with cases pending in other federal or state courts may face conflicts involving rulings on discovery or substantive motions, timetables for discovery, selection of class counsel, certification rulings, trial, and settlement, and may also face duplicative work and expense." Manual for Complex Litigation, Fourth, § 21.15. By reinforcing the principles of collateral estoppel with the threat of holding a vexatious litigant in contempt of court, a district judge may deter the filing of frivolous and repetitive lawsuits. *See Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d 1515, 1524 (9th Cir. 1983).

In this case, the Court is already faced with an overlapping putative class action filed by Plaintiffs' counsel in the District of North Dakota less than four months after it commenced the action pending in this District. The second-filed Complaint alleges claims against the Defendants nearly identical to those in the first-filed Complaint. The underlying factual issues that will require development overlap substantially. Although the named plaintiffs in the two cases are different, the named plaintiffs in the second-filed case fall within the nationwide class proposed in this action and could fall within the selected state class depending upon which states are intended to be included. The Court would benefit from enjoining Plaintiffs' counsel from further complicating the management of this case and wasting judicial resources by filing additional related

lawsuits against the Defendants. *See Northwest Airlines v. American Airlines*, 989 F.2d

1002, 1007 (8th Cir. 1993) (concluding "[t]he spectre of duplicative efforts and costs and

of inconvenience to the parties, together with the waste of judicial resources inherent in

parallel litigation, all provide support for the District Court's decision [to enjoin parties

from proceeding with a later-filed lawsuit]").

**B.      Balance of Harms and Public Interest Favor Injunction.**

There is no evident threat to Plaintiffs' or their counsels' rights by preventing

related filings until this Court rules on certification.  Plaintiffs' counsel is already

pursuing certification of two nearly identical nationwide classes against Defendants in

different federal courts.  They are not prejudiced by a requirement to see their first-filed

action through to the certification ruling before initiating additional related litigation

against the Defendants.

Without an injunction barring future federal or State proceedings, Defendants will

suffer harm.  If future duplicative actions are filed in state court, Defendants will then be

severely limited in their ability to enjoin those proceedings under the Anti-Injunction Act.

*Kansas Pub. Employees Retirement Sys. v. Reimer & Koger Assocs.*, 77 F.3d 1063, 1068

(8th Cir. 1996) (noting that the Anti-Injunction Act prohibits federal courts from enjoining

*pending* proceedings in state courts unless the injunction falls within one of three

exceptions).  Courts must construe the exceptions to the Anti-Injunction Act narrowly

and resolve doubts in favor of letting the state action proceed.  *Id.* (citing *Atlantic Coast

Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970)).  Further,

8

Defendants will be harmed by the additional time and cost of any additional duplication litigation.

Finally, the public interest would be served by the injunction by preventing duplicative and overlapping filings, which are costly both in terms of the legal system's time and taxpayer money. *Baker Elec. Co-op Inc. v. Chaske*, 28 F.3d 1466, 1474 (8th Cir. (public interest factor involves, among other things, the "public's interest in minimizing unnecessary costs" to be met from public coffers).

### C.      An Injunction Will Deter Further Forum Shopping By Plaintiffs' Counsel.

"Litigants who engage in forum shopping have the potential 'to seriously impair the federal court's flexibility and authority to decide the case.'" *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1203 (7th Cir. 1996) (citing *Atlantic Coastline R.R.*, 398 U.S. at 295). Courts in this Circuit have expressed an interest in preventing court and judge shopping for class certification. *See Yasgur v. Aegis Mortg. Corp.*, 1999 U.S. Dist. LEXIS 20989, *6 (D. Minn.) (attached hereto as O'Neal Aff., Exh. B). As the *Yasgur* court noted, "The Eighth Circuit has not directly addressed the issue of court/judge shopping for class certification. It has, however, suggested some interest in preventing this sort of game playing." *Id.* at *6.

In this case, Plaintiffs' counsel is already pursuing certification of two nearly identical nationwide classes against Defendants in different federal courts. The Court should enjoin them from further complicating the management of this case and wasting judicial resources by filing additional related lawsuits against the Defendant.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court, in accordance with Federal Rule of Civil Procedure 65, enjoin Plaintiffs' counsel from commencing any new actions, without leave of this Court, against Defendants related to the claims under consideration in this proceeding.


Dated:  November 16, 2007

**FAEGRE & BENSON LLP**


s/ James A. O'Neal
_____
James A. O'Neal, #8248X
Daniel J. Connolly, #197427
Amy R. Freestone, #285493
Catherine G. Davis, #0386635
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000

**Attorneys for Defendants Zurn Pex, Inc.
and Zurn Industries, LLC**

fb.us.2407228.09

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Denise and Terry Cox, on behalf of themselves and all others similarly situated, | Court File No. 07-3652 (ADM/RLE) |
| Plaintiffs and Proposed Class Representatives, | **LR 7.1(c) WORD COUNT COMPLIANCE CERTIFICATE REGARDING DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO ENJOIN FILING OF RELATED LAWSUITS** |
| vs. | |
| Zurn PEX, Inc. and Zurn Industries, Inc., | |
| Defendants. | |

I, James A. O'Neal, certify that Defendants' Memorandum of In Support Of Defendants' Memorandum In Support Of Motion To Enjoin Filing Of Related Lawsuits complies with Local Rule 7.1(c).

I further certify that, in preparation of this memorandum, I used Microsoft Word 2003, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above-referenced memorandum contains 2,294 words.

Date:  November 16, 2007

FAEGRE & BENSON LLP

s/ James A. O'Neal
James A. O'Neal, #8248X
Daniel J. Connolly, #197427
Amy R. Freestone, #28493
Catherine G. Davis, #0386635
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
**Attorneys for Defendants Zurn Pex, Inc. and
Zurn Industries, LLC**

fb.us.2420457.03

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Denise and Terry Cox, on behalf of themselves
and all others similarly situated,

      Plaintiffs and Proposed
      Class Representatives,

vs.

Zurn PEX, Inc. and Zurn Industries, Inc.,

      Defendants.

Court File No. 07-3652 (ADM/RLE)

**AFFIDAVIT OF
JAMES A. O'NEAL**

James A. O'Neal, being first duly sworn upon oath, states:

1.      I am an attorney with the law firm of Faegre & Benson LLP and I am one of the lawyers representing Defendants Zurn Pex, Inc. and Zurn Industries, LLC in the above-captioned matter.  I make this affidavit in support of the Defendants' Motion to Enjoin Filing of Related Lawsuits.

2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint in the case captioned *Beverly Barnes and Brian Johnston v. Zurn Pex, Inc. and Zurn Industries, Inc.*, Court No.: 07-cv-00074 (DLH/CSM), in the Federal District Court for the District of North Dakota.

3.      Attached hereto as Exhibit B is a true and correct copy of *Yasgur v. Aegis Mortg. Corp.*, 1999 U.S. Dist. LEXIS 20989 (D. Minn.).

1

THIS CONCLUDES MY AFFIDAVIT.


Dated:  November 16, 2007

s/ James A. O'Neal
James A. O'Neal

Subscribed and sworn to before me
this 16th day of November, 2007.


s/Sandra S. Hanscom
Notary Public

fb.us.2419472.04

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT R

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | |
|---|---|
| Beverly Barnes and Brian Johnston, on behalf of themselves and all others similarly situated, | Court No.: 07-cv-00074 (DLH/CSM) |
| Plaintiffs and Proposed Class Representatives, | **MOTION TO STAY LITIGATION PENDING CLASS CERTIFICATION DECISION IN FIRST-FILED ACTION** |
| vs. | |
| Zurn Pex, Inc. and Zurn Industries, Inc., | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

Defendants Zurn Pex, Inc. and Zurn Industries, LLC (improperly named in the

Complaint as Zurn Industries, Inc.) (collectively referred to herein as "Defendants"), by

their undersigned counsel, hereby move the Court for an order staying this litigation

pending the class certification decision by the District of Minnesota in <u>Denise Cox and</u>

<u>Terry Cox v. Zurn Pex, Inc. and Zurn Industries, Inc</u>.  The grounds for the Defendants'

motion are set forth in the accompanying Memorandum, which is incorporated here by

reference.

Defendants request an oral argument on their Motion to Stay at a time to be

determined by the Court.

1

Dated:  November 16, 2007                    *SERKLAND LAW FIRM*


                            s/ Ronald H. McLean
                            Ronald McLean (ID#03260)
                            Jane Dynes (ID#04495)
                            10 Roberts Street
                            P.O. Box 6017
                            Fargo, ND 58108
                            (701) 232-8957


                            Of Counsel:
                            *FAEGRE & BENSON LLP*
                            James A. O'Neal, #8248X
                            Daniel J. Connolly, #197427
                            Amy R. Freestone, #285493
                            Catherine G. Davis, #0386635
                            2200 Wells Fargo Center
                            90 South Seventh Street
                            Minneapolis, MN  55402
                            (612) 766-7000

                            *COUNSEL FOR DEFENDANTS*
                            *ZURN PEX, INC. AND ZURN*
                            *INDUSTRIES, LLC*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
### SOUTHWESTERN DIVISION

| | |
|---|---|
| Beverly Barnes and Brian Johnston, on behalf of themselves and all others similarly situated, | Court No.: 07-cv-00074 (DLH/CSM) |
| Plaintiffs and Proposed Class Representatives, | |
| vs. | **MEMORANDUM IN SUPPORT OF MOTION TO STAY LITIGATION PENDING CLASS CERTIFICATION DECISION IN FIRST-FILED ACTION** |
| Zurn Pex, Inc. and Zurn Industries, Inc., | |
| Defendants. | |

Defendants Zurn Pex, Inc. and Zurn Industries, LLC (improperly named in the Complaint as Zurn Industries, Inc.) (collectively referred to herein as "Defendants") respectfully submit this memorandum in support of their motion to stay this case pending a class certification decision in a nearly identical first-filed action in the District of Minnesota.[1]

## BACKGROUND AND FACTS

### I.   PENDING ACTION IN THE DISTRICT OF MINNESOTA

On July 10, 2007, Defendants were served with a Summons and Complaint for a putative class action commenced in Becker County District Court, Seventh Judicial

---

[1] By contemporaneous motion, Defendants are asking the District Court of Minnesota to enjoin Plaintiffs' counsel from instituting any other actions seeking similar relief.

District, State of Minnesota. ("Cox Complaint", Exhibit A).   Plaintiffs Denise and Terry

Cox alleged a variety of claims related to brass crimp fittings which are sold by Zurn Pex,

Inc., including: (1) consumer fraud, (2) false advertising, (3) negligence, (4) negligent

failure to warn, (5) negligent misrepresentation, (6) breach of implied warranties, (7)

breach of express warranties, and (8) violation of the Magnuson-Moss Warranty Act.

Plaintiffs are represented by Larson King, LLP, a firm located in St. Paul, Minnesota.

Plaintiffs seek the certification of a class of "all persons and entities that own a

structure located within the State of Minnesota that contains a Zurn PEX plumbing

system with brass crimp fittings." Cox Complaint ¶ 37.  The Plaintiffs also propose two

alternate classes.  The first alternate class includes "all persons and entities that own a

structure located within the United States that contains a Zurn PEX plumbing system

with brass crimp fittings." Cox Complaint ¶ 38.  The second alternate class includes "all

persons and entities that own a structure located within certain, but not all, of the United

States, all as may be more specifically identified in subsequent motions to certify a class,

that contains a Zurn PEX plumbing system with brass crimp fittings." Cox Complaint ¶

39.  Each of the three proposed classes includes "…all such persons or entities who

contacted Zurn or its representatives about their Zurn PEX plumbing system and were

denied or partially denied warranty coverage for failure of the Zurn PEX plumbing

system based on a claim that 'corrosion' was not covered by the warranty or that other

alleged warranty limitations applied." Complaint ¶ 37-39.

On August 8, 2007, Defendants removed the case to United States District Court

for the District of Minnesota. ("Notice of Removal", Exhibit B).  On October 24, 2007,

the parties appeared at a pre-trial hearing before Magistrate Judge Erickson to address

Plaintiffs' motion for a single phase discovery plan. At that hearing, it was apparent that

Plaintiffs would not be successful in their motion which called for discovery of both

certification and merits issues simultaneously. On October 26, 2007, Magistrate Judge

Erickson issued a Minute Order denying Plaintiffs' motion for a single phase discovery

plan. ("Minute Order", Exhibit C) At this time, both Plaintiffs and Defendants have

served their initial disclosures and are preparing their initial productions.

## II.     ACTION PENDING BEFORE THE DISTRICT OF NORTH DAKOTA

On October 26, 2007, Defendants were served with a Complaint alleging nearly

identical claims related to brass crimp fitting which are manufactured and sold by Zurn

Pex, Inc., including: (1) consumer fraud, (2) false advertising, (3) negligence, (4)

negligent failure to warn, (5) negligent misrepresentation, (6) breach of implied

warranties, (7) breach of express warranties, and (8) violation of the Magnuson-Moss

Warranty Act. The Plaintiffs in this action, Beverly Barnes and Brian Johnston, are also

represented by Larson King, LLP. The plaintiffs are both residents of North Dakota and

therefore fall within the second and third putative classes proposed in the District of

Minnesota action.

Beverly Barnes and Brian Johnston brought this action on behalf on themselves

and three alternative putative classes. The putative classes are described using language

identical to the Cox Complaint, except that the first class is limited to persons or entities

owning structures in North Dakota (instead of Minnesota). Barnes Complaint ¶ 36-38.

## ARGUMENT

I.    THE COURT HAS THE POWER TO STAY PROCEEDINGS IN THE
      INTEREST OF JUDICIAL ECONOMY

### A.    General Authority

The power of a district court to stay an action pending on its docket is "incidental

to the power inherent in every court to control the disposition of the causes on its docket

with economy of time and effort for itself, for counsel, and for litigants." Landis v. North

Am. Co., 299 U.S. 248, 254 (1936).  In determining whether a stay is warranted, a court

must exercise its discretion and weigh competing interests. Id. at 254-55.  The following

factors are relevant to this Court's determination of whether to stay the current

proceedings: (1) whether a stay will simplify issues and promote judicial economy; (2)

the balance of harm to the parties; and (3) the length of the requested stay.  See Cheyney

State College Faculty v. Hufstedler, 703 F.2d 732, 737-38 (3d Cir. 1983)(citing Landis,

299 U.S. at 254-57).

### B.    Duplicative Federal Litigation is Disfavored

Duplicative litigation in federal courts should be avoided.  Missouri ex rel. Nixon

v. Prudential Health Care Plan, Inc., 259 F.3d 949, 953-54 (8th Cir. 2001); accord

Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976) ("As

between federal district courts, . . . though no precise rule has evolved, the general

principle is to avoid duplicative litigation.").  Plaintiffs may not pursue multiple federal

suits against the same party involving the same controversy at the same time. Id. at 954.

Accordingly, "the well-established rule is that in cases of concurrent jurisdiction, 'the

first court in which jurisdiction attaches has priority to consider the case.'" United States

Fire Ins. Co. v. Goodyear Tire & Rubber Co., 920 F.2d 487, 488 (8th Cir. 1990)(citing

Orthmann v. Apple River Campground Inc., 765 F.2d 119, 121 (8th Cir. 1985)).  If the

availability of the federal forum for the first-filed action is not yet certain for the

plaintiffs, a court can properly stay the second-filed action to see whether the first-filed

action can comprehensively dispose of the entire case. See Selph v. Nelson, Reabe &

Snyder, Inc. 966 F.2d 411, 413 (8th Cir. 1992)(finding a stay of the second-filed action

more appropriate than dismissal when personal jurisdiction issues remained in first-filed

action.); Central States, Southeast and Southwest Areas Pension Fund v. Paramount

Liquor Co., 203 F.3d 442, 444 (7th Cir. 2000) ("When comity among tribunals justifies

giving priority to a particular suit, the other action (or actions) should be stayed, rather

than dismissed, unless it is absolutely clear that dismissal cannot adversely affect any

litigant's interest.").

## II.  THE COURT SHOULD STAY THIS CASE PENDING THE CLASS CERTIFICATION DECISION IN COX V. ZURN PEX, INC. IN THE DISTRICT OF MINNESOTA

### C.  A Stay Will Simplify the Issues and Promote Judicial Economy

The Manual for Complex Litigation states that "[a] federal district judge asked to

certify a class action that overlaps with, duplicates, or competes with cases pending in

other federal or state courts may face conflicts involving rulings on discovery or

substantive motions, timetables for discovery, selection of class counsel, certification

rulings, trial, and settlement, and may also face duplicative work and expense."  Manual

for Complex Litigation, Fourth, § 21.15.   The Manual counsels, "delay in deciding

certification might also be appropriate if other cases in state or federal court are at a more advanced state in the litigation." Id.  In the face of overlapping class actions, staying a later filed or less developed case is appropriate.  See Romine v. Compuserve Corp., 160 F.3d 337, 342-343 (6th Cir. 1998)(affirmed district court's decision to stay federal class action proceeding in deference to parallel state action).

In this case, the Court is faced with a putative class action which heavily overlaps, and almost duplicates, a case already pending in the District of Minnesota.  The Complaint in this action alleges claims against the Defendants nearly identical to those in the first-filed Complaint.  The underlying factual issues that will require development overlap substantially.  Although the named plaintiffs in the two cases are different, the named plaintiffs in this case fall within the third putative class proposed in the District of Minnesota action and could fall within the second punitive class depending upon which states are intended to be included.

The District of Minnesota action has already proceeded past an initial discovery plan dispute and the pre-trial hearing is scheduled for December 17, 2007.  See Minute Order.  The parties have already served their initial disclosures and are preparing for first phase document production in early December.  Allowing the first-filed action to proceed to the certification decision while staying this action will conserve judicial and party resources.  If a class is certified in the District of Minnesota, the scope of the class will be highly relevant to this Court as it considers certification of the different classes proposed by the plaintiffs.

D.      **The Stay Would Be Temporary and Would Not Unduly Harm the Plaintiffs**

A stay tolls the statute of limitations, which avoids the risk that the plaintiffs' cause of action will be time-barred. <u>Selph v. Nelson, Reabe & Snyder, Inc.</u>, 966 F.2d 411, 413 (8th Cir. 1992).

The stay in this case would be temporary.  Although the discovery plan for the District of Minnesota action will be decided at the upcoming pre-trial hearing, Defendants have proposed that plaintiffs' Motion for Class Certification shall be filed and the Hearing thereon completed on or before July 22, 2008.  ("Defendants' Proposed Pretrial Order", Exhibit D).

E.      **Timing Of This Action Suggests Plaintiffs' Counsel Is Forum Shopping Regarding Class Certification**

In addition to considerations of judicial economy and avoidance of duplicative litigation, the likelihood of forum shopping should be considered by this Court in deciding whether to stay the current action. See <u>Travelers Indem. Co. v. Madonna</u>, 914 F.2d 1364, 1367-1368 (9th Cir. 1990)(because the prevention of forum shopping would promote wise judicial administration, forum shopping is an appropriate factor to consider in deciding whether to grant a stay).

Courts in this Circuit have expressed an interest in preventing court and judge shopping for class certification. See <u>Yasgur v. Aegis Mortg. Corp.</u>, 1999 U.S. Dist. LEXIS 20989, *6 (D. Minn. 1999) ("The Eighth Circuit has not directly addressed the issue of court/judge shopping for class certification.  It has, however, suggested some interest in preventing this sort of game playing.")

In this case, the same counsel represents the plaintiffs in both the District of Minnesota and District of North Dakota actions. Facing the potential for an unfavorable discovery plan decision in the District of Minnesota, Counsel filed a nearly identical complaint in the District of North Dakota. The Court should not allow this case to proceed towards certification in tandem with the District of Minnesota action. The Court should defer any further consideration of this case until the District of Minnesota has resolved the relevant class certification issues. A stay in this case would help deter future duplicative filings by plaintiffs' counsel.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court stay this case pending a class certification decision in a nearly identical first-filed action in the District of Minnesota.

Dated:  November 16, 2007                    *SERKLAND LAW FIRM*


                                             s/ Ronald H. McLean
                                             Ronald McLean (ID#03260)
                                             Jane Dynes (ID#04495)
                                             10 Roberts Street
                                             P.O. Box 6017
                                             Fargo, ND 58108
                                             (701) 232-8957


                                             Of Counsel:
                                             *FAEGRE & BENSON LLP*
                                             James A. O'Neal, #8248X
                                             Daniel J. Connolly, #197427
                                             Amy R. Freestone, #285493
                                             Catherine G. Davis, #0386635
                                             2200 Wells Fargo Center
                                             90 South Seventh Street
                                             Minneapolis, MN  55402
                                             (612) 766-7000

                                             *COUNSEL FOR DEFENDANTS
                                             ZURN PEX, INC. AND ZURN
                                             INDUSTRIES, LLC*

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re ZURN PEX PLUMBING
PRODUCTS LITIGATION

MDL DOCKET NO. _____

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

# EXHIBIT S

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

---

Beverly Barnes and Brian Johnston, on behalf of
themselves and all others similarly situated,

      Court No.: 07-cv-00074 (DLH/CSM)

Plaintiffs and Proposed
Class Representatives,

vs.

Zurn Pex, Inc. and Zurn Industries, Inc.,

Defendants.

---

## DEFENDANTS' SCHEDULING/DISCOVERY PLAN

      Pursuant to Rule 26(f), counsel for the Defendants certify that on January 18, 2008 they conferred with counsel for plaintiffs by telephone to discuss the nature and basis of their clients' claims and defenses, the possibilities for a prompt settlement or resolution of the case, and a proposed discovery plan. After conferring on that occasion and within the last week, counsel for the parties have agreed to submit separate scheduling/discovery plans given their substantial disagreements on matters relevant thereto, particularly whether discovery should be conducted in two phases, with the first phase to be focused on class certification.

    1.    Defendants will make their Rule 26(a)(1) disclosures contemporaneously with the filing of this Plan.

    2.    The issues on which the parties need to conduct discovery are:

3/6

This is a products liability case styled as a putative class action.  By way of background, a nearly identical putative class action filed by the same plaintiffs' counsel in this matter, alleging nearly identical claims against these same Defendants is currently ongoing in the District of Minnesota.  Defendants submit that the coordination of discovery proceedings in this action with that currently pending and related putative class action *Cox v. Zurn Pex, Inc. and Zurn Industries, Inc.*, D. Minn., Court File No. 07-3652, which is already well into the discovery process already, will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation by, *inter alia*, eliminating duplicative discovery, preventing inconsistent pretrial rulings including rulings regarding discovery schedules and discovery rulings, and conserving the resources of the parties, their counsel, and the judiciary.

On that basis, Defendants propose that this case should proceed in two phases for discovery and trial-readiness purposes.  Phase I discovery and scheduling will occur prior to the hearing on class certification and will be governed by the present order.  Phase II discovery and scheduling will occur after the Court's order on certification and will be determined by a second scheduling order set within sixty days of the order on certification. The court in the *Cox* matter adopted just such a phasing of discovery.  For ease of reference, Defendants attach the Order of Magistrate Judge Erickson dated October 24, 2008 here.

Defendants do understand that the court in its Order for Rule 26(f) Planning Meeting and Rule 16(b) Scheduling Conference set the date of March 13, 2009 as a deadline for dispositive motions unless good cause is shown.  Defendants submit this is

such a case that requires an altered schedule and timeline to take class certification matters into account.

For the above reasons, Defendants here propose a Scheduling Plan that takes into account the nature of this case as a putative class action that will require a hearing on the certification issue as a primary matter of course:

3.    The parties shall have until September 15, 2008 to complete Phase I fact discovery and to file discovery motions.

4.    The parties shall provide the names of expert witnesses as to class certification and complete reports under Rule 26(a)(2) as follows:

The Plaintiffs' disclosures shall be made on or before September 30, 2008.  The Defendants' disclosures shall be made on or before October 13, 2008.

5.    The parties shall have until November 17 to complete discovery depositions of Plaintiffs' expert witnesses on class certification.  The parties shall have until December 15 to complete discovery depositions of Defendants' expert witnesses on class certification.

6.    The deadline for the parties to move to join additional parties will be set after the class certification issue has been determined by the Court.

7.    The deadline for the parties to move to amend pleadings to add claims or defenses will be set after the class certification issue has been determined by the Court, except that motions to amend the class definition must be filed, and the hearings thereon completed, on or before October 1, 2008.

8.     The deadline for the parties to file other nondispositive motions will be set after the class certification issue has been determined by the Court.

9.     The deadline for the parties to file threshold motions (e.g., jurisdiction, qualified immunity, statute of limitations) will be set after the class certification issue has been determined by the Court.  Discovery shall not be stayed during the pendency of such motions.

10.     The deadline for Plaintiffs to file their motion for class certification shall be January 9, 2009.

11.     The deadline for the parties to file other dispositive motions (summary judgment as to all or part of the case) will be set after the class certification issue has been determined by the Court.

12.     Each party shall serve no more than 25 interrogatories, including subparts. No broad contention interrogatories (i.e., "List all facts supporting your claim that . . .") shall be used.

13.     Each side shall take no more than 5 discovery depositions, excluding expert witness depositions, prior to the resolution of class certification.  Discovery shall not be unnecessarily duplicative of discovery taken in *Cox v. Zurn PEX, Inc. and Zurn Industries, Inc.*, Court File No. 07-3652.

14.     Depositions taken for presentation at trial shall be completed 45 days before trial.

15.     Counsel have discussed between themselves and explored with their clients early involvement in alternative dispute resolution. The following option(s) would be appropriate in this case:

_____ **arbitration**

_____ **mediation** (choose one):

_____ private mediator

_____ court-hosted early settlement conference – should the conference be held before a judge who will not be the trial judge?

_____ yes

_____ doesn't matter

_____ **early neutral evaluation** before   (choose one):

_____ judge other than trial judge

_____ neutral technical expert

_____ neutral attorney

_____ other (specify)_____

___X___ none (explain reasons)

Defendants believe any agreed upon mediation is premature at this time. The case cannot be reasonably evaluated until the parties know if this will or will not be certified as a class action, and the definition and extent of any class that is found appropriate, albeit  Defendants deny that any class certification is appropriate.

The parties shall be ready to evaluate the case for settlement purposes after class certification is resolved. (If an ADR option other than a court-hosted settlement conference is chosen, counsel shall designate one of themselves to report back to the magistrate judge that the ADR effort was completed and whether or not it was successful). The court reminds the parties that early involvement in ADR is voluntary, not mandatory. Participation in ADR is encouraged by the court but is not required except for a settlement conference shortly before trial.

16.     It is unclear whether a mid-discovery status conference would be helpful in this case, at least insofar as Defendants know at this time.  Should it appear such a conference is necessary, counsel can so advise the Court.

17.     The Defendants will not voluntarily waive their rights to proceed before a district judge and consent to have a magistrate judge conduct any and all further proceedings in the case, including the trial, and order the entry of a final judgment.

18. Trial of this case will be by jury.

19. The estimated length of trial is dependent on whether class certification is granted or denied.

Dated: March 6, 2008

**SERKLAND LAW FIRM**

Ronald H. McLean, #03260
Jane L. Dynes, #04495
10 Roberts Street
P.O. Box 6017
Fargo, ND 58108
(701) 232-8957

Of Counsel:
**FAEGRE & BENSON LLP**
James A. O'Neal
Daniel J. Connolly
Amy R. Freestone
Catherine G. Davis
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
(612) 766-7000
*Counsel for Defendants Zurn Pex, Inc.*
*and Zurn Industries, LLC*

<u>**ORDER**</u>

The above scheduling/discovery plan is approved with the following additions/modifications:

Dated: _____

_____
United States Magistrate Judge